## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRILEGIANT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 3:02 CV 2237(MRK) |
| | ) | |
| BP PRODUCTS NORTH AMERICA INC., | ) | |
| | ) | |
| Defendant. | ) | June ____, 2004 |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

### Parties

1.      Plaintiff Trilegiant Corporation, successor-in-interest to SafeCard Services, Inc.,

is a Delaware Corporation with its principal place of business in Norwalk, Connecticut.

(Complaint ¶ 1; Answer ¶ 1)

2.      Plaintiff was also referred to for a period of time as Cendant.

3.     Plaintiff is a provider of membership-based travel, shopping, health, entertainment and consumer protection services billed periodically (usually annually) to members on their credit or debit cards.  (Complaint ¶ 1)

4.     Defendant BP Products North America Inc., f/k/a BP Amoco Company ("BP"), is a Maryland petroleum corporation with its principal place of business in Illinois.  (Answer ¶ 2)

## Jurisdiction

5.     The Court has jurisdiction over the subject matter of this action pursuant to its diversity jurisdiction.  (Answer ¶ 3)

6.     The Court has personal jurisdiction over the defendant, and venue in this district is proper.  (Answer ¶ 3)

## The Agreement

7.     On August 3, 1992, the parties entered into an agreement (the "Agreement") the goal of which was to create and profit from a joint marketing effort.  (Exhibit 1; Answer ¶ 4)

8.     The Agreement provided that Trilegiant would use its expertise and capabilities to market and provide a Trilegiant membership program, called the BP Horizon Card Program (the "Horizon Program"), to existing credit card customers of BP, as well as potential new credit card customers of BP.  (Exhibit 1 at ¶ 1)

9.      For its part BP would, among other things, provide Trilegiant with the names and addresses of its existing credit card customers.  (Exhibit 1 at ¶ 6)

10.     The parties further agreed that during **and after** the term of the Agreement, they would share in the Profits, as defined by the Agreement, generated by the jointly created Horizon Program.  (Exhibit 1 at ¶¶ 3, 3(d), and 15)

11.     As set forth in Exhibit B of the Agreement, the Horizon Program was a membership program provided as an enhancement to holders of BP credit cards and BP Visa credit cards.  (Exhibit 1)

12.     Membership benefits of the Horizon Program included 20% oil change rebates, travel reservation services, 5% travel rebates, emergency cash, emergency airline tickets, common carrier life insurance, emergency message service, credit card protection, document registration, lost key return service, and rental car discounts.  (Exhibit 1)

13.     Horizon Program members were charged an annual membership fee of $25.00, which was billed to the member's BP credit card or BP Visa card.  (Exhibit 1 at ¶ 1)

14.     The Agreement originally provided that BP and Trilegiant would share in the Horizon Program membership fee revenues with 57.5% of the Profit to BP and 42.5% of the Profit to Trilegiant.  (Exhibit 1 at ¶ 3)

15.    "Profit" is defined by the Agreement as gross Horizon Program revenues, less cancellations, credits and refunds, and less certain specified expenses incurred by Trilegiant, including a $4.15 annual per member servicing fee.  (Exhibit 1 at ¶¶ 3(A) - (C).

16.    **During and after the term of the Agreement**, Trilegiant and BP reconciled the membership revenues each month and determined the Profits to be shared pursuant to the Agreement.  (Exhibit 1 at ¶¶ 3(d) and 9; K. Clift)

17.    BP is relieved of its obligation to share Profits with Trilegiant only in the event of a material breach of the Agreement by Trilegiant.  (Exhibit 1 at ¶ 15(d)(ii))

18.    The BP Horizon Credit Card was issued and managed by Associates National Bank ("Associates"), and the BP Visa Horizon credit card was issued and managed by Bank One, a.k.a. First USA,("FUSA").  (C. Vann)

19.    Associates was acquired by Citigroup in September 2000**.**  (M. Evans)

## Brief History of the Horizon Program

20.    Pursuant to the Agreement, Trilegiant was responsible for designing, creating, printing, and mailing of all Horizon Program solicitation and membership materials to existing and potential BP credit card customers.  (Exhibit 1 at ¶ 5)

21.    From August 15, 1992 to October 27, 1999, Trilegiant solicited existing and potential credit card customers for the Horizon Program pursuant to the Agreement.  (C. Vann)

22.     Included in the solicitation materials provided to each and every prospective Horizon Program member was an agreement entitled "BP Horizon Service Membership Terms and Conditions" (e.g., Exhibits 155 and 156, hereinafter "Membership Agreement"), which stated in pertinent part:

> AGREEMENT made between [Trilegiant], a Delaware Corporation with offices at 707 Summer Street, Stamford, Connecticut, 06901, providing a service called BP Horizon Service, called "BHS," and the person specified on the accompanying BP Horizon Membership Card.

(C. Vann)

23.     The Membership Agreement set forth the terms of services, use, liability, governing law, arbitration, membership fee, renewals and right to cancel between Trilegiant and the Horizon Program member, and by signing the membership application, the prospective members entered into a contractual relationship with Trilegiant.  (Exhibits 155 and 156)

24.     The Membership Agreement gave Trilegiant the right to bill the Program's annual $25.00 membership fee to the member's credit card automatically each year on the member's renewal date until such time as the member affirmatively cancelled the program.  (Id.)

25.     Long-term members in such programs tend to be "very loyal" and the Horizon Program was regarded by the parties as being a valuable asset.  (Exhibits 34 at 3 and 102 at 3)

26.     Once a member was approved and enrolled in the Horizon Program, Trilegiant sent the member a "fulfillment kit," which described the Program's benefits and set forth the membership terms.  (Exhibit 1 at ¶ 3(c); C. Vann)

27.     Trilegiant was solely responsible for administering the Horizon Program, servicing its members and providing all Program benefits directly to members.  (Exhibit 1)

28.     Horizon Program members contacted Trilegiant directly via 1-800-HOT-LINE for general information and customer service; for travel services, Horizon Program members contacted Trilegiant at 1-800-832-5832; and for written inquiries, Horizon Program members contacted Trilegiant directly at Trilegiant's offices at 3001 E. Pershing Blvd., Cheyenne, WY 82011-5786.  (Exhibit 141)

29.     On or around March 19, 1996, BP and Trilegiant amended the Agreement to provide that the parties would thereafter divide the Profits 63.5% to BP and 36.5% to Trilegiant. (Exhibit 27)

30.     On October 27, 1999, Trilegiant gave notice of its intent to terminate the Agreement effective August 15, 2000 pursuant to paragraph 14 of the Agreement.  (Exhibit 3; C. Vann)

31.     Pursuant to the Agreement, termination "for any reason whatsoever" relieved Trilegiant of its obligation to solicit new members into the Horizon Program as of the date of the notice.  (Exhibit 1 at ¶ 15(a))

32.     After August 15, 2000, BP and Trilegiant continued to share the Horizon Program membership renewal fees in accordance with the Agreement.  (Exhibit 1 at ¶¶ 3(d) and 15(d); C. Vann; N. Iglesias)

33.     From August 15, 2000 to June 2002, Trilegiant continued to administer and service the Horizon Program and to provide benefits to the Horizon Program members. (N. Iglesias)

34.     On or about May 1, 2002, BP instructed the issuers of the Horizon Program credit cards to cease posting Trilegiant's $25.00 annual fee to members' accounts.  (Exhibit 95)

35.     On or about June 21, 2002, BP caused the Horizon Program members to be provided with new credit cards.  (Exhibits 130 and 145)

36.     More particularly, BP caused BP Multicards to be issued to the BP Horizon members and BP Visa cards (with Multicard benefits) to be issued to the BP Visa Horizon members.  (Id.)

37.     By replacing the Horizon Program with its "new" Multicard program, BP appropriated to itself the entire revenue stream associated with the Horizon Program and deprived Trilegiant of its share of those revenues.  (Exhibits 1 and 118)

### The Horizon Program:  September 1999 to June 2002

A.     Trilegiant's Termination Notice

38.     In September 1999, Chip Vann was the Trilegiant employee responsible for the BP Horizon Program.  (C. Vann)

39.     At that time, he interfaced with Carey Isom, his BP counterpart on the Horizon Program.  (C. Vann)

40.     By 1999, Trilegiant had been actively marketing the program for seven years and results had steadily diminished to the point where new marketing was no longer profitable. (Exhibits 2 and 72; C. Vann)

41.     Chip Vann communicated the foregoing to Carey Isom.  (Exhibits 29 and 74; C. Vann)

42.     He made it clear to BP that Trilegiant had no issue with continuing to service and bill the existing Horizon Club members; it simply wanted to cease unprofitable marketing. (Exhibit 75; C. Vann)

43.     BP did not consent to Trilegiant's request to be relieved from its obligation to market and enroll new members.  (Exhibits 103; C. Vann)

44.     As a consequence, Trilegiant stated it would continue fulfilling its obligations, but that it would issue a termination notice effective August 15, 2000, as provided for in the Agreement.  (Exhibits 1 at ¶ 14 and 3; C. Vann)

45.     The notice of termination expressly confirmed the parties' continuing obligation to share the Horizon Program revenues "for so long as Members continue to pay their annual fees under the Program."  (Exhibit 3)

46.     Recognizing that the Agreement required the sharing of revenues for the life of the Horizon Program (absent material breach by Trilegiant), BP sought to identify a breach of the Agreement which would allow BP to take over the Horizon Program without any compensation to Trilegiant:

> I would argue that "continuing to process enrollments" does not fulfill their contractual obligations. . . .  This would allow us to move to another vendor without continuing to pay them residuals which we are otherwise obligated to do.

(Exhibit 103; Exhibit 5:  "We tossed around the idea of claiming a breach to avoid revenue income sharing. . . .")

B.     BP's "Harmonization Program"

47.     In December 1999, BP merged with Amoco.  (L. Kilrae at 11; J. DuBoyce at 11)

48.     Amoco had fee card programs comparable to the BP Horizon and BP Visa Horizon programs.  (L. Kilrae)

49.     BP decided to consolidate these programs, calling the consolidation process "Fee Card Harmonization."  (Exhibit 5)

50.     In reviewing its options for the Horizon Program, BP understood that:

        a.      If Trilegiant continued to service the members, BP had to share the revenues.

        b.      Even if BP replaced Trilegiant with another servicer, it would still have to share the "Profits" with Trilegiant.

        c.      Only a "material breach" by Trilegiant would allow BP to appropriate to itself all of the Horizon Program renewal revenues.  (Exhibit 5)

51.      For reasons that are unclear, however, BP purportedly became concerned that Trilegiant would stop servicing the Horizon Program members after August 15, 2000.  (Exhibit 146)

52.      Upon being contacted, Trilegiant repeatedly and consistently assured BP that Trilegiant would continue to service the Horizon Program members **indefinitely**.  (Exhibit 9; Exhibit 58; Exhibit 18; C. Vann; N. Iglesias)

53.      BP representatives themselves realized that Trilegiant never intended to stop servicing the Horizon members.

> [Trilegiant] did not intend to cancel the Agreement in its entirety, but merely wanted to stop processing new members.

(Exhibit 19)

C.      <u>BP's Initial Decision to Terminate the Horizon Program in 2000</u>

54.     Around May 30, 2000, BP began considering a strategy by which, starting in July 2000, it would notify renewing Horizon members that the Program had been terminated, and offer them an Amoco Multicard and a generic BP credit card.  (Exhibit 12)

55.     BP realized that it had to be clear that the members were being offered a "new product so that we don't owe Cendant any fee renewal."  (Exhibit 13)

56.     Associates, the bank that issued the BP Horizon cards, advised BP that it could not simply "upgrade" the Horizon Program members to Amoco Multicards "because the products are not the same and do not qualify for a succession;" [i.e., the automatic replacement of one fee card program with another].  (Exhibit 15)

57.     On July 25, 2000, BP informed Trilegiant that it "was working on a plan not to renew [Horizon] members as they come due over the next year."  (Exhibit 18)

58.     Trilegiant's representative, Nayr Iglesias (who had replaced Chip Vann), questioned the logic behind terminating the Horizon Program and reminded BP of Trilegiant's rights in the renewal revenues.  (Exhibit 18; N. Iglesias)

59.     BP acknowledged Trilegiant's contractual right to its share of the renewal revenues, but noted that BP "is not required to continue the program."  (Exhibit 18)

60.     Soon thereafter, however, BP decided **not** to cancel the Program in 2000, and for the next two years it continued to share the revenues with Trilegiant in accordance with the Agreement.  (Exhibit 61; N. Iglesias)

D.    BP's Decision to "Offer" Its New BP MultiCard to BP Horizon Program Members

61.    During the ensuing months BP decided that its "new," "harmonized" fee card, the BP Multicard, would replace the Horizon card.  (Exhibit 107)

62.    BP and Associates, the issuing bank, agreed that starting in mid-2001 the new BP Multicard program would be "offered" to Horizon Program members.  (Exhibit 107)

63.    BP and the Associates both concluded that the Agreement would "allow these customers to be solicited since the product is **different** than the one they are currently receiving." (Exhibit 107; emphasis added)

64.    The foregoing conclusion was based on the provision in the Agreement that allowed BP to discontinue the Horizon Program "altogether" without incurring any additional liability to Trilegiant.  (Exhibit 1, ¶ 15(c))

65.    On June 29, 2001, BP orally notified Trilegiant that it was terminating the Horizon and Visa Horizon Programs on a rolling basis over 12 months beginning on November 1, 2001; (i.e., memberships coming due for renewal each month would be allowed to lapse).  (N. Igelesias)

66.    This notice was confirmed by email and letter dated July 13, 2001 and July 26, 2001, respectively.  (Exhibits 62 and 31)

67.     BP further informed Trilegiant that it intended to "offer" the terminated members the new BP Multicard program:  "The Card members will be solicited for the new program, and **this will not be an automatic succession**."  (Exhibits 63 and 31; emphasis added)

68.     Trilegiant protested, but BP felt comfortable that if it discontinued the **old** program and **solicited** for a **new** program, it would not owe Trilegiant anything.  (Exhibit 62)

69.     When concerns were raised about BP's contractual obligations to Trilegiant, one BP representative wrote, ". . . the loophole might be that you'll need to terminate the agreement." (Exhibit 80)

E.     BP's Decision to Appropriate the Horizon Program Members

70.     Approximately two months later, BP's financial analysis showed that if, contrary to what it had told Trilegiant, BP **automatically succeeded** the Horizon members to the "new" Multicard program, BP's 2002 revenues would be enhanced by over $1 million.  (Exhibit 22)

71.     BP's analysis further indicated that if it had to **solicit** the Horizon Program members, it would lose approximately 50% of those valuable members.  (Exhibit 102 at 3)

72.     Shortly thereafter, and notwithstanding its previous notice to Trilegiant, BP began "investigating" the possibility of automatically succeeding the members without telling Trilegiant.  (Exhibit 35)

73.     BP worked with Associates to find a way to convert the Horizon Program members to its "new" Multicard without Trilegiant's participation.  (Exhibits 39, 87, 114)

74.     Late in October 2002, BP decided it would automatically succeed the Horizon members to its "new" fee card -- the BP Multicard.  (Exhibit 83)

75.     BP then began mapping its strategy and rationalizing its decision to automatically succeed the Horizon Program members.  (Exhibit 38:  "[We need to explain] why we think 'succession' is now okay, when it wasn't a few months ago.")

76.     In order to justify its decision that automatic succession was appropriate, BP decided that the "new" BP Multicard was simply an "enhanced" pay card program.  (Exhibit 39)

77.     Whereas previously BP had wanted to characterize its new BP Multicard as being significantly different than the BP Horizon card so that it could argue that it was discontinuing the Horizon Program "altogether" (Exhibit 1 at 15(c)), it now characterized the new program as being a mere "enhancement" of the existing Horizon Program so that it could automatically succeed the members and "enhance" its annual revenues by $1 million.  (Exhibits 38, 39 and 112)

78.     In fact, the two programs did offer remarkably similar benefits; both provided similar credit terms, credit card registration, travel accident insurance, emergency cash and discounts for certain travel-related services.  (Exhibits 112 and 145)

79.     Over the ensuing seven months (November 2001 to May 2002), BP planned the automatic succession; (e.g., Exhibits 88, 114 and 142)

80.     BP took pains to make sure Trilegiant did not "get wind" of its plans until the latest possible moment.  (Exhibit 83)

81.     Consequently, BP ordered Associates to cease posting Trilegiant's annual fee charges to members' credit card  accounts even before BP had notified Trilegiant that the Horizon Program was purportedly being cancelled.  (Exhibits 42, 44 and 47)

82.     Even then, BP's letter misleadingly stated that the "new BP Multicard" would be **offered** to "existing fee cardholders," and failed to mention that, effective May 1, Trilegiant's monthly fee billings were no longer being posted by Associates to member credit card accounts.  (Exhibit 44, emphasis added)

83.     It was not until May 15, 2002 that BP advised Trilegiant to cease sending its electronic membership billing transmissions to Associates, over two weeks after Associates had already stopped posting those billings.  (Exhibit 50)

84.     BP still did not disclose to Trilegiant that BP was automatically enrolling all of the Horizon Program members in its Multicard program and retaining all of the membership revenues for itself.  (Exhibits 44 and 50)

85.     In late May 2002, BP notified all Horizon Program members that the Program was being replaced by the "new" BP Multicard program.  (Exhibits 46 and 52)

86.     BP recognized its legal exposure for appropriating these revenues.  (Exhibit 53)

87.     By the end of June 2002, all of the Horizon members had been switched to the BP Multicard or BP Visa Card programs.  (Exhibit 130)

## Damages

88.     Approximately 50,000 Horizon Program members were converted to the BP Multicard Program and about 10,000 Visa Horizon Program members were converted to the BP Visa Program.  (Exhibits 130 and 118)

89.     Using historical attrition rates (percentage of members lost each year) of 17.08% (Horizon) and 18.48% (Visa Horizon), one can calculate the revenues these members would have generated for the ensuing years.

90.     These projected attrition rates are conservative; BP assumed a more aggressive 15% attrition rate in making its Horizon Program revenue projections.  (Exhibits 22 and 118)

91.     Trilegiant's cost of servicing these members is $.71 per member per year. (G. Hilinski)

92.    The present value of Trilegiant's lost profits as of the date of the breach, June 2002, is shown in the following table:

| Years of Revenue | | | |
|---|---|---|---|
| | | **10** | **20** |
| | **5** | 2,602,766 | 2,832,141 |
| | **6** | 2,521,691 | 2,722,724 |
| | **7** | 2,444,739 | 2,621,060 |
| | **8** | 2,371,650 | 2,526,405 |
| **Discount Rate** | **9** | 2,302,182 | 2,438,102 |
| | **10** | 2,236,111 | 2,355,570 |
| | **11** | 2,173,227 | 2,278,288 |
| | **12** | 2,113,337 | 2,205,794 |
| | **13** | 2,056,259 | 2,137,677 |
| | **14** | 2,001,825 | 2,073,566 |
| | **15** | 1,949,879 | 2,013,132 |

(G. Hilinski)

## PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW

### COUNT I (Breach of Contract)

1.     BP breached its contract with Trilegiant by converting the Horizon Program members to its Multicard program.

2.     Under Ohio law, there are four basic elements to a breach of contract claim:  (1) the existence of a binding contract or agreement, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages as a result of the breach.  Garofalo v. Chicago Title Ins. Co., 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995);  Doner v. Snapp, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (1994).

3.     It is the burden of the party seeking to enforce the contract to prove, by a preponderance of the evidence, all of the elements of a claim for breach of contract.  Cooper & Pachell v. Haslage, 142 Ohio App. 3d 704, 707, 756 N.E.2d 1248 (2001).

4.     A breach of contract occurs where the breaching party fails to fulfill its contractual obligations without legal excuse.  Garofalo v. Chicago Title Ins. Co., 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995).

5.     Parties to a contract may provide for their respective rights and liabilities in the event of the termination thereof.  Merrill v. Continental Assur. Co., 200 Cal.App.2d 663, 19 Cal.Rptr. 432 (1962).

6.      The termination of a contract is not a recission.  <u>U.S. v. Southern Gulf Lumber Co.</u>, 106 F.Supp. 815, 818 (S.D.Ala. 1952).  <u>See</u> <u>Merrill v. Continental Assur. Co.</u>, 200 Cal.App.2d 663, 671, 19 Cal.Rptr. 432 (1962) (stating rule that "[s]tipulations in the contract as to the rights of the parties on termination will ordinarily be enforced according to their terms"); <u>Factory Realty Corp. v. Corbin-Holmes Shoe Co.</u>, 312 Mass. 325, 330, 44 N.E.2d 671 (1942) (noting that cancellation of an agreement does not put an end to all the covenants and liabilities thereunder as though they had never existed).

7.      In the interpretation and construction of contracts, the court's chief function is to ascertain the intent of the parties.  <u>Foster Wheeler Enviresponse, Inc., v. Frankiln County Convention Facilities Authority</u>, 78 Ohio St. 3d 353, 361, 678 N.E.2d 519 (1997).

8.      The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.  <u>Blosser v. Enderlin</u>, 113 Ohio St. 121, 129, 148 N.E. 393 (1925).

9.      A contract should be construed as a whole and the intent of each part gathered from a consideration of the whole.  <u>Foster Wheeler Enviresponse, Inc., v. Frankiln County Convention Facilities Authority</u>, 78 Ohio St. 3d 353, 361, 678 N.E.2d 519 (1997); *Restatement (Second) of Contracts* § 202(2).

10.     The intent of the parties must be determined from the entire instrument and not from detached parts.  <u>Tri-State Group, Inc. v. Ohio Edison Co.</u>, 151 Ohio App. 3d 1, 9, 782 N.E.2d 1240 (2002)

11.     To determine the parties' contractual rights and obligations, the court need not go beyond the plain language of the agreement.  <u>Id.</u>

A.     <u>The Plain Language of the Agreement</u>

12.     The only provisions in the Agreement relieving BP of its obligations to share revenues with Trilegiant required (1) a material breach of the Agreement by Trilegiant or (2) BP's termination of the Agreement and of the Horizon Program altogether.  (Exhibit 1 at ¶¶ 15(b) and 15(c))

13.     The Agreement clearly provided that both during **and after** the term of the Agreement, the parties would share in the revenues generated by the jointly created Horizon Program.  (Exhibit 1 at ¶¶ 3(d), 9 and 15)

14.     Specifically, paragraph 3(d) required Trilegiant to prepare monthly profit reconciliations both "during and **after the term of this Agreement**."  (Exhibit 1)

15.     Further, all of the termination provisions contemplated that the Horizon Program would continue and the Program revenues would continue to be shared after the Agreement was terminated.  (Exhibit 1 at ¶ 15)

16.     None of the Agreement's termination provisions permitted Trilegiant, at its option, to stop servicing the Horizon Program.  (Exhibit 1 at ¶ 15)

17.     Based on the Agreement as a whole, it is clear that the parties intended that the Horizon Program would continue post termination and that revenues would continue to be divided as long as the Program continued.  (Exhibit 1)

B.      Implied Terms

18.     Although the Agreement was silent regarding events pursuant to termination by Trilegiant absent a material breach by BP, the court may imply provisions necessary to effectuate the intent of the parties.  *Williston on Contracts*, § 31:7 (4th ed. 2003).

19.     Such implied terms are as much a part of the contract as those that are expressed.  Id.

20.     Only reasonable terms should be implied in a contract that is silent on a particular matter.  Id.

21.     The parties clearly expressed their desire to share Program revenues both during and after the term of the Agreement.  (Exhibit 1 ¶¶ 3(d), 9 and 15)

22.     Based on the express terms in the contract, BP was obligated to share the revenues derived from the Horizon Program unless either Trilegiant materially breached the contract with BP or BP terminated the Agreement and discontinued the Horizon Program "altogether."  (Exhibit 1 ¶¶ 9 and 15)

23.     Under the terms of the Agreement, BP was required to continue to share renewal revenues if it continued the Horizon Program after having terminated the Agreement for reasons other than a material breach by Trilegiant.  (Exhibit 1 at ¶ 15(d))

24.     It is therefore reasonable to conclude that termination by Trilegiant would not relieve BP of its obligation to share with Trilegiant the Horizon Program revenues.

C.     The Parties' Performance of the Agreement

25.     The court may also consider extrinsic evidence, i.e., evidence outside the four corners of the contract, in determining the parties intent or resolving ambiguous contractual language.  Blosser v. Carter, 67 Ohio App.3d 215, 219, 586 N.E.2d 253 (1990).

26.     Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible to more than one interpretation.  U.S. Fidelity & Guaranty Co. v. St. Elizabeth Medical Center, 129 Ohio App.3d 45, 55, 716 N.E.2d 1201 (1998).

27.     This extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) **any acts by the parties that demonstrate the construction they gave to their agreement**.  Id. at 56 (emphasis added).

28.     The parties actions subsequent to the termination of the Agreement demonstrate that they understood that the Horizon Program revenues would continue to be divided as provided in the Agreement after termination.

29.     After August 15, 2000, the effective date of Trilegiant's termination, BP and Trilegiant continued to share the Horizon Program renewal revenues in accordance with the Agreement.  (Exhibit 1 at ¶ 15(d))

30.     When an agreement provides for repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given **great weight** in the interpretation of the agreement.  Restatement (Second) of Contracts §202(4); Association of Fire Fighters, Local 93 v. City of Cleveland, 2002 WL 191994, 2002-Ohio-498 (Ohio App. 8 Dist. Feb 07, 2002) ("the parties' conduct in performing a contract is both admissible and **significant** evidence in interpreting its terms")  Shimmon v. National Screw & Tack Co., 26 Ohio Dec. 315 (1925) ("[w]here the intention of the parties to a contract is not expressly stipulated in the instrument itself, or if there is any doubt as to the intention of the parties, the court, in attempting to arrive at the meaning and intention of the parties, should give **great weight** to the acts and conduct of the parties, and to the construction and interpretation by them placed upon it for many years continuously after it had been entered into with full knowledge of the questions involved").

31.     On a monthly basis during **and after** the termination of the Agreement, Trilegiant and BP reconciled the Horizon Club revenues and determined the revenues to be shared pursuant to the Agreement.  (Exhibit 1 at ¶ 3(d))

32.     BP's post-termination conduct illustrates that it understood that there was an obligation to continue to share Horizon Program revenues after the termination of the Agreement.

33.     BP breached the Agreement because its replacement of the Horizon Program with the almost identical Multicard program constituted a continuation of the Horizon Program and a misappropriation of all of that Program's revenues.

34.     BP breached its Agreement with Trilegiant by failing to fulfill its contractual obligations without legal excuse.  Garofalo v. Chicago Title Ins. Co., 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995).

35.     BP's breach of the Agreement has resulted in significant financial loss to Trilegiant.

36.     Trilegiant is entitled to damages for the natural and proximate result of the breach of contract by the defendant.  Blank v. Snyder, 33 Ohio Misc. 67, 68-69, 291 N.E.2d 796 (1972).


**COUNT TWO (Breach of the Implied Duty of Good Faith And Fair Dealing)**

37.     When parties enter into contracts, they are bound to each other by "standards of good faith and fair-dealing."  Laurent v. Flood Data Services, Inc., 146 Ohio App.3d 392, 399, 766 N.E.2d 221 (2001), citing, Bolling v. Clevepak Corp., 20 Ohio App.3d 113, 121, 484 N.E.2d 1367 (1984);  *Restatement (Second) of Contracts* § 205.

38.     Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.  There is "an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Williston on Contracts* § 38:15, 4th ed. (2003).

39.     Good faith means "honesty in fact in the conduct or transaction concerned." Creggin Group, Ltd. v. Crown Diversified Industries Corp., 113 Ohio App.3d 853, 860, 682 N.E.2d 692, 34 UCC Rep.Serv.2d 980 (Ohio App. 12 Dist. Aug 26, 1996).

40.     BP did not perform in good faith.

41.     Specifically, BP deliberately misrepresented to Trilegiant that it intended to "offer" the terminated members the "new BP Multicard program" when in fact it was secretly transferring the Horizon Program members directly into its new program without Trilegiant's knowledge.  (Exhibit 31, 35, 63)

42.     BP misrepresented and hid its actions from Trilegiant in order to avoid its ongoing obligations under the Agreement.

43.     Trilegiant has been damaged by BP's breach of the implied covenant of good faith and fair dealing by being deprived of the value to it of the Horizon Program.

## COUNT THREE (Violation of Connecticut Unfair Trade Practices)

44.     BP violated the Connecticut Unfair Trade Practices Act ("CUTPA") by engaging in deceptive and unfair acts designed to misappropriate BP Horizon Card Program members to its own program.

45.     The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110a et. seq.

46.     An act or practice violates CUTPA if:  (1) it offends public policy as it has been established by statutes, the common law, or otherwise established concept of unfairness; (2) it is immoral, unethical, oppressive, or unscrupulous; or (3) it causes substantial injury to consumers, competitors or other businessmen.  Journal Publishing Co. v. Hartford Courant Co., 261 Conn. 673, 695-96, 804 A.2d 823 (2002).

47.     CUTPA applies to practices among business people as well as consumer transactions.  Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 494-98, 656 A.2d 1009 (1995).

48.     "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."  Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 242, 520 A.2d 1008 (1987).

49.     A trade practice is deceptive if it has a tendency or capacity to deceive. Brandewiede v. Emery Worldwide, 890 F.Supp. 79, 82 (D.Conn. 1994).

50.     CUTPA is to be liberally construed so as to effectuate its public policy goals. Web Press Services Corp v. New London Motors Inc., 203 Conn. 342, 354, 525 A.2d 57 (1987).

51.     BP acknowledged Trilegiant's contractual right to its share of the renewal revenues, as specified in the Agreement.  (Exhibit 1 at ¶ 3(d) and 9, Exhibit 28)

52.     BP deliberately and secretly appropriated Horizon Club members to its new program, without Trilegiant's knowledge or consent.

53.     BP misrepresented to Trilegiant that it was offering the new BP Multicard to Horizon Club members when in fact it was automatically enrolling all of the Horizon Program members in its Multicard program and retaining all of the membership revenues for itself. (Exhibits 44 and 50).

54.     BP made a conscious effort to keep Trilegiant in the dark about its plans until the latest possible moment.  (Exhibit 83)

55.     By  retaining all the membership revenues for itself, BP ignored the terms of the Agreement requiring it to share revenues with Trilegiant.

56.     The misappropriation of business property is "the sort of deceptive, unethical or unscrupulous practice at which CUTPA is directed." <u>Stamboulis v. Sullivan</u>, 2001 WL 987773 (Conn.Super. 2001) (misappropriation of insurance agent's work product sufficient to state a claim under CUTPA); <u>Pro-Fitness, Inc., v. Plankenhorn</u>, 1995 WL 774494 (Conn.Super. 1995) (misappropriation of trade secret, clients and business opportunities sufficient for cause of action under CUTPA).

57.     BP, by its acts, engaged in deceptive conduct of trade or commerce in violation of CUTPA.

58.     BP unscrupulously and wrongfully appropriated Trilegiant's Horizon Club members so as to avoid its payment obligations to Trilegiant.

59.     As a direct and proximate result of BP's actions and conduct, Trilegiant has suffered and continues to suffer an economic loss in that it has been deprived of its share of the value of the Horizon Program.

## COUNT FOUR (Tortious Interference With Contractual Relations)

60.     BP tortiously interfered with the contractual relationship between Trilegiant and each Horizon Club member, as expressed in the BP Horizon Service Membership Terms and Conditions (the "Membership Agreement"). (Exhibits 155 and 156)

61.     Tortious interference with contract rights requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with that relationship, (4) the interference was tortious and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct.  Collum v. Chapin, 40 Conn.App. 449, 452, 671 A.2d 1329 (1996).

62.     A defendant's conduct is tortious if "the defendant was guilty of fraud, misrepresentation, intimidation or molestation … or that the defendant acted maliciously."  New Haven v. East Haven, 47 Conn.Supp. 594, 613, 822 A.2d 376 (2001), aff'd, 263 Conn. 108, 818 A.2d 741 (2003).

63.     Malice does not require ill will, but intentional interference without justification. Daley v. Aetna Life and Cas Co., 249 Conn. 766, 806, 734 A.2d 112 (1999).

64.     The tort normally requires that a third party adversely affect the contractual relations of two other parties.  Wellington Systems, Inc. v. Redding Group, Inc., 49 Conn.App. 152, 168, 714 A.2d 21 (1998)

65.     Each member of the Horizon Program had a contractual relationship with Trilegiant, wherein Trilegiant provided membership services to the Horizon Club members as set forth in the Membership Agreement.  (Exhibits 155 and 156)

66.     In turn, the Membership Agreement gave Trilegiant the right to bill the Program's $25.00 membership fee annually to the member's credit card until such time as the member left the Program.  (Id.)

67.     BP knew of Trilegiant's contractual relationship with the Horizon Club members.

68.     BP, as a third party, deliberately interfered with that relationship by secretly transferring the Horizon Club members to the new program without Trilegiant's knowledge or consent.  (Exhibits 44 and 50)

69.     Additionally, BP ordered Associates to cease posting Trilegiant's annual fee charges to members' cardholder accounts.  (Exhibits 42, 44 and 47)

70.     As a result, Trilegiant could no longer charge its membership fee as provided for in the Membership Agreement.

71.     BP's conduct was tortious because it intentionally appropriated the Horizon Club members directly to its new Multicard program, while misrepresenting to Trilegiant that it was merely offering the new Multicard to existing cardholders. (Exhibits 31, 44 and 63)

72.     As a result of BP's tortious conduct, Trilegiant has lost its share of the Horizon Program's value.

## COUNT FIVE (Unjust Enrichment)

73.     BP has been unjustly enriched by retaining 100% of the revenues from the Horizon Program.

74.     Unjust enrichment requires that a plaintiff: (1) confer a benefit upon the defendant, (2) the defendant had knowledge of the benefit, and (3) circumstances render it unjust or inequitable to permit the defendant to retain the benefit without compensating the plaintiff. Laurent v. Flood Data Services, Inc., 140 Ohio.App.3d 392, 400, 766 N.E.2d 221 (2001).

75.     The benefit must be conferred as a response to the fraud, misrepresentation or bad faith of the defendant.  Id.

76.     Trilegiant conferred a benefit on BP by marketing, administering and servicing the Horizon Program and providing benefits to the existing Horizon Program members.

77.     Further, BP has benefited by appropriating the Horizon Program members without compensating Trilegiant for its efforts to create and maintain the Program.

78.     BP knew that by automatically appropriating, rather than soliciting, Horizon Club members, its 2002 revenues alone would be enhanced by over $1 million.

79.     BP also knew that if it succeeded in its wrongful conduct (by secretly transferring the Horizon Program to the new program) it would no longer have to compensate Trilegiant as long as the "new" program continued.

80.     BP has wrongfully appropriated the Horizon Program members.

81.     It is unjust and inequitable to permit BP to retain all of the revenues received from the Horizon Program members without compensating Trilegiant.

                              THE PLAINTIFF
                              TRILEGIANT CORPORATION


                              By_____
                                  Robert P. Dolian (CT 04278)
                                  M. Juliet Bonazzoli (CT 21394)
                                  Cummings & Lockwood LLC
                                  Four Stamford Plaza
                                  107 Elm Street
                                  Stamford, CT  06902
                                  Tel.  (203) 327-1700
                                  Fax  (203) 351-4534


                        **CERTIFICATE OF SERVICE**

     This is to certify that on this ___ day of June, 2004, a copy of the foregoing Plaintiff's Proposed Findings of Fact was served via facsimile and first-class U.S. Mail, postage prepaid, on:

                    Steven M. Greenspan, Esq.
                    Brian D. Porch, Jr., Esq.
                    Day, Berry & Howard LLP
                    One Canterbury Green
                    Stamford, CT  06901-2047


                              _____
                                  Robert P. Dolian

.StmLib1:1063678.1 07/12/04