UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRILEGIANT CORPORATION, | : | CIVIL ACTION NO. |
| | : | 3:02CV02237 (MRK) |
| Plaintiff, | : | |
| VS. | : | |
| | : | |
| BP PRODUCTS NORTH AMERICA INC. | : | |
| | : | |
| Defendant. | : | JULY 12, 2004 |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant, BP Products North America Inc. ("BP"), respectfully submits its Proposed Findings of Fact and Conclusions of Law.

**BP's RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF FACT**

1.      Admit.

2.      Denied.  Plaintiff, Trilegiant Corporation ("Trilegiant"), is a subsidiary of Cendant Corporation ("Cendant").

3.      Admit.

4.      Admit.

5.      Admit.

6.      Admit.

7.      Denied.  BP entered into an Agreement with SafeCard Services, Inc., predecessor-in-interest to Trilegiant, dated August 7, 1992 ("Agreement"), pursuant to which BP desired to market a package of additional services and benefits to its existing credit card holders as well as potential new credit card customers on a fee basis.  (Exhibit 1.)

8.      Denied.  The Agreement provides for Trilegiant to market the services and benefits to existing BP credit card customers as well as potential new cardholders through a BP-owned credit card program called the BP Horizon Program.  (Exhibit 1.)  The Agreement provides that "a new complimentary BP credit card with a 'Horizon Card' designation" will be offered to "both existing and new BP cardholders" (¶ 1); that "[i]t is the intent of the parties that . . . enrollment in the Program will not be a requirement for the issuance of a BP credit card" (¶ 1); that each cardholder is to be billed "by BP via their BP credit card account" (¶ 8); and, "it is understood that . . . the promotion of goodwill toward BP and its products is of the essence" (¶ 11).  (Exhibit 1.)

9.      Defendant admits that pursuant to the Agreement, BP provided Trilegiant with the names of its customers.

10.     Denied.  Under Paragraphs 14 and 15 of the Agreement, Trilegiant shares in profits after the term of the Agreement only in two circumstances, neither of which occurred here.  Trilegiant is not entitled to share in Profits after the term if it terminates the Agreement. (Exhibit 1, ¶¶ 14, 15(d), 15(e).)

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit.  The Agreement provided that BP and Trilegiant would share in the profits by BP receiving 57.5% of the profits and Trilegiant receiving 42.5% of the profits.  (Exhibit 1.) On or about March 19, 1996, BP and Trilegiant amended the Agreement to provide that BP would receive 63.5% of the profits and Trilegiant would receive 36.5% of the profits.  (Exhibit 27.)

15.     Denied.  Trilegiant was entitled to four different forms of payment under the Agreement: (a) profit-sharing; (b) solicitation costs; (c) costs of service; and (d) costs of fulfillment.  (Exhibit 1 at ¶ 3.)  The Profits of the BP Horizon program are calculated as gross program sales, less cancellations, credits and refunds, less the total pre-established reimbursed costs for the cost of service and cost of fulfillment. (Exhibit 1 at ¶ 3.)

(i)     Section 3, subparagraph (b) of the Agreement identifies Trilegiant's costs for fulfilling its servicing obligations under the Agreement ("Cost of Service") and specifies initial costs of $4.15 per member.  (See id.)

-3-

(ii)     Section 3(b) states that each of the services that included in the $4.15 Cost of Service are listed in Exhibit B of the Agreement.  Both Section 3(b) and Exhibit B of the Agreement identify "oil rebates" as one of the services expressly included within Trilegiant's Cost of Service.  (See id.)

(iii)     Section 3(b) states that the parties estimated at the time of contracting that $2.24 of the total Cost of Service is attributable to Trilegiant's costs for providing the oil rebates but that, after one year, the parties would adjust that number up or down based on a determination that the actual costs for providing the oil rebate differed from $2.24 by more than 10%.  (See id.)  The parties were unable to predict with any precision the cost of the oil rebate service because there was no historical data on the service. (See id.)

(iv)     After the first year of the BP Horizon program, Trilegiant discovered that the actual costs to provide the oil rebates was at most $0.17 per member.  (Exhibits 181, 135.)

16.     Denied.  BP and Trilegiant shared profits consistent with Paragraph 3 of the Agreement during the term of the Agreement and on a temporary basis after the term of the Agreement during the transition period while BP prepared to launch its new card product. (Exhibit 1 at ¶ 3, Exhibit 108, L. Kilrea, J. Montague, J. DuBoyce.)

17.     Denied.  BP had no obligation to continuing sharing Profits because Trilegiant terminated the Agreement.

(i)    Paragraph 14 of the Agreement provides that either party may terminate the Agreement by giving written notice to the other not less than ninety days prior to the expiration of the initial term or any subsequent annual extension.

(ii)    Paragraph 15 of the Agreement does not apply to the instant circumstances where Trilegiant terminates the Agreement <u>not</u> as a result of a material breach by BP.

(iii)    Under Paragraph 15 of the Agreement, BP has no obligation to share profits with Trilegiant after the Agreement is terminated unless: (1) BP, terminates the Agreement and chooses <u>not</u> to discontinue the program (¶15(c)) or (2) Trilegiant terminates the Agreement as a result of a material breach by BP (¶ 15(e)). (Exhibit 1, ¶¶ 14, 15.)  Neither circumstance occurred here.  In this case, Trilegiant terminated the Agreement for its own business reasons.  (Exhibits 3, 29, 72, 73, 75, 170.)

18.    Admit.  The Associates National Bank, Inc., ("Associates"), later acquired by Citicorp Credit Services, Inc. USA ("Citi"), issued credit to all cardholder members for and had "the credit relationship with the [BP Horizon] customer[s]" and First Usa Bank, N.A. ("First USA") issued credit and maintained the credit relationship with BP Horizon Visa members. (Exhibits 164, 165, M. Evans, T. Walker.) Associates/Citi sent a Card Member Agreement ("Citi CMA") to the BP Horizon members and First USA sent its Card Member Agreement ("FUSA CMA") to BP Horizon Visa members.  (<u>See id</u>.)

19.    Admit.

20.     Admit.

21.     Denied.  Trilegiant's last efforts to solicit for new members occurred in December, 1998, which, by September, 1999, caused BP to believe that Trilegiant may have been in breach of the Agreement.  (Exhibits 29, 72, 75, 103, K. Clift deposition.)

22.     Denied.  The "BP Horizon Service Membership Terms and Conditions" ("Terms and Conditions") to which Plaintiff refers is contained within Exhibit 141 (not Exhibits 155 or 156).  Even if the document was sent to customers, it would not constitute a binding agreement because the BP Horizon card was a BP-owned product and card applicants could only obtain a BP Horizon credit card by obtaining credit issued through Citi (or First USA for BP Horizon Visa customers).  (Exhibit 1, M. Evans, T. Walker.)

23.     Denied.  The Terms and Conditions Plaintiff refers to did not create a contractual relationship between Trilegiant and the cardholders.  The customers had a contractual relationship with BP.

24.     Denied.  Paragraph 8 of the Agreement provided that "members of the Program will be billed for their services by BP via their BP credit card account using BP's standard procedures."  (Exhibit 1 at ¶ 8.)  If, for purposes of efficiency, BP allowed Trilegiant to bill card members directly so that it may subtract its costs for services from member fees before sending BP 65% of the profits, that would not have created any rights in Trilegiant or a contractual relationship between it and the cardholders.

25.     Denied.

26.     BP admits that Trilegiant would not have sent such materials to customers until they were already "approved and enrolled" in the BP Horizon Program.

27.     BP admits that Trilegiant was obligated to provide services to members of the BP Horizon Program pursuant to Paragraph 3 of the Agreement. (Exhibit 1.)

28.     Denied.

29.     Admit.

30.     Admit.

31.     Admit.  The Agreement also relieved BP of any obligation to share profits as of the effective date of termination if Trilegiant terminated.  (Exhibit 1 at ¶¶ 14, 15.)

32.     BP admits that after Trilegiant's termination became effective on August 15, 2000, BP and Trilegiant shared profits on a temporary basis thereafter while BP prepared to launch its new card product.  (Exhibit 1 at ¶ 3, Exhibit 108, L. Kilrea, J. Montague, J. DuBoyce.)

33.     Following the effective date of Trilegiant's termination on August 15, 2000, Trilegiant continued to provide services to card members on a temporary basis until BP was in a position to offer BP Horizon members a new card product. (See id.)

34.     Denied.

35.    Denied.  BP admits that BP, through Citi, sent former BP Horizon members BP's new product, the BP MultiCard.

36.    BP admits that after notifying Trilegiant several times of its intentions to discontinue the BP Horizon Program and launch its new card product, and after notifying cardholders one month beforehand that the BP Horizon Program was being discontinued, Citi sent BP Horizon members the BP MultiCard.  (Exhibits 20, 30, 31, 44, 50, 178.)

37.    Denied.  BP was entitled under the Agreement to issue its new program and retain the entire revenue stream.  (Exhibit 1.)

38.    The evidence is not clear as to whether Chip Vann was the Trilegiant employee "responsible" for the BP Horizon Program in September, 1999.

39.    Admit.

40.    Denied.  Trilegiant had not actively marketed BP's card program since December, 1998.  (Exhibits 29, 72, 75,103, K. Clift.)

41-42.  BP denies all of Plaintiff's assertions in Paragraphs 41-42 with the exception of the following:

(i)    By electronic mail dated September 8, 1999, Carey Isom of BP inquired of Cendant why it ceased performing its obligations to solicit new members under the Agreement.

In response Chip Vann, Cendant's Director of Marketing replied that "fee card marketing [was] not profitable." (Exhibit 29.)

(ii)    During that same time period, Cendant strategized internally on how best to convince BP to discontinue the Program or turn servicing of the program to another vendor, presumably to avoid having to terminate the Agreement itself without any chance for compensation. (Exhibit 72.)

(iii)    By letter dated October 27, 1999 ("Termination Letter"), Trilegiant notified BP that it was terminating the Agreement pursuant to ¶ 14, to become effective August 15, 2000. (Exhibit 3.)

43.    Admit. BP refused to allow Trilegiant unilaterally to modify the Agreement to abandon its obligations to solicit new members.

44.    Denied. BP admits that it received Trilegiant's letter of termination dated October 27, 1999, effective August 14, 2000.

45.    Denied. Trilegiant's termination letter expressly stated that it was terminating the Agreement in accordance with Paragraph 14 of the Agreement. (Exhibit 3.)

46.    Denied. In quoting from Exhibit 5, Plaintiff omitted the remainder of the sentence which states, "however Cendant terminated the Agreement in the meantime." By October 5, 1999, prior to the dates on which either Exhibit 103 or 5 were created, Trilegiant had repeatedly requested BP to "g[ive] this business to another vendor." (Exhibits 29, 75.) However, as a result of Trilegiant's refusal to perform its obligations to solicit for new members

under the Agreement since December, 1998, BP believed that Trilegiant was in breach of the Agreement and considered pursuing its right to terminate in response to that breach. (Exhibits 29, 72, 75,103, K. Clift.)  BP determined this issue to be irrelevant after Trilegiant's October 27, 1999 termination because Trilegiant had chosen to terminate the Agreement and BP correctly understood that it had no further obligation to compensate Trilegiant after the effective date of termination.  (Exhibits 5, 103.)  While it is true that BP considered whether Trilegiant had breached the Agreement, the issue became moot once Trilegiant terminated the Agreement.

      47.     Admit.

      48.     Admit.

      49.     Admit.

      50.     Denied.  BP understood before the August 15, 2000 effective termination date that the three options only applied where BP, not Trilegiant, terminated the Agreement.  (Exhibit 5, J. DuBoyce.)  Jim DuBoyce, BP's procurement manager, testified that, consistent with the hand-written notation, the inclusion of the word "Cendant" rather than "BPA" in this document was incorrect because BP would only have post-termination payment obligations if it, rather than

Trilegiant, terminated the Agreement. (J. DuBoyce.) BP had no obligation to share Profit

following a termination by Trilegiant. (Id.)

51.    Denied. BP's reasoning for becoming concerned that its cardholders would no

longer be serviced after Trilegiant's effective date of termination was clear – BP understood that

neither party maintained any payment or servicing obligations after that date, and BP knew that it

would not be ready to launch its new program by August 15, 2000. (Exhibits 1, 12, J. DuBoyce,

E. Best, L. Kilrea.)

52.    Denied. Trilegiant's responses to whether it would continue to service members

after August 15, 2000 were unclear to BP and until July 25, 2000, when BP explained to

Trilegiant that it had "clearly terminate[d] the entire agreement" and BP was "ready to

implement the process to begin withdrawing th[e] program from the market" (Exhibit 18), BP

never understood Trilegiant's position to be that it intended to service members "indefinitely."

(Exhibits 12, 18, 20, 59.)

53.    Denied. During the parties discussion referenced in Exhibit 19, BP questioned

"this new position being stated by Cendant." (Exhibit 19.) Jim DuBoyce explained that through

this internal electronic communication he was expressing his "belief that there may have been a

miscommunication" but that his "belief was [Cendant] did not intend to but that they **had**

cancelled the contract." (Exhibit 19, J. DuBoyce at 68:19-24, 70:6-18, emphasis added.)

54.     Admit.  Around May 30, 2000, BP had not yet developed its new card product and strategized how it would maintain its relationship with BP Horizon members following Trilegiant's effective termination date of August 15, 2000. (Exhibit 12.)

55.     Denied.  BP did not owe Trilegiant any renewals because Trilegiant terminated the Agreement.

56.     BP admits that prior to the effective date of termination BP and Citi contemplated offering BP Horizon members a different card product such as the "Amoco MultiCard" but such plans were never realized because Trilegiant agreed temporarily to service BP Horizon memberships after the effective date of termination while BP prepared to launch its new card product, the BP MultiCard.  (Exhibits 20, 108, L. Kilrea, J. Montague, J. DuBoyce.)

57 - 60.  Denied.

(i)     Jim DuBoyce testified that a few months prior to the effective date of termination, BP was concerned that existing BP Horizon customers would be dropped from the Program as of August 15, 2000 before BP had developed and launched its replacement program, despite the fact that many of them already paid their annual fee to receive benefits and services. (J. DuBoyce.)

(ii)      Accordingly, in May, 2000 Mr. DuBoyce contacted Ms. Nayr Iglesias, Director of Partnership Marketing at Trilegiant, in order to obtain Trilegiant's assurance that notwithstanding the termination of the Agreement, it would continue servicing existing card members after August 15, 2000 on a temporary basis while BP prepared to launch its new card product.  (Exhibits 12, 20,  J. DuBoyce.)

(iii)      Thereafter, on May 17, 2000, Ms. Iglesias stated that her understanding of Trilegiant's October, 1999 termination was that "[Trilegiant] did not want to take on any more enrollments due to low quantities and in addition [wanted to] terminate the contract." (Exhibit 63.)

(iv)      On July 10, 2000 Ms. Iglesias advised Mr. DuBoyce that after August 15, 2000 Trilegiant would continue to service existing members, new members enrolled prior to August, 2000 and members renewing prior to August, 2000.  (Exhibit 58.)

(v)      On July 25, 2000 Mr. DuBoyce and Ms. Iglesias exchanged multiple e-mail communications in which they discussed Trilegiant's continued servicing of existing card members after the August 15, 2000 effective termination date.  (Exhibits 18, 19, 20.)  During those conversations Mr. DuBoyce informed Ms. Iglesias that BP would not owe Trilegiant any further revenue from renewals after the effective date of termination because Trilegiant terminated the entire Agreement in October, 1999.  (Id.)  He further explained that after the effective date of termination, Cendant could receive commissions during the time in which it continued to service memberships but that BP was free to discontinue the Program at any time.

(Id.)  Mr. DuBoyce also notified Ms. Iglesias that BP would soon "implement the process to

begin withdrawing the program from the market."  (Exhibit 20.)  Trilegiant agreed to continue to

service the BP Horizon Club members after August 15, 2000 on a temporary basis pending

readiness of the new program and did so as BP paid Trilegiant all the same fees and revenue

sharing as required under the Agreement.  (Exhibits 108, 12.)

61 – 63.       BP denies Plaintiff's assertions but admits that in 2001, BP and Citi were

developing BP's new card product, the BP MultiCard, which offered several additional features

"which ma[de] the BP MultiCard a better product."  (Exhibit 112.)

64.    Denied.

65 -66.       Denied.  On or about June 29, 2001 and through electronic mail on July

13, 2001 ("notice of discontinuance"), Lisa Kilrea, Marketing Manager of BP, notified Trilegiant

that BP planned to discontinue the Horizon Program effective November 1, 2001 because it had

"now harmonized [its] card portfolios and will be offering a new product to [its] Base customers

going forward." (Exhibits 30, 31.)

67.    Admit.

68.    Denied.  BP did not believe that it had any obligation to compensate Trilegiant

following its discontinuation of its BP Horizon Program because Trilegiant had terminated the

Agreement.  (J. DuBoyce)

69.    BP admits that BP's consultant made the statement cited by Plaintiff but she had no knowledge of what the contract said between BP and Cendant.  (E. Best.)

70.    Admit.

71.    Denied.

72.    Denied.

73.    Denied.  BP sought to obtain Trilegiant's cooperation but Trilegiant refused to provide BP the renewal information it needed.  (Exhibits 104, 142.)  Thereafter, BP looked to Citi for information regarding member billings and to provide notice to the cardholders that the BP Horizon Program was being discontinued. (Id.)

74.    Denied.

75.    Denied.  The determination of whether automatically to succeed former BP Horizon members upon discontinuation focused solely on the interests of ensuring that BP Horizon members were given a better product than the BP Horizon card, neither BP nor Citi viewed that determination as being impacted by any claims by Trilegiant to post-termination revenue.  (Exhibit 112, L. Kilrea T. Walker)

76.     Denied.  The BP MultiCard is a new and better product than the BP Horizon card. (Exhibits 24, 46, 85, 112, 117, 145.)

77.     Denied.  The BP MultiCard offers new and improved features and the BP Horizon Program was discontinued altogether.  Use of the term "enhancement" simply (and correctly) means that the product is an enhanced, better, product.  (See id.; see also Exhibits 39, 112.)

78.     Denied.  In **addition** to the benefits provided by the BP Horizon card, the BP MultiCard offered new enhanced features, including: a benefit known as the "Online Savers Guide" that provides savings on restaurant dining and movie tickets, a "Roadside Assistance" program, charge privileges at major hotels, convenience checks, personal cash checks, up to 50% discounts on hotels compared to the BP Horizon card's 5% hotel discount for members that book reservations through a specified 1-800 number, 20% discounts from  participating retailers, and "revolving credit privileges" at hotels and car rentals. (Exhibits 24, 46, 85, 107, 117.)   The BP MultiCard also had different credit terms than the BP Horizon card, including an increased annual fee and a completely different late fee arrangement.  (Id.)

79.     Denied.  Due to certain unexpected delays, including Trilegiant's refusal to provide BP with information pertaining to renewals which BP needed in order to solicit cardholders to the BP MultiCard upon their renewal dates (Exhibits 140, 142), the Horizon Program was not discontinued on November 1, 2001, and Trilegiant continued to service the members and got paid for its services.  (L. Kilrea, J. Montague.)

80.     Denied.  BP originally notified Trilegiant of its plans to "remove th[e] product from the market" on July 25, 2000 and, again notified Trilegiant on July 13, 2001 of its plans to discontinue the program.  As a result of these communications, "Trilegiant's marketing personnel stopped returning BP phone calls regarding termination and transition of the program" and "[i]n 4Q2001, Trilegiant temporarily stopped forwarding BP their portion of the commission payment; [o]ver $400,000 due to BP was held **per instructions from [Trilegiant's] legal department**." (Exhibit 44.)  Accordingly, BP reasonably feared that when it ultimately implemented its discontinuation of the program, Trilegiant might disrupt its efforts in some way.  (Exhibits 20, 82, L. Kilrea.)  However, BP notified Trilegiant on several occasions over a two-year period of its plans to discontinue the program once its new product was ready to be launched.  (Exhibits 20, 30, 31, 44, 50.)

81.     Denied.  In furtherance of BP and Citi's efforts to discontinue the program, it was necessary for Citi to "turn off billing for the Horizon product" but Jennifer Montague, BP's Credit Card Marketing Manager, informed Trilegiant by way of electronic mail that its payments were merely being held up until the termination process was final, at which point BP fully intended to forward any amount owed to Trilegiant.  (Exhibit 183, J. Montague.)  Additionally, Trilegiant did not report a disruption in billings until May 7, 2002, after BP notified Trilegiant by way of letter dated May 1, 2002 that the BP Horizon Program was being discontinued.  (Exhibit 44.)

-17-

82.     Denied.  By letter dated May 1, 2002, BP notified Mr. Nat Lipman, Chief

Executive Officer of Trilegiant, that BP had "now developed and [was] marketing . . . [the] BP

MultiCard" and that BP planned to discontinue the Horizon card product.  (Exhibit 44.)


(i)     By letter dated May 15, 2002, BP informed Trilegiant that BP the Horizon

Program would end effective June 30, 2002.  (Exhibit 50.)


(ii)     By letters dated May 22 and May 23, 2002, Citi, on BP's behalf, gave

notice to the Horizon card members that the Horizon Program was being discontinued, effective

July 1, 2002.  (Exhibits 54, 178.)


83.     Denied.  BP's letter dated May 1, 2002 notified Trilegiant that it would

discontinue the program and that BP had "communicated this plan to [Trilegiant's] legal and

marketing teams, specifically Nayr Iglesias and Lawrence Lehan, over the past year."  (Exhibits

44, 20, 30, 31, 50.)


84.     Denied.  From July, 2000, immediately before the effective date of Trilegiant's

termination of the Agreement (August 15, 2000) until its ultimate discontinuation of the program

in July, 2002, BP informed Trilegiant several times that it planned to discontinue the BP Horizon

Program in order to launch its new card product to former BP Horizon members. (Exhibits 44,

20, 30, 31, 50.) Whether BP required former Horizon members to apply for the new product or

whether it automatically accepted them based upon their proven credit-worthiness under the BP

Horizon Program is of no consequence because BP had no obligation to continue the program

after Trilegiant chose to terminate the Agreement.  (Exhibit 1 at ¶¶ 14, 15; Exhibits 44, 20, 30,

31, 50.)   Additionally, any former BP Horizon member that joined the BP MultiCard program

but had an outstanding balance on his BP Horizon account continued to receive a separate bill for

their those accounts until the balance was paid off.  (Exhibit 175.)   Former BP Horizon

customers that joined the BP MultiCard program "were treated like a new account, with

eligibility for credit line increases, purchase pads, authorizations, etc.."  (Exhibit 182.)

85.     BP admits that on or about May 22, 2002, BP, through Citi, notified BP Horizon

members that the BP Horizon cards were "being discontinued and will be replaced by the new

BP MuliCard program.  Your BP Horizon benefits . . . will terminate effective July 1, 2002."

86.     Denied.

87.     Denied.  A total of 49,970 out of 52,416 of BP's former BP Horizon members

accepted the BP's new BP MultiCard.  (Exhibit 180.)  At least 254 of those former BP Horizon

members "opted-out" of joining the BP MuliCard program.  (Id.)

**Damages**

88.     Denied.  49,970 former BP Horizon members joined the BP MultiCard program,

it is unclear from the evidence how many of the 10,000 former BP Horizon Visa members joined

the BP MultiCard program.

89.    Admit.

90.    Denied.  BP admits that it used various estimated attrition rates when drafting revenue projections at various times, including an estimated attrition rate of 15%.  However, prior to BP's discontinuation of the BP Horizon Program, attrition during the last year of the program (2001-2002) was as high as 34.6%.  (Expert Report of A. Schachter at 5-6; Exhibit 179.)  Therefore, BP denies that Trilegiant's use of a 17.08% (Horizon) and 18.48% (Horizon Visa) is "conservative."

91.    Admit.  The $0.71 includes $0.17 for the actual cost for providing oil rebates.

92.    Denied.  As stated in the Expert Report of Alan A. Schachter dated March 16, 2004, the present value of Plaintiff's alleged damages can be no more than $1,465,000 based on a five-year discount rate, $1,720,000 based on a ten-year discount rate, and $1,773,000 based on a twenty-year discount rate.  (Expert Report of A. Schachter at 12.)

## PROPOSED CONCLUSIONS OF LAW

A.    Choice of Law

1.    In a diversity action, courts must apply the choice of law rules of the forum state. See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 611 (2d Cir. 1996). Consistent with the choice of law clause in Paragraph 16 of the Agreement, Ohio law applies to Trilegiant's breach of contract, breach of implied covenant of good faith and fair dealing and unjust enrichment claims but not to its unfair trade practices or tortious interference claims. See id.

2.    By statute, Trilegiant's claim under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et. seq. ("CUTPA") is governed by Connecticut law.

3.    Connecticut's choice of law rules for torts require the court to select the local law of the state having the "most significant relationship to the occurrence and the parties to the dispute." O'Connor v. O'Connor, 201 Conn. 632, 652, 519 A.2d 13 (1986); see also MM Global Servs. v. Dow Chem. Co., 283 F. Supp. 2d 689 (D. Conn., 2003); Pollack v. Bridgestone/ Firestone, Inc., 939 F. Supp. 151, 153 (D. Conn. 1996).

4.    In applying the "most significant relationship" test the Court must consider: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the residence, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any between the parties is centered. See id. The court "must also consider the relevant policies and interests of each state involved." Id. These factors are to be evaluated according to their relative importance with respect to the particular issue. See id

5.     Under the "most significant relationship" test, Illinois law applies to Plaintiff's tortious interference claim.  In this case: (1) the alleged injury occurred in Connecticut; (2) the alleged tortious conduct occurred in Illinois; (3) BP is a corporate domiciliary of Illinois and Trilegiant is a corporate domiciliary of Connecticut[1]; and (4) the parties' relationship is not centered in either state but expands across multiple states.

6.     While the above factors suggest that Illinois and Connecticut have equal relationships to the parties, the state interest factor strongly favors application of Illinois law. Contrary to Connecticut's law for tortious interference, the Illinois standard is succinctly defined and places its resident businesses on specific notice of the types of conduct that will subject them to liability.  See Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 527-528 (7th Cir., 2003) (elements for tortious interference in Illinois are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages") (quoting HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131 Ill. 2d 145, 545 N.E.2d 672, 676, 137 Ill. Dec. 19 (Ill. 1989)).

7.     Just as general contract law provides clear standards for businesses to rely upon to avoid liability, Illinois tortious interference law affords the same rigidness, thereby facilitating development and growth.  Illinois's requirements that a "valid and enforceable" contract existed between the plaintiff and the third party and that the third party have actually breached that contract provide its residents with clear guidance.   This stringent standard informs Illinois

_____

[1] BP's principal place of business is Illinois and Trilegiant's is Connecticut.

businesses which types of transactions they may lawfully execute and those that will subject

them to liability.  Such awareness alleviates costs typically associated with efforts to avoid legal

uncertainties in executing business transactions, reduces litigation exposure and provides

industry and the courts with clear and predictable guidelines to follow.  As a result, Illinois

tortious interference law protects its businesses and facilitates its commercial industry.

8.    In contrast, Connecticut's standard for tortious interference is more ambiguous,

enabling some plaintiff's to show that the "relationship" interfered with or the "wrongfulness" of

the defendant's conduct satisfies the legal standard, while other similarly situated plaintiff's may

not.  See Subsolutions, Inc. v. Doctor's Assocs., 62 F. Supp. 2d 616, 628 (D. Conn. 1999)

("[g]iven the nature of competition, not all conduct that interferes with a business relationship is

actionable."); Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 130 (D. Conn. 1993);

Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Serv. Co., 169 Conn. 407, 415, 363

A.2d 86 (1975).  Illinois leaves no uncertainty, ensuring that its residents understand which types

of transactions to avoid and which to pursue.  Thus, Illinois has the most significant relationship

and accordingly, governs Plaintiff's tortious interference claim.


B.    Breach Of Contract


(i)    Trilegiant had no right to renewals after terminating the Agreement.


1.    Contract interpretation is a question of law for the Court to decide.  DiMarco v.

Shay, 154 Ohio App. 3d 141, 148 (Ohio App. 2003) (citing Alexander v. Buckeye Pipe Line Co.,

374 N.E.2d 146, par. 1 of syllabus[2] (Ohio 1978)).  When the terms in a contract are

unambiguous, courts will not create a new contract by finding an intent not expressed in its clear

language.  See Alexander v. Buckeye Pipe Line Co., 374 N.E.2d 146, 150 (Ohio 1978); Shifrin

v. Forest City Enterprises, Inc., 64 Ohio St. 3d 635, 638 (Ohio 1992).  A contractual provision is

only ambiguous if there is an indistinctness or uncertainty of meaning in the language used.  See

Morgan v. Morgan, 1994 Ohio App. LEXIS 2572, *8 (Ohio App., June 14, 1994) (citing 43 Ohio

Jurisprudence 3d 431-432, Evidence and Witnesses, Sec. 569).  Where the language of an

agreement is clear and unambiguous, courts should not read-into the contract that which the

parties excluded by their chosen words. See Adkins v. Bush, 2003 Ohio App. LEXIS 2505, *7-8

(Ohio App., June 2, 2003) (citing Morgan v. Morgan, 1994 Ohio App. LEXIS 2572 *8-9 (Ohio

App., June 14, 1994)) (interpreting separation agreement based on contract law and stating that,

"where there is no uncertainty, but only an absence in the agreement of a provision about a

particular matter, the court must not construe as included something intended to be excluded nor

make the contract speak where it was silent").


2.     The provisions of ¶¶ 14 and 15 of the Agreement are clear and unambiguous.

Absent a material breach of the Agreement by BP, which is not even alleged or claimed, the

Agreement only provides Trilegiant with a right to receive a share of post-termination renewals

where BP, as opposed to Trilegiant, terminates the Agreement under circumstances described in

¶ 15(d).

---

[2] In Ohio, the precedent in each case is to be found in the syllabus rather than in the text
of the opinion. See GMC v. Mahoning Valley Sanitary Dist., 780 F.2d 1021, *7-8 (6th Cir. 1985)
(citing Cassidy v. Glossip, 231 N.E.2d 64, n. 1 (Ohio 1967)).

3.      Paragraphs 14 and 15 are the only paragraphs in the Agreement which pertain to termination.  As amended, Paragraph 14 states:

> [T]his Agreement will extend on a year to year basis, provided that either party may terminate this Agreement on August 15, 1999 or on each of the succeeding annual anniversary dates thereafter upon providing written notice to the other not less than ninety (90) days prior to such date. . .

(Exhibit 1 at ¶ 14.)

The language of Paragraph 14 is clear and unambiguous.  It does not provide any contractual basis for Trilegiant to receive any share of post-termination revenue if it chooses to terminate the Agreement.

4.      By its letter dated October 27, 1999 ("Termination Letter"), Trilegiant terminated the entire Agreement under Paragraph 14 thereby forgoing any right to receive a share of renewal commissions after the effective date of termination.  Trilegiant's letter cannot be construed to have created any type of partial termination in which Trilegiant could cease to perform its principal obligation to solicit new members under the Agreement, while allowing Trilegiant to collect fee revenue thereafter for eternity.  To construe ¶ 14 in the manner advanced by Trilegiant would effectively rewrite the Agreement, which is improper under the fundamental principles of contract interpretation in Ohio.  See Ullman v. May, 147 Ohio St. 468, 47572 N.E. 2d 63 (Ohio 1947). The plain meaning of Paragraph 14 is that a termination is complete upon the effective date of termination, and Paragraph 15 than governs the specific circumstances where post-termination revenue sharing is required.  The only Paragraph that may alter the parties' obligations beyond that date is Paragraph 15.

5.      Paragraph 15 sets out the rights and obligations of the parties upon certain types of terminations.  (Exhibit 1.)  Subparagraphs 15(d) and 15(e) describe the very limited circumstances in which Trilegiant may have an opportunity to continue to receive revenue from membership renewals after termination, neither of which apply here.[3]  (Exhibit 1.) These subparagraphs expressly state that they apply only to instances where BP terminates the Agreement.  Therefore, they cannot be interpreted as affording Trilegiant continuous and ongoing renewal revenue where it, rather than BP, terminates.  See Shifrin, 64 Ohio St. 3d at 638, *supra*.

6.      The fact that Paragraph 15 is the only provision within the Agreement that addresses post-termination rights suggests that the only reasonable expectation of the parties was that contractual rights would survive termination only if one of the scenarios expressly described in Paragraph 15 occurred.  See Adkins, 2003 Ohio App. LEXIS 2505 at *7-8; Morgan v. Morgan, 1994 Ohio App. LEXIS 2572 at *8-9, *supra*.

7.      Subparagraph 15(d) provides that "[i]if [the] Agreement is terminated *by BP* pursuant to paragraph 14 other than as a result of material breach by [Trilegiant] and if BP does NOT then discontinue the Program, then BP at its sole discretion may [choose to either (i) have Trilegiant continue servicing members after termination and allow Trilegiant to continue sharing in renewal revenues; or, (ii) turn servicing over to a third party or service the program itself]." (Exhibit 1.)  Under either scenario, Trilegiant is afforded the right to continue receiving post-termination revenue only if it is BP that terminates the Agreement.  See id.

---

[3] Subparagraph 15(b) only refers to continued fees in order to clarify that Trilegiant is not entitled to such fees where BP terminates following a material breach on the part of Trilegiant.

8.      Subparagraph 15(e) affords post-termination revenues to Trilegiant where Trilegiant terminates but that provision only applies if BP commits a material breach of the Agreement.  (Exhibit 1.)

9.      The Agreement affords Trilegiant with rights to post-termination renewal revenue in very limited circumstances.  BP must either have terminated or committed a material breach of the Agreement.  Here, Trilegiant terminated the Agreement on October 27, 1999, and therefore, relinquished any rights to post-termination revenue.

10.     The Agreement simply does not provide that Trilegiant would be paid a share of ongoing renewal revenues in the event it chose to terminate the Agreement.  Therefore, such a provision should not be imputed into the Agreement.  See  Adkins, 2003 Ohio App. LEXIS 2505 at *7-8; Morgan, 1994 Ohio App. LEXIS 2572 at *8-9, *supra*.  The Agreement was sensibly designed so that Trilegiant's share of revenue was protected if it was not in breach, and (1) BP chose to terminate the Agreement and continue the program (15(d)) or (2) Trilegiant was forced to terminate the Agreement because BP breached the Agreement (15(e)).  There was no contractually bargained-for revenue protection where, as here, Trilegiant chooses to terminate the Agreement for its own business reasons.  There was no breach of contract.

>   *(ii)     Even if the terms of the Agreement applied, BP's ultimate discontinuance*
>   *was proper.*

11.     Even if the Court were somehow to apply the terms of the original Agreement to

the parties' actions after August 15, 2000, BP discontinued the product consistent with Paragraph

15(c) and therefore, no longer owed any obligation to share revenue with Trilegiant.

>   Paragraph 15(c) states:

>   If this Agreement is terminated by BP pursuant to paragraph 14 other than as a
>   result of material breach by [Trilegiant] and if BP then discontinues the Program
>   altogether (i.e., the Horizon Card is no longer issued as a credit card product of
>   BP or accepted at BP service stations), BP will inform then-existing Members that
>   the Program is being discontinued and *will have no further obligation to*
>   *[Trilegiant] for renewal revenue from then-existing Members . . .*

(Exhibit 1.)  Because BP sent Trilegiant notice of its discontinuation on July 13, 2001, nearly one

year before it ultimately discontinued the Program; notified Trilegiant in writing on May 1, 2002

that it was ending the Horizon Program and offering its new product; sent a letter dated May 15,

2002 informing Trilegiant that the Program would end effective June 30, 2002, and cardholders

were notified of the same-- BP's discontinued the Program in a manner consistent with

Paragraph 15(c).   Thus, even if Trilegiant had not terminated the Agreement on October 27,

1999, either of these written notices would have satisfied the notice requirements for affecting a

proper termination of the Agreement under Paragraph 14 and such termination would have

become effective the following August 15, 2002.


12.     After Trilegiant's August 15, 2000 effective termination date of the Agreement,

Trilegiant no longer had any right to continue to share in renewal revenue and BP was free to

discontinue the Program *any* time it chose thereafter.

C.     Implied Covenant of Good Faith and Fair Dealing

1.     "[P]arties to [any] contract are bound towards one another by standards of good faith and fair dealing." Bolling v. Clevepack Corp., 484 N.E.2d 1367, 1376 (Ohio Ct. App. 1984); see also Restatement (Second), Contracts § 205 (1979) (every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement). (Internal quotation marks omitted); Needham v. Provident Bank, 675 N.E.2d 514, 523 n. 4 (Ohio Ct. App. 1996).  In other words, every contract carries an implied duty requiring that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Miller v. Gunckle, No. CA2000-02-026, 2000 WL 1818543 (Ohio App. 12 Dist. Dec 11, 2000) rev'd on other grounds, 775 N.E.2d 475 (Ohio 2002).

2.     "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." Bennco Liquidating Co. v. Ameritrust Co. Natl. Assn., 621 N.E.2d 760, 762 (Ohio Ct. App. 1993).

3.     The implied covenant of good faith and fair dealing is an implied condition that must arise out of the "specific bargain of the parties as manifested in their agreement." Carrols Corp. v. Canton Joint Venture, 1990 Ohio Misc. LEXIS 4, 22-25 (Ohio Misc. 1990) (citing Sessions, Inc. v. Morton, 491 F. 2d 854, 857 (9th Cir. 1974)).  As set forth above, acted consistent with the termination provisions of the Agreement.  It is axiomatic that no implied condition could arise that conflicts with the Agreement's own terms.  See id.

-29-

4.     Moreover, a defendant only violates its duty of good faith when it acts in a manner which has no "reasonable justification," in light of the contract. <u>Zoppo v. Homestead Ins. Co.</u>, 644 N.E.2d 397, 399 (Ohio 1994).  Breach of the implied covenant requires an element of "bad faith, [which] although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." <u>Slater v. Motorists Mut. Ins. Co.</u>, 187 N.E.2d 45, 45 (Ohio 1962), <u>overruled on other grounds by</u>, <u>Zoppo v. Homestead Ins. Co.</u> 644 N.E.2d 397, 397 (Ohio 1994).  That BP notified Trilegiant on several occasions from July, 2000 (just prior to the effective date of Trilegiant's termination of the Agreement) to July, 2002 of its plans to discontinue the BP Horizon Program in order to offer BP Horizon members its new card product demonstrates that its conduct falls well short of such malice.  (Exhibit 59, 30, 31, 44, 50.)

5.     Furthermore, because BP provided such notices to Trilegiant over a period of two years before implementing its discontinuation, BP cannot be deemed to have, as Plaintiff asserts, "deliberately misrepresented" its intentions to Trilegiant .  Trilegiant was placed on clear notice of BP's intentions that the BP Horizon program would only continue to exist temporarily while BP prepared to launch its new product.  Whether BP gradually discontinued the program member by member or over several days did not affect the interests of Trilegiant.  Whether BP effected a transition to a new program automatically or by a different mechanism is immaterial. Even under if BP terminated the Agreement under Paragraph 14 of the Agreement and then

discontinued the program under Paragraph 15(c), Trilegiant would no longer have any right to maintain a relationship with the cardholders upon such discontinuance.

D.     Connecticut Unfair Trade Practices Act

1.     When determining whether a practice violates the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et. seq. ("CUTPA"), the Court will consider "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise- whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Jarrow Formulas, Inc. v. Int'l Nutrition Co., 175 F. Supp. 2d 296 (D. Conn. 2001). A breach of contract claim generally does not constitute a CUTPA violation. See GE Capital Corp. v. DirecTV, Inc., 94 F. Supp. 2d 190, 204 (D. Conn. 1999) (citing Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1038 (2d Cir. 1995). CUTPA is not intended to give "corporations yet one more cause of action for their battle chests." GE Capital Corp., 94 F. Supp. at 205. "While such companies are not excluded from CUTPA's reach, their status cannot be ignored when analyzing whether a practice is unfair." Id.

2.     Trilegiant cannot point to any evidence that BP's actions offended public policy as established by the statutes or common law, or that they were immoral, unethical, oppressive or

unscrupulous.[4]  Apart from reciting the legal terminology typically used in relation to CUTPA

analysis, Trilegiant failed to prove any specific conduct on the part of BP that was unfair or

immoral.  Within its implied duty of good faith and fair dealing claim Trilegiant alleges that BP

"misrepresented its actions to Trilegiant and has wrongfully appropriated the Horizon Club

members by secretly transferring Club Members into the new program to avoid its ongoing

obligations to Trilegiant."  See id. at ¶ 38.  As discussed above, Trilegiant no longer had any

"ongoing obligations to Trilegiant" after Trilegiant's August 15, 2000 termination.  Additionally,

BP cannot be said to have "misrepresented" anything to Trilegiant.  There is no evidence

suggesting that BP ever made any false statements to Trilegiant.  Nor did BP have any obligation

to inform Trilegiant of its harmonization plans or its intentions to introduce its new product.  BP

had the absolute right to transition to its new program in the manner it chose - - Trilegiant had

terminated the Agreement.

     3.     Nevertheless, the evidence shows that on several occasions, BP *did* notify

Trilegiant of its plans to discontinue the Program in order to offer its new card product.

(Exhibits 20, 30, 31, 44, 50.)  Mr. DuBoyce's communications to Nayr Iglesias on July 25, 2000

placed Trilegiant on notice of BP's intention eventually to discontinue and to offer a new

product.  (Exhibits 18, 20.)  One year later, on July 13, 2001, BP sent its notice of discontinuance

to Trilegiant in which it informed Trilegiant of its plans to end the program and to introduce its

new product.  (Exhibits 30, 31.)  On May 1, 2002, BP provided Trilegiant additional notice of its

intent to end the Program because it had "now developed and [was] marketing . . . [the] BP

MultiCard."  (Exhibit 44.)  BP sent its final notice to Trilegiant on May 15, 2002.  (Exhibit 50.)

---

     [4] Plaintiff's Complaint does not allege that BP's conduct caused substantial injury to
consumers or BP's competitors.

Thus, Trilegiant's allegations that BP "misrepresented its actions" and implemented its plans "secretly" are conclusory and unsupported by the evidence.

4.      Furthermore, where a contract exists, the plaintiff "is unlikely to prevail on a claim that conduct that was not even a breach of contract constituted an unfair trade practice." Wyatt Energy, Inc. v. Motiva Enters., LLC, 2002 Conn. Super. LEXIS 3995, *26 (Conn. Super., December 12, 2002).

5.      As previously discussed, BP discontinued the Program and launched its new card product in a manner consistent with the parties' expectations under the original Agreement, their course of dealings and their post-termination conduct.  Because BP's actions would have been proper even under the terms of the original Agreement BP's conduct was fair and equitable.

6.      At best, this case presents a legitimate dispute regarding post-termination rights to share in renewal revenue, an inherently contractual claim, such does not rise to the level of an unfair trade practice under any scenario.

E.      Tortious Interference With Contractual Relations

1.      The elements for tortious interference in Illinois are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages." Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 527-528 (7th Cir., 2003)

(quoting <u>HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.</u>, 131 Ill. 2d 145, 545

N.E.2d 672, 676, 137 Ill. Dec. 19 (Ill. 1989)).


2.      Trilegiant cannot satisfy the elements listed above because no contract existed

between Trilegiant and BP's cardholders.  Trilegiant had no separate independent legal

relationship with BP's card members.  Its only connection to the card members flowed from the

Horizon Agreement executed with BP.  But for BP, Trilegiant would have had no relationship

with the members.


4.      The Terms and Conditions does not constitute a contract or establish a business

relationship between Trilegiant and the cardholders because Trilegiant already had a preexisting

contractual duty by virtue of the Agreement to provide services to the card members.  <u>See</u>

<u>Contempo Design, Inc. v. Chicago & Northeast Ill. Dist. Council of Carpenters</u>, 226 F.3d 535,

550 (7th Cir., 2000) ("promising to perform a duty that already is owed under an existing

contract is not consideration").  Therefore, there was no consideration exchanged for the Terms

and Conditions.


5.      Additionally, the cardholders were not customers of Trilegiant, the service

provider, but rather of BP and Citi.  Potential card members applied for a BP-owned credit card.

As the issuing bank, Citi chose whether to extend credit to potential cardholders or to deny them

admission into the program.  Therefore, only Citi's[5] card member agreement ("Citi CMA")

contained the material terms constituting offer, acceptance and consideration between the card

member applicant and Citi as the credit-issuer. Trilegiant on the other hand, had nothing to offer

and no authority to decline a member's admission. Rather, under its Agreement with BP,

Trilegiant was already obligated to provide services to applicants once Citi accepted them into

the program. Once accepted, the applicant became the holder of a BP-owned credit card, the BP

Horizon card. If the customer paid the fees, membership status continued. If BP chose to

discontinue the program it could, without having to make any further payment to Trilegiant.


6.      Furthermore, Trilegiant cannot satisfy the fourth element for tortious interference

in Illinois because BP's cardholders could never be said to have "breached" the Terms and

Conditions because even the language of that document states that the cardholder can cancel

his/her membership at any time. Additionally, BP ended the program, not the cardholders.


### Were The Court To Apply Connecticut Law, BP States The Following:


7.      Trilegiant's claim for tortious interference fails because: (1) BP's conduct cannot

be considered tortious; and, (2) Trilegiant did not have a contractual relationship with Horizon

members nor a reasonable expectation that it would continue to receive profits from the

portfolio.


8.      The scope of wrongful conduct a defendant may be held liable for under CUTPA

is much broader than the type of tortious conduct contemplated by a claim for tortious

interference of contractual relations. See McKeown Distributors, Inc. v. Gyp-Crete Corp., 618 F.

Supp. 632, 644 (D. Conn. 1985). Although a plaintiff may show that the defendant's actions

---

[5] First USA's Card Member Agreement had the same effect for the BP Horizon Visa

equate to unfair conduct under CUTPA, such conduct must meet a higher level of wrongfulness for tortious interference.  See id.  Therefore, if the Court rules that BP's conduct did not satisfy the standard for wrongful conduct under CUTPA, BP cannot be held liable for tortious interference.  See id.

9.      As discussed in the previous section, Trilegiant cannot show that BP's actions amount to the level of unfairness required under CUTPA because BP owed no continuing obligation to pay Trilegiant renewal revenues after Trilegiant's termination.  And, BP placed Trilegiant on full notice of its intentions to ultimately discontinue the Horizon Program in order to introduce its new product.  Accordingly, Trilegiant cannot show that BP's conduct satisfies the higher standard of wrongfulness for tortious interference.  See id.

10.      "It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."  High-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27, 761 A.2d 1268 (2000).

11.      In order for a claim for tortious interference to succeed the plaintiff must "plead and prove at least some improper motive or improper means . . . A claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. . . This element of improper motive or improper means may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . .

Program.  See Exhibit 165.

. or that the defendant acted maliciously (citations and internal quotations omitted)." <u>Fenn v.</u> <u>Yale Univ.</u>, 283 F. Supp. 2d 615, 639 (D. Conn. 2003) (<u>quoting</u> <u>Blake v. Levy</u>, 464 A.2d 52, 55 (1983)) (<u>and</u> <u>citing</u> <u>Robert S. Weiss and Assoc., Inc. v. Wiederlight</u>, 546 A.2d 216, 223 (1988); <u>Golembeski v. Metichewan Grange No. 19020</u>, 569 A.2d 1157, 1159-60, cert. denied, 573 A.2d 320 (1990)). "Given the nature of competition, not all conduct that interferes with a business relationship is actionable." <u>Subsolutions, Inc. v. Doctor's Assocs.</u>, 62 F. Supp. 2d 616, 628 (D. Conn. 1999) (<u>citing</u> <u>Chem-Tek, Inc. v. General Motors Corp.</u>, 816 F. Supp. 123, 130 (D. Conn. 1993); <u>Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Serv. Co.</u>, 169 Conn. 407, 415, 363 A.2d 86 (1975) (recognizing that "fair and free competition is necessary to the economic life of a community, and one may, by legitimate means, interfere with a competitor's mere expectancy that his business relations will continue")). Thus, more than mere interference, the plaintiff must show that the defendant's conduct was in fact "tortious." <u>See</u> <u>Croslan v.</u> <u>Housing Auth.</u>, 974 F. Supp. 161, 167 (U.S. Dist. , 1997).

12.     In <u>McKeown Distributors, Inc. v. Gyp-Crete Corp.</u>, 618 F. Supp. 632 (D. Conn. 1985), the defendant was a supplier that entered into a distribution agreement with the plaintiff, a company that distributed goods to multiple customers. <u>See</u> <u>id</u>. Years later, the defendant terminated the agreement and notified each of the plaintiff's customers that the plaintiff was no longer its distributor. <u>See</u> <u>id</u>. The defendant then offered to distribute its product to the plaintiff's customers. <u>See</u> <u>id</u>. The defendant then began distributing to the plaintiff's former customers within the plaintiff's distribution territory. <u>See</u> <u>id</u>. In assessing the plaintiff's claims for unfair trade practices and tortious interference the Court found that because the defendant's termination was permissible under its agreement with the plaintiff, its actions did not satisfy the

type of unfairness or wrongfulness required for either claim.  See id.  The Court stated that the defendant's "sales of its products to willing customers after the lawful termination of the Agreement hardly can be characterized as fraudulent or malicious conduct."  Id.

13.    As previously discussed, BP's discontinuation of the program and enrollment of former Horizon customers to the BP MultiCard was consistent with the parties' understanding and would have been permissible under the terms of the Agreement.  Trilegiant had already terminated the Agreement and had no continued right to share in the renewal base thereafter.  BP also provided notice to Trilegiant of its plans to discontinue the program on several occasions.  Finally, Trilegiant never had any ownership rights to the card member portfolio.  Rather, under ¶ 15(c) of the Agreement, BP was completely free to discontinue the Program without compensating Trilegiant for any lost future revenue.  Therefore, BP's actions were fair and equitable and cannot be said to constitute "malicious" or "tortious" conduct.  The notion that these customer relationships were somehow a property right of Trilegiant is directly contradicted by 15(c) that allowed BP unilaterally to terminate the program and not pay Trilegiant a nickel.

14.    As discussed above, no "contractual or beneficial relationship" nor "business expectancy" existed between Trilegiant and the BP Horizon card members.  Trilegiant's only connection to BP's card members flowed from the Agreement executed with BP.  It had no separate independent legal relationship with the card members.  But for BP, Trilegiant would have had no relationship with members.

15.    The Terms and Conditions does not constitute a contract or establish a business relationship between Trilegiant and the cardholders because Trilegiant already had a preexisting contractual duty by virtue of the Agreement to provide services to the card members.  See

Gianetti v. Norwalk Hospital, 211 Conn. 51, 557 A.2d 1249, 1989 Conn. LEXIS 109 (1989)

("[c]onsideration is not adequate when it is a mere promise to perform that which the promisor is

already bound to do" (citation omitted)) (rev'd on other grounds).

16.    Additionally, as discussed in ¶ 4 above, the cardholders were not customers of

Trilegiant, the service provider, but rather of BP, the owner of the program and Citi, the bank

issuing credit to each member. Trilegiant no authority to decline a member's admission and had

a pre-existing duty under the Agreement to provide services to applicants once Citi accepted

them into the program. Once accepted, the applicant became the holder of a BP-owned credit

card, the BP Horizon card. Therefore, the Terms and Conditions had no legal effect and did not

establish any relationship between Trilegiant and the cardholder. If the customer paid the fees,

membership status continued. If BP chose to discontinue the program it could, without having to

make any further payment to Trilegiant.

17.    Finally, although "the existence of a contract is not a required element for liability

for tortious interference, the plaintiff nevertheless must prove that 'there was a reasonable

probability that the plaintiff would have made a profit.'" Dreamcatcher Software Dev., LLC. v.

Pop Warner Little Scholars, Inc., 298 F. Supp. 2d 276, 287 (D. Conn. 2004) (quoting Selby v.

Pelletier, 1 Conn. App. 320, 324, 472 A.2d 1285 (Conn. App. 1996)). A plaintiff cannot

"recover for an interference with a mere possibility of his making a profit. On the contrary,

wherever such a cause of action as this is recognized, it is held that the tort is not complete unless

there has been actual damage suffered." Heyman v. Kline, 344 F. Supp. 1110, 1116 (D. Conn.

1970). Here, Trilegiant could not have had any reasonable expectation that it would continue to

collect renewal revenues from the portfolio indefinitely because it had already terminated the

Agreement and further, because BP had the absolute right under ¶ 15(c) to terminate the

Agreement if it terminated the Horizon program.


F.    Unjust Enrichment

1.    In order to succeed on a claim for unjust enrichment, Plaintiff must show that:

"(1) [it] conferred a benefit upon the defendant; (2) the defendant had knowledge of the benefit;

and (3) circumstances render it unjust or inequitable to permit the defendant to retain the benefit

without compensating the plaintiff." Laurent v. Flood Data Servs., 146 Ohio App. 3d 392, 399,

766 N.E.2d 221 (Ohio App. 2001).


2.    The plaintiff must confer the benefit as a response to fraud, misrepresentation or

bad faith on behalf of the defendant.  See id. (citing National City Bank v. Fleming (1981), 2

Ohio App.3d 50, 58, 440 N.E.2d 590).


3.    Here, Trilegiant never conferred any benefit upon BP for which it was not

compensated.  Contrary to Plaintiff's assertion BP fully compensated Trilegiant for any of its

time, "marketing, administering and servicing the Horizon program and providing benefits to the

existing Horizon members."  Pursuant to Paragraph 3 of the Agreement, BP paid Trilegiant its

solicitation, fulfillment and administrative costs.


4.    Regardless, in the absence of fraud, mistake, duress, undue influence or illegality,

a party is not entitled to compensation on the ground of unjust enrichment "if [it] received from

the other that which was agreed between them the other should give in return." <u>Ullman v. May</u>,

147 Ohio St. 468, 477-78, 72 N.E.2d 63 (Ohio 1947).  In other words, a claim for unjust

enrichment is not valid where the parties exercised their rights under a contract. <u>Nelson Sand &</u>

<u>Gravel, Inc. v. Ring</u>, 2002 Ohio App. LEXIS 6230 (Ohio App. 8th Dist., November 22, 2002)

(citing <u>Ullman</u>, 147 Ohio St. at 478.)


5.     As discussed above, the parties performed their obligations in a manner consistent

with the terms of the Agreement.  After Trilegiant's termination, BP was free to transfer the

Horizon Program to a different vendor, service the Program on its own or discontinue the

Program entirely without any payment to Trilegiant.


6.     Accordingly, Trilegiant was not denied any benefit and BP was free to enroll

former Horizon members into its new program, in any manner it chose.  There was nothing

"unjust" about BP retaining the revenue stream from its new program because Trilegiant had

voluntarily abandoned its rights to program revenues by terminating the Agreement.

DEFENDANT,
BP PRODUCTS NORTH AMERICA INC.


By:_____
Steven M. Greenspan (ct00380)
Brian D. Porch, Jr. (ct23650)
One Canterbury Green
Stamford, CT 06901-2047
tel (203) 977-7300
fax (203) 977-7301
smgreenspan@dbh.com
bdporch@dbh.com
Its Attorneys

## <u>CERTIFICATION</u>

THIS IS TO CERTIFY that a copy of the foregoing was mailed this 2nd day of July, 2004, via U.S. regular mail, postage prepaid, to

Robert P. Dolian
M. Julie Bonazzoli
Cummings & Lockwood LLC
Four Stamford Plaza
107 Elm Street
Stamford, CT 06902

_____
Brian D. Porch, Jr.