UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

TRILEGIANT CORPORATION,               )
                                      )
                    Plaintiff,        )
                                      )
        v.                            ) Civil Action No.: 3:02 CV 2237 (MRK)
                                      )
BP PRODUCTS NORTH AMERICA, INC.       )
                                      )
                    Defendant.        )

EXPERT REPORT OF
ALAN A. SCHACHTER, MBA, CPA.ABV, CVA, CFE, DABFA
WILLAMETTE MANAGEMENT ASSOCIATES
March 16, 2004

## 1.0    INTRODUCTION

### 1.1    Identification of Parties and Background

The parties to this action are Trilegiant Corporation ("Trilegiant") as Plaintiff and BP Products North America, Inc. ("BP") as Defendant.

On September 19, 2003, Trilegiant filed an Amended Complaint that alleged breach of contract for failure of BP to pay to Trilegiant profits generated by the BP Horizon Club Program.[1]

On August 3, 1992, SafeCard Services, Inc., as predecessor-in-interest to Trilegiant, entered into an agreement (the "Agreement") with BP. The Agreement set forth the terms for a business relationship under which Plaintiff would market the BP Horizon Card Program (the "Horizon Club") to existing and potential new credit card customers of Defendant.[2]

Trilegiant Corporation is a subsidiary of Cendant Corporation ("Cendant").[3]    Trilegiant provides consumers with a variety of membership programs offering discounted products and services in such areas as retail shopping, auto, dining, home improvement and credit information.[4]

BP Products North America is a petroleum refining and distribution company.

The Agreement provided that Trilegiant would use its expertise and capabilities to market and provide Horizon Club services. The Horizon Club provided a number of benefits to its members:[5]

      a.  A 20% rebate on oil changes;
      b.  A travel reservation service with 5% travel rebates;
      c.  Emergency cash;
      d.  Emergency airline tickets;
      e.  Common carrier life insurance;
      f.  Emergency message service;
      g.  Credit card protection;
      h.  Document registration;
      i.  Lost key return service; and
      j.  Car rental discounts.

The Agreement provided that BP and Trilegiant would share in the "Profits" (Profits is defined in the Agreement).[6]  According the terms of the Agreement, BP would receive

---

[1] Trilegiant v. BP Amended Complaint.
[2] Ibid.
[3] Cendant Corporation Form 10-K December 31, 2003, page 3.
[4] Cendant Corporation Form 10-K December 31, 2003, page F-19.
[5] Agreement, Exhibit B.

57.5% of the Profits and Trilegiant would receive 42.5% of the Profits. Profits are calculated as gross program sales, less cancellations, credits and refunds, less the total of the following pre-established costs[7]:

    a.  Solicitation Costs, representing, in the case of solo mailings, creative design, postage, printing and production of mailing materials, etc., and in the case of pre-screened mailings, list and credit bureau costs;

    b.  Trilegiant's Cost of Service, defined as the costs of providing the various program services. This Cost of Service is equivalent to the "Service Fee" in the Hilinski Analyses (defined below); and

    c.  Trilegiant's Cost of Fulfillment, a one-time cost of $1.75 per new-enrollment.

The business relationship BP formed with Trilegiant was for an initial term of one year. Thereafter, the Agreement would be extended on a year-to-year basis, provided that either party may terminate the Agreement by giving written notice to the other not less than ninety days prior to the expiration of the initial term or any subsequent annual extension.

On or around March 19, 1996, BP and Trilegiant amended the Agreement to provide that BP would receive 63.5% of Profits and Trilegiant would receive 36.5% of Profits.[8]

On October 27, 1999, Trilegiant gave notice of its intent to terminate the Agreement effective August 15, 2000.[9]

From August 15, 2000 through June 2002, Trilegiant continued to administer the Horizon Club.[10]

## 1.2   Engagement Overview

I have been engaged by the law firm of Day, Berry & Howard, LLP to provide an expert report rebutting the damage analysis issued by Greg Hilinski on August 22, 2003, and revised on October 6, 2003, in relation to alleged economic losses suffered by Trilegiant as a result of the alleged failure of BP to perform under the Agreement. In addition, I have been asked to calculate alleged damages utilizing the methodology described in Section 2 below.

In addition to the opinions expressed in this report, I may be asked to render additional opinions in a either a supplemental report, at deposition, or upon further discovery, review and analysis on our part, or in response to the reports or testimony of Plaintiff's expert(s).

---

[6] Agreement page 2.
[7] Agreement page 2.
[8] Amended Complaint at 19.
[9] Amended Complaint at 20.
[10] Amended Complaint at 22, and discussions with counsel.

### 1.3    Information Considered and Relied Upon

In preparing my opinion and analysis, I relied upon the documents listed in Exhibit II of this report.

### 1.4    Assumptions and Limiting Conditions

Certain analyses in this report are based upon information produced in discovery and/or provided by counsel that I assume to be true and accurate.

The damages calculation is based on a number of assumptions utilized by Hilinski which are as of yet unsubstantiated, and for which I have no supporting data, including but not limited to:

- Base period revenues,
- Number of members,
- Attrition rates, and
- Servicing expenses.

My calculations are predicated on the assumptions that alleged breach of contract actually occurred and that these assumptions utilized by Hilinski are correct.

As is customary in this type of engagement, I will continue to review my analysis and consider any additional information received subsequent to the date of this report. I reserve the right to supplement my report as necessary. I may also provide further testimony on damages in response to additional work performed by Plaintiff's expert(s).

### 1.5    Statement of Independence

My fees for this engagement are based on my firm's standard hourly rates and are not contingent upon the outcome of this case. Neither Willamette Management Associates nor I have a present or contemplated future interest in any of the parties to this matter.

## 2.0   ANALYSIS OF ECONOMIC DAMAGE

On August 22, 2003, Trilegiant filed a damage analysis issued by Mr. Greg Hilinski (the "First Hilinski Analysis"), represented by bates numbers TRI 2005106 – TRI 2005141, related to the estimated damages suffered by Trilegiant as a result of BP's alleged breach of the Agreement.[11]   The First Hilinski Analysis calculated total damages of $2,730,026 using a 10-year period, and $2,970,923 using a 20-year period.

On October 6, 2003, Trilegiant filed a supplemental expert disclosure updating the analysis prepared by Hilinski.[12] This analysis, represented by bates numbers TRI 2005707 – TRI 2005757 (the "Revised Hilinski Analysis"), contains calculations indicating damages to Trilegiant of $2,602,766 over a 10-year period, and $2,832,141 over a 20-year period.  (The Hilinski Analysis and the Revised Hilinski Analysis are hereinafter referred to collectively as the "Hilinski Analyses.")

On January 15, 2004, additional information prepared by Hilinski was provided to Day, Berry & Howard, LLP (TRI 2005707 – TRI 2005775).

At the request of counsel, I examined the Hilinski Analyses.  My analysis included consideration of factors such as the assumptions, inputs, and methodology utilized by Hilinski.  With respect to the Hilinski Analyses, it is my opinion that its conclusion as to the level of damages is inflated and unsupportable.

At the request of counsel, I have recalculated alleged damages using alternative assumptions to those used in the Hilinski Analysis.  I have accepted a number of assumptions as used by Hilinski, while for others I utilized alternatives to Hilinski's assumptions based on my own professional judgment and/or materials produced in discovery.  For the purpose of this analysis, and for this purpose only, I adopted the input data used in the Hilinski Analyses regarding Horizon Club base period revenues, rates of customer retention, and other inputs affecting the ultimate Hilinski damages claim.

My analysis of the assumptions in the Hilinski Analyses, and the extent to which I have adopted them, follow below.

Subject Entities
The Hilinski Analyses calculate damages separately for two components of the Horizon Club Program, the BP Horizon program (referred to as BP Oil Fee Card, #19 in the Hilinski Analyses) and the BP Visa Horizon program (BP Visa Fee Card, #419).[13]   The results of the two analyses are then added together to calculate total damages.  I have accepted Plaintiff's use of these programs, although the Amended Complaint only refers to

---

[11] Plaintiff's Supplemental Expert Disclosure, October 6, 2003
[12] Ibid.
[13] The Hilinski deposition discusses the two programs on pages 74-78 without discussing the composition of either program.

4

the BP Horizon Card Program as a single entity, and I have no independent verification of what individual components might comprise the BP Horizon Card Program.[14]

Revenues and Number of Members
The Hilinski Analyses use as a starting point the "gross billings" for each month for the period June 2001 through May 2002 (the "base period").  [15]  I have no way of knowing whether this revenue data contains any other revenues in addition to membership fees.  I have accepted and utilized this assumption, though this data is unsubstantiated and I have no backup data.

Hilinski then applies a "cancel rate," or attrition rate, to each respective month of the base period to arrive at projected revenues for June 2002 through May 2003.  Revenues for year subsequent to June 2003 are reduced by the identical cancel rate throughout the 20-year period.  Therefore, any inaccuracies and/or discrepancies in the data for the base period would be replicated throughout the 20-year period of the Hilinski Analyses.

Hilinski then determines the number of members in each program each month by dividing the resultant total revenues for the month by the $25 annual fee for each member.  This is an unusual approach regarding a business operation where membership is the most important aspect of the business, and for which one would expect that the actual number of members each month would be readily available and used as the basis of an analysis such as Hilinski has performed.

Cancel Rate
The Hilinski Analyses use a cancel rate that assumes that the number of members who pay membership fees each month is based on the number of members one year earlier, reduced by an attrition rate that is calculated separately for each of the two programs.[16]  The cancel rate applied to #19, BP Oil Fee Card, is 17.08%, and the cancel rate applied to #419, BP Visa Fee Card, is 18.48%.  The use of an attrition assumption seems reasonable when applied over a relatively short projections period.  This assumption becomes speculative when applied over a 10- to 20-year period, since it is uncertain that recent membership patterns will replicate over such a long period given expected changes in business and the economy in general.  The Revised Hilinski Analyses modify the attrition calculation, applying a methodology described as a "cancel curve," but without explanation in the Plaintiff's Supplemental Expert Disclosure dated October 6, 2003.

There are a number of reasons to question the credibility of the cancel rate utilized by Hilinski.  One reason is that the new BP Multicard has better benefits.[17]

Another factor is that the cancel rate used by Hilinski for the Visa Fee Card, 18.48%, is higher than the rate used for the Oil Fee Card, 17.08%.  This is inconsistent with industry trends, which show that specialized, non-credit cards such as the Oil Fee Card have been

[14] Amended Complaint ¶5.
[15] Hilinski deposition, page 83.
[16] Hilinski deposition, page 68.
[17] Based on telephone conversation with Ellen Best on March 15, 2004.

5

declining in popularity compared to credit cards such as the Visa Fee Card.[18]   Therefore, one would expect the Oil Fee Card to exhibit a higher cancel rate.

A document produced in discovery dated April 3, 2001 indicates that "There are currently approximately 90,000 Horizon members."[19]   This suggests that as of that time, approximately 90,000 members paid membership dues over the previous 12 months.  The Hilinski Analyses estimate that over the base period, the twelve month period from June 2001 through May 2002, that 58,861 Horizon Club members paid membership dues.  This represents a decline of approximately 34.6% over this period.

The aforementioned issues raises further questions as to the reliability of the cancel rates utilized by Hilinski.  Because I have no other information, I have accepted the assumptions used by Hilinski, though I have no verification or backup data.

Time Period
The Hilinski Analyses use a starting point of June 2002, and calculates alleged damages for a period of twenty years through May 2022.  The selection of a twenty-year period ending in May, 2022 is clearly arbitrary.  In fact, Hilinski indicated that he almost always uses a shorter period for projections:

> "The methodology – we will normally for new marketing campaigns, we will normally use a five year discounted cash flow."[20]

Hilinski then indicates that in connection with a five year period, "That is our company standard."[21]   Common sense dictates that trying to determine how many current members of an oil company membership card program will still be members ten, fifteen, or twenty years from now is clearly an exercise in speculation rather than a carefully thought out statistical analysis.  The Hilinski Analyses fail to take into account a number of factors that would subject projections of membership in these programs to significant risks, including but not limited to the age of members, demographics, competition, customer satisfaction, and life expectancy.  The level of risk inherent in the use of such a long time period is also a factor in the selection of an appropriate discount rate, which is discussed below.

In addition, the manner in which Hilinski applied the discount rate to this time period is incorrect.  He applies no discount factor to the first month of projections, June 2002, which suggests that the profits generated that month were a certainty.  I have applied the discount rate discussed below to the first month as well as to all successive monthly, resulting in a calculation of damages as of May 31, 2002 (the "valuation date").   In addition, I have applied a "mid-month" discounting convention.  This reflects the fact that profits are generated throughout each month, as opposed to the Hilinski Analyses, which

---

[18] Based on telephone conversation with Ellen Best on March 15, 2004.
[19] BP Private Label – Program Request Form – BP Fee Card Program Harmonization and Card Reissuance (BP 0558)
[20] Hilinski deposition page, 13.
[21] Hilinski deposition page, 14.

assume that every dollar of profit for each month is received on the final day of each month.

Service Fee

The Hilinski Analyses subtract a "Service Fee" from the net revenue stream. The Service Fee represents payments to Trilegiant for providing service to members of the Horizon Club, including the oil rebate component of the Horizon Club services.

This Service Fee is apparently based on the "Cost of Service" described in §3.b of the Agreement, which reads in pertinent part:

> "Said Cost of Service is defined as the costs of providing the various Program services (as enumerated in Exhibit B) to Members, and administration of the Program. Said Cost of Service will be $4.15 per paid Program member (net of cancellations) per year for the service package set forth in Exhibit B."

The next paragraph, addressing the issue of the oil rebate, reads in pertinent part:

> "The Program includes a service feature of a "20% rebate on oil changes" as described in Exhibit B. While the parties believe that the estimate cost of $2.24 per member per year for this feature is reasonable, they have no way of predicting with any degree of certainty what the actual cost will be…the parties agree to examine this feature after one year (and periodically thereafter) and, if the actual cost of providing it is more than ten percent (10%) less than or greater than $2.24, then the parties will either adjust the cost to the actual cost or eliminate or modify it."

Documents produced in discovery, however, indicate that the estimated cost for Trilegiant to provide this oil rebate benefit to members was 14¢[22], not the $2.24 estimated in the Agreement. It is apparent to anybody who examines this data that the 94% difference between the estimated and actual costs of providing this service is considerably greater than the 10% differential threshold that would cause the parties to either adjust, eliminate or modify this cost.

Hilinski, in contrast, rather than reducing the oil change estimate of $2.24 to either the 14¢ or 17¢ estimate shown in internal documents, apparently adds the 17¢ figure to the original estimate of $4.15, and uses $4.32 as the cost of the service fee per member.[23]

---

[22] BP Horizon Service Cost Assumptions (TRI 2005775); also BP Summary (TRI 2005784). It should be noted that there is also at least one document (TRI 2005142) showing a 17¢ cost for the oil change program, but since this number is a handwritten change on correspondence, it seems less reliable than the 14¢ figure, for which supporting assumptions are shown.
[23] Plaintiff's Supplemental Expert Disclosure, page 2. Also, Hilinski deposition, page 87, indicates that the $4.32 figure came from "That was taking the contract price of $4.15 and adding on to that the 17 cent benefit for an oil change reimbursement."

For my own calculations, I have subtracted the estimated $2.24 cost of providing the oil rebate service from the $4.15 total service fee estimate. I then added back 14¢, representing the actual cost of providing the service based on internal Trilegiant documents, resulting in a total service fee of $2.05 per member (see Exhibit VI).

Expense of Servicing
The Hilinski Analyses subtracts a "Expense of Servicing" of $0.71 per member per year, described as "...the cost of servicing one member for one year."[24] Hilinski called this expense "...the approximate cost of the benefits – the benefits that would be supplied to a member."[25] It is significant to note that calculations of this amount shown on documents produced in discovery include an oil rebate cost per member per year of $0.14.[26]

Discount Rate
The Hilinski Analyses use a discount rate of 5% to calculate the present value, apparently as of June 30, 2002, of Trilegiant's alleged lost profits. This rate is lower than the 5.65% interest rate on 20-year U.S. treasury bonds at that time, and is offered without any explanation or support.

A discount rate is used to determine a single present value of a stream of future benefits, in this case a stream of projected profits to Trilegiant from the Horizon Club. The results of this exercise are generally known as a "discounted cash flow" (DCF) analysis.

The most generally accepted measure of the discount rate contains two components: the risk-free rate ($r_f$), and the risk premium ($r_p$). The risk-free rate represents the expected return on an investment in a future stream of cash flows that contains virtually no risk to the investor. The best measure of the risk-free rate is the total rate of return available on U.S. government bonds of a similar duration as the future income stream in question. The risk premium reflects the additional risk inherent in a projected stream of benefits more uncertain that those derived from U.S. government securities. This additional risk reflects a number of factors, including business risk, company size, and other market, industry, company and investment-specific factors. The company- and investment-specific factors, which may either raise or lower the measure of the investment's risk, include competitive position, technological factors, and other specific risk factors affecting the business. A low discount rate reflects a very high likelihood that future profits and/or cash flows will be achieved; correspondingly, a high discount rate reflects a high degree of uncertainty that future profits and/or cash flows will be realized.

The 5% discount rate used in the Hilinski Analyses in effect treats the projected profits of the Horizon Card program as a sure thing, as certain and reliable as getting paid interest on a U.S. Treasury bond. This is, of course, a completely erroneous assumption. The use of a 5% discount rate, rather than a proper risk-adjusted discount rate, greatly exaggerates and distorts, without factual or financial basis, the present value of any alleged lost profits.

---

[24] Plaintiff's Supplemental Expert Disclosure, page 2.
[25] Hilinski deposition, page 89.
[26] TRI 2005786.

In deposition, Hilinski indicates that "A discount rate is generally a percentage applied to future cash flows to take into consideration either a risk profile or time value of money…"[27] Yet, Hilinski utilized a discount rate that indicated a lower level of risk even than U.S. treasury obligations. Although the discount rate is one of the most important inputs into an expert opinion, Hilinski didn't develop a discount rate, but utilized one supplied by his firm's Cheyenne accounting office, and indicated that he didn't discuss this discount rate with anyone.[28]

In fact, Hilinski indicated that Trilegiant recently used a discount rate of 20% in determining the feasibility of a product.[29] Hilinski also indicated that 20% is the standard discount rate used at Trilegiant, and has been used "for the most part" in every discounted cash flow analysis that his group has been involved in since approximately 1999.[30]

Exhibit VII presents the calculation of the present value discount rate that is appropriate to apply to the projected net cash flow in the DCF method. To estimate the appropriate present value discount rate to apply to the projected Profits of the Horizon Club, I estimated the appropriate cost of capital.

The cost of capital in a financial sense is the minimum rate of return an investment should yield in order to provide the required rate of return to all sources of capital: (1) common equity; (2) preferred equity; and (3) long-term debt.

For consistency purposes, I have identified the component costs of capital by the following symbols throughout this discussion:

$kd$ = after-tax component cost of debt capital
$ke$ = component cost of equity capital
$ka$ = weighted-average cost of capital

The cost of debt capital, $kd$, is the company's marginal cost of debt. Trilegiant's cost of debt as of the valuation date is estimated based on parent company Cendant's levels of interest expense as compared to profits. This cost of debt is then adjusted to place it on an after tax basis consistent with the cost of equity below.

A company's cost of equity capital, $ke$, is the expected (or required) rate of return on the company's common stock. The company must be expected to earn $ke$ on the equity portion of its investments to keep the price of its stock from declining. There are several generally accepted methods for calculating the cost of equity capital. I used the "build-up" approach in my analysis.

The build-up approach is a "bottom-up" approach that builds a rate of return on equity capital using (1) a risk free rate of return, plus (2) empirical evidence of equity rate of

---

[27] Hilinski deposition, page 8.
[28] Hilinski deposition, page 31-32.
[29] Hilinski deposition, page 21.
[30] Hilinski deposition, page 23.

9

return data found in the Ibbotson Associates publication, Stocks, Bonds, Bills and Inflation – 2003 Yearbook (SBBI), plus (3) a component representing risk specific to the subject business.

As of June 1, 2002, the yield on the 20-year U.S. Treasury bond was 5.65 percent. Accordingly, I used 5.65 percent as the risk-free rate in my analysis.

The empirical evidence in SBBI includes a long-term equity risk premium, which represents the incremental rate of return realized on large capitalization common stocks in excess of the risk free rate, based upon evidence for the period from 1926 to 2002. I used a long-term equity risk premium of 7.0 percent in our analysis. In addition I have included adjustments in order to factor in risk associated with the size of the subject business interest as well as the overall unsystematic risk associated with businesses in this industry. SBBI's evidence supports a 4.7 percent adjustment for businesses similar in size to the Horizon Club, reflecting the extra risk indicated by businesses of this size as compared to the broader market in general. I also felt a specific risk premium of 5.0 percent for the unsystematic risk inherent in the projections of future profits from the Horizon Club was necessary.

The calculation of the cost of equity capital specific to the Horizon Club is presented in Exhibit VII. Based on the evidence described above, I estimated a cost of equity capital equal to 22.35 percent.

As discussed previously, capital structure includes an interest-bearing debt component. Therefore, I determined that the appropriate present value discount rate should be determined by weighting both the cost of equity and the cost of debt capital by the percentages indicated by industry data. I have utilized capital structure based on Cendant's actual capital structure for 2002, giving 64 percent of the weight to the cost of equity capital and 36 percent to the cost of debt capital,[31] I estimated the weighted average cost of capital to be 16 percent (rounded).

My calculations of alleged damages, which do not express my opinion that there were any damages sustained but are hypothetical only, are summarized in Exhibit V.

---

[31] Cendant Corporation Form 10-K December 31, 2002, page 62.

## 3.0    CALCULATION OF DAMAGES

Total damages were calculated on the basis of projected results "but for" the alleged breach.  My damage calculation equals:

| | |
|---|---|
| 5-year period .............................................. | $ 1,465,000 |
| 10-year period ........................................... | 1,720,000 |
| 20-year period ........................................... | 1,773,000 |

## 4.0    CONCLUSION

It is my opinion, based on the investigation and analysis discussed in this report, that maximum alleged damages are set forth below, which could be further reduced by the various factors set forth in this report.

| | |
|---|---|
| 5-year period .......................................... | $ 1,465,000 |
| 10-year period ........................................ | 1,720,000 |
| 20-year period ........................................ | 1,773,000 |

**Exhibit I**

## ALAN A. SCHACHTER, CPA·ABV, CVA, CFE
*Curriculum Vitae*

## PROFESSIONAL HISTORY

- Willamette Management Associates, Principal, 2003 – Present
- Centerprise Advisors Litigation & Valuation Services, Managing Director, Litigation, 2001 – 2003
- Scillia, Dowling & Natarelli, CPAs and Advisors, Managing Director, 2001 - present
- Urbach Kahn & Werlin, Shareholder, Litigation, 1989 – 2000
- Schachter & Co., Owner, 1979 - 1989
- Schachter & Horan, Partner, 1974 – 1979
- Lester Witte & Co., Partner, 1969 – 1974
- H. A. Schachter & Co., 1967 – 1969
- Peat Marwick Mitchell & Co., 1966 – 1967
- H.A. Schachter & Co., May 1965 – Dec. 1965

## *EDUCATION*

- MBA, Pace University, 1972
- Advanced Certificate of Taxation, Pace University, 1987
- B.S. Economics, Wharton School, University of Pennsylvania, 1965

## PROFESSIONAL DESIGNATIONS

- Certified Public Accountant, New York, 1969 -- present
- Certified Public Accountant, Connecticut, 2001 – present
- Certified Fraud Examiner, 1993 – present
- Certified Valuation Analyst, 1997 – present
- Diplomate, American Board of Forensic Accounting, 1997 – present
- Medicare Hearing Officer, 1979 – 1986
- New York State Department of Health Approved Receiver, 1986 – present
- Accredited in Business Valuation, AICPA, 1998 – present

## MEMBERSHIPS & CHAIRMANSHIPS

- Special Consultant to New York State Department of Taxation and Finance, Office of Tax Enforcement, 1996 – 2000
- Member, American College of Forensic Examiners, 1997 – present
- Member, American Institute of Certified Public Accountants, 1969 – present

## MEMBERSHIPS & CHAIRMANSHIPS (Continued)
- Member, New York State Society of Certified Public Accountants, 1969 – present
- Member, Connecticut Society of Certified Public Accountants, 2001 – present
- Chair and Member, Litigation Support Committee of New York State Society of CPAs, 1992 – 1998
- Health Care Financial Management Association, 1970 – 2000
- Member, Institute of Business Appraisers, 1992 – present
- Member, National Association of Certified Valuation Analysts, 1997 – present
- American Academy of Matrimonial Lawyers:  Financial Services Committee, 1992 – 1996
- New York State Department of Health RUGS Advisory Committee, 1984 – 1987
- Member, The Regional Bar Association, 2001 – present
- Member, The Southwestern Area Commerce & Industry Association of Connecticut, Inc. (SACIA), 2001 – present

## CONFERENCES & SPEAKING ENGAGEMENTS

Lectures regarding business valuation and damage claims before the following organizations:
- National Health Lawyers Association – Legal Accounting Defense Team, 1984
- New York State Society of Certified Public Accountants – Various Seminars on Valuation of Closely Held Businesses and Litigation Support Topics, 1992 – 1998
- New York State Bar Association – Various Valuation Seminars, 1992 – 1999
- Health Care Financial Management Association – Valuation of Health Care Facilities, 1994
- American Institute of Certified Public Accountants and Illinois CPA Foundation – Engagement Approach to Researching, Evaluating and Understanding the Company, 1995
- New York State Supreme Court Justices - Valuation of Businesses and Professional Practices, 1996
- Association of the Bar of the City of New York – New York State Tax Amnesty Act, 1997
- Brooklyn Bar Association – Valuation of Closely Held Businesses, 1997
- Gerontology Institute – Nursing Home Fraud & Abuse and Corporate Compliance, 1998
- State & Local Government Benefits Association – Detecting Health Care Fraud and Abuse, 1998
- The American College of Health Care Administrators, New York Chapter – Corporate Compliance Programs and Enforcement Initiatives in Health Care, 1998

## CONFERENCES & SPEAKING ENGAGEMENTS (Continued)

- Practicing Law Institute -- Basic Accounting for the General Practitioner, 1999 – 2002
- The Center to Promote Health Care Studies, Inc. – Fraud and Abuse, Corporate Compliance and Revenue Recognition, 2000
- New York State Health Facilities Association -- Nursing Home Corporate Compliance Plans, 2001
- Connecticut State Bar Association – Valuation of Intellectual Property, 2002
- The Regional Bar Association/Family Law Section – Valuation of Intellectual Property, 2002
- Quinnipiac Law School -- Compliance Workshop for Meeting HIPAA 2000 Regulations, 2002
- Connecticut Society of Certified Public Accountants – Valuing a Professional Practice, 2002
- Massachusetts Society of Certified Public Accountants Conference -- Developing Niche Practices, 2002
- Critical Issues in Electronic Discovery, 2003

## PUBLICATIONS

- "Preindictment Strategy for the Attorney-Accountant Defense Team in White Collar Fraud Cases," Criminal Law Journal, 1979
- "The Role of the Legal Accounting Defense Team," American Law Reporter, 1982
- "Role of the Investigative Accountant," *Handbook of Financial Planning for Divorce and Separation*, 1988
- *Fraud in the Health Care Industry: The Auditors Responsibility Under SAS 82*, American Institute of Certified Public Accountants (publication and video), 1998
- "Applying Basic Business Valuation Techniques to a Specialized Business (Ocean-Going Tankers)," Encyclopedia of Matrimonial Practice, 1991
- "The Investigative Accountant and Confidentiality in a Criminal Tax Fraud Investigation," The CPA Journal, 1993
- "Innocent Spouse Considerations for Parties Contemplating a Joint Return," NYS Society of Certified Public Accountants, 1994
- *Corporate Compliance Plans for Health Care Providers*, American Institute of Certified Public Accountants, 2000
- "The Investigative Accountant and Confidentiality in a Criminal Tax Fraud Case," Journal of Construction Accounting & Taxation, 2002

**EXHIBIT II**

**INFORMATION CONSIDERED AND RELIED UPON**

1. Amended Complaint, dated October 6, 2003
2. Agreement dated August 3, 1992
3. Plaintiff's Supplemental Expert Disclosure dated October 6, 2003
4. SBBI 2003, Ibbotson Associates
5. The Wall Street Journal
6. Deposition of Greg Hilinski October 27, 2003
7. Analyses prepared by Greg Hilinski (TRI 2005106 – TRI 2005141, TRI 2005707 – TRI 2005757, and TRI 2005758 – TRI 2005774)
8. BP Summary (TRI 2005876, TRI 2005784)
9. Draft of letter dated December 13, 1993 to Kathy Thompson at BP Oil (TRI 2005142)
10. BP Horizon Service Cost Assumptions (TRI 2005775)
11. Cendant Corporation Form 10-K December 31, 2002
12. Telephone conversation with Ellen Best, March 15, 2004
13. BP Private Label – Program Request Form – BP Fee Card Program Harmonization and Card Reissuance (BP 0558)