UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRILEGIANT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. NO: 3:02 CV2237 (MRK) |
| | ) | |
| | ) | |
| BP PRODUCTS NORTH AMERICA, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | August 13, 2004 |

**PLAINTIFF'S SUPPLEMENTAL BRIEF**

The Plaintiff, Trilegiant Corporation ("Trilegiant"), by and through its attorneys, Cummings & Lockwood, LLC, respectfully submits this Supplemental Brief in support of its position that the 1992 Agreement between BP and SafeCard Services Inc., (the "Agreement"), permits Trilegiant to share in post-termination revenues from the jointly created Horizon Program (the "Program"), even where Trilegiant terminated the Agreement. In support thereof, Trilegiant states the following:

I.   **THE PLAIN LANGUAGE OF THE AGREEMENT DEMONSTRATES THAT THE PARTIES INTENDED TO SHARE PROGRAM REVENUES BOTH DURING AND AFTER ITS TERM**

Based on the Agreement as a whole, it is clear that the parties intended that the Program would continue post-termination and its revenues be divided. Contrary to BP's assertions, the Agreement is replete with provisions that clearly recognize this right.

It is a fundamental principle in contract construction that contracts should be interpreted "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." Skivolocki v. E. Ohio Gas Co., 38 Ohio St.2d 244, 313 N.E.2d 374 (1974). The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement. Blosser v. Enderlin, 113 Ohio St. 121, 148 N.E. 393 (1925); Kelly v. Med. Life Ins. Co., 31 Ohio St.3d 130, 509 N.E.2d 411 (1987). When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties. Shifrin v. Forest City Enterprises, Inc., 64 Ohio St.3d 635, 597 N.E.2d 499 (1992).

However, both the Restatement (Second) of Contracts and Ohio common law adhere to the principle that a contract should be construed **as a whole** and the intent of each part gathered from a consideration of the whole. Foster Wheeler Enviresponse, Inc., v. Frankiln County Convention Facilities Authority, 78 Ohio St. 3d 353, 678 N.E.2d 519 (1997); Restatement (Second) of Contracts § 202(2); see also 18 Ohio Jurisprudence 3d Contracts § 120 (2004) ("individual provisions of a contract are not to be read in isolation, but as part of the contract as a whole"). Otherwise, abstract interpretation, devoid of context, will result. See e.g., *Corbin on Contracts*, Vol. 5 §24.1 p. 246 (2003), citing, Schenck v. HJI Assocs., 295 N.J. Super 445, 684 A.2d 481 (1996) ("the court should avoid interpreting the contract in a way that would give literal sense of particular terms, isolated from context, ascendancy over the reason and spirit of the whole of the contract, assessed in relation to the circumstances and situation of the parties and the objects they were striving to obtain").

In this instance, the parties clearly intended that the Program would endure post-termination and that its revenues would continue to be shared. First, the recitals of the Agreement separately define "Program" and "Agreement". The recitals "are frequently intended to … shed light on the circumstances the parties wished to have considered in the interpretation of the main body of the contract." *Farnsworth on Contracts*, p. 469 § 7.11 (1996). Here, the separate definitions applied to each demonstrates that the parties always considered the two as distinct.

Second, reading the Agreement as a whole, the parties contemplated the Program continuing after the Agreement's termination. Some examples of this language follow:

- ¶ 3d:  Monthly reconciliations required during **and after** the term of the Agreement. (emphasis added).
- ¶ 9:  BP's duty to pay SafeCard continues as long as there are Program revenues.
- ¶ 15a:  BP's right to solicit for new members of the Program after termination of the Agreement.
- ¶ 15b:  SafeCard's relinquishing of rights to Program renewal revenues after termination of the Agreement by BP for SafeCard's material breach. (i.e., Program can continue where BP is the party that exercises right to terminate.)
- ¶ 15c and d:  BP's option to terminate or continue the Program after its termination of the Agreement.
- ¶ 15e:  SafeCard's right to renewal revenues after its termination of the Agreement for BP's material breach. (i.e., Program can continue where SafeCard exercises right to terminate.)

Similarly, when read as a whole, the Agreement also clearly recognizes Trilegiant's right to renewal revenues:

- ¶ 3d: Reconciliations and payments in accordance therewith (i.e., dividing of profits) required "on a monthly basis during **and after** the term of this Agreement." (emphasis added).
- ¶ 9: BP's duty to remit monies to SafeCard monthly continues as long as there were billing charges for the Program. (i.e., as long as Program continues.)
- ¶ 15b: SafeCard's material breach causes it to "relinquish its **right** to further renewal revenues." (emphasis added).
- ¶ 15c: BP's termination of "the Program altogether" relieves it of its "**obligation** to SafeCard for renewal revenues." (emphasis added).
- ¶ 15d (i) and (ii): If the Program continues after BP's termination, SafeCard continues to have right to renewal revenues, **even if it is no longer the servicer**.
- ¶ 15e: SafeCard's **right** to renewal and servicing revenues continues after termination of the Agreement for BP's material breach.
- Moreover, **no termination provision nor any other provision in the Agreement** contemplates that the Program will terminate upon the termination of the Agreement.

Based on the above, it is apparent that both Trilegiant and BP intended that if the Program continued after termination of the Agreement, then its revenues had to be shared. Indeed, the only provisions in the Agreement relieving BP of its obligations to share revenues with Trilegiant required (1) a material breach of the Agreement by

4

Trilegiant or (2) BP's termination of the Agreement and of the Horizon Program "altogether." ¶¶ 15(b) and 15(c). There is no dispute that neither of these events ever occurred, at least not prior to June 2002. Further, none of the Agreement's termination provisions (whether at BP's instigation or Trilegiant's) permitted Trilegiant, at its option, to stop servicing the Program. ¶ 15. Taken together then, all of the Agreement's provisions clearly point to the parties' intention that Trilegiant share in post-termination revenues unless Trilegiant either materially breached the Agreement or BP terminated the Agreement and Program altogether. Since neither occurred, the Court must give effect to the parties' mutual intent to share revenue from the ongoing Program. <u>Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.</u>, 86 Ohio St. 3d 270, 714 N.E.2d 898 (1999).

## II. IF AMBIGUITY EXISTS, THE COURT MAY CONSIDER EVIDENCE OUTSIDE THE AGREEMENT, INCLUDING COURSE OF PERFORMANCE

If the Court believes the Agreement is ambiguous regarding Trilegiant's post-termination rights, the Court may consider evidence outside of the Agreement to ascertain the parties' intent. In this case, the evidence simply clarifies the parties' intent that Trilegiant would share in Program revenues post-termination absent either a material breach or a complete termination of the Program.

Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible to more than one interpretation. <u>U.S. Fidelity & Guaranty Co. v. St. Elizabeth Medical Center</u>, 129 Ohio App.3d 45, 716 N.E.2d 1201 (1998). When ambiguity exists, the court may consider extrinsic evidence i.e., evidence outside the four corners of the contract, in

determining the parties intent or resolving ambiguous contractual language.  <u>Blosser v. Carter</u>, 67 Ohio App.3d 215, 586 N.E.2d 253 (1990). This extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and **(3) any acts by the parties that demonstrate the construction they gave to their agreement.**  <u>Id.</u> at 56. (emphasis added); <u>see</u> <u>also</u>  <u>Moiser v. Parry</u>, 54 N.E. 364 Ohio (1899); <u>Courtwright v. Scrimger</u>, 110 Ohio St. 547, 144 N.E. 294 (1924); <u>Grundstein v. Suburban Motor Freight, Inc.</u>, 92 Ohio App. 181, 107 N.E.2d 366 (1952).  This is particularly true where the agreement provides for repeated occasions of performance.  <u>See</u> Restatement (Second) of Contracts § 202(4) ("when an agreement provides for repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, **any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.**") (emphasis added).  In fact, the Restatement (Second) of Contracts states "the parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."  § 202(4) cmt. g.

The parties' post-termination actions demonstrate that they believed that the Program revenues would continue to be divided.  There is no dispute that after the August 15, 2000 termination date BP and Trilegiant, on a monthly basis, continued to reconcile and share the Program renewal revenues in compliance with the Agreement.  ¶15(d), ¶ 3(d).  BP's post-termination statements and actions only reinforces the parties' understanding that there was an obligation to continue to share Program revenues:

<u>Statements</u>

- Exhibit 5: (1) recognition that BP still must share revenues of renewing members despite Cendant's termination of contract, (2) recognition of contract options including duty to continue sharing renewal revenues after termination of the contract, and (3) recognition that the "buy-out" of the "portfolio" from Cendant is an option.
- Exhibit 13: "Be clear that this [Amoco Multicard] is a new product so that we don't owe Cendant any fee renewal."
- Exhibit 18: "You are correct, Cendant has the right to revenue from the renewals, but BP is not required to continue the program."
- Exhibit 19: "We could continue with the Horizon program 'as is' and view it as a cash generating annuity."
- Exhibit 20: "We do not dispute Cendant's right to the renewals. . . ."
- Exhibit 57: ". . . the contract does not specify post-termination obligations if they cancel, but it seems wrong to not let the existing members run their course."
- Exhibit 62: "What Nayr says [Cendant has the rights to the renewal base] is technically true, except that if you as BP discontinue the program, you can solicit for a new product but not succeed them automatically."
- Exhibit 80: ". . . the loophole might be that you'll need to terminate the agreement" and "From all our communications, I understood that we could discontinue the program and offer a new one."
- Exhibit 102: "Current BP Horizon file is owned and managed by Cendant/CUC . . . cost to buy-out?"

- Exhibit 107 (last page): "BP's agreement with Cendant will allow these [Horizon] customers to be solicited since the product [Multicard] is different than the one they are currently receiving."

Acts

- Exhibit 5: BP "tossed around" the idea of claiming a material breach as a means of overcoming Cendant's rights to renewal revenue.

- Exhibit 26 <u>et.</u> <u>seq.</u>: BP decided to "terminate" the Program and "offer" the "new" Multicard program.

- Exhibit 83: BP began hiding the fact of the automatic succession from Trilegiant ("We don't want Cendant to 'get wind'…")

- Exhibit 103: BP's Catherine Wilton-Bransch is "dead-set on getting them [Cendant] for breach of contract." Further, she acknowledges that if Trilegiant breached "This would allow us to move to another vendor without continuing to pay them residuals which we are otherwise obligated to do."

And perhaps most telling of all, BP paid Trilegiant the full amount of the revenues it was owed right through the "end" of the Program. All told, the acts and statements of BP, and in particular its course of performance, clearly reflect the interpretation that Trilegiant had right to revenues from the Program renewals as long as the Program continued. This interpretation is entitled to great weight under Ohio law. See <u>Association of Fire Fighters, Local 93 v. City of Cleveland</u>, 2002 WL 191994 (Ohio App. 8 Dist. Feb 07, 2002) ("the parties' conduct in performing a contract is both admissible and significant evidence in interpreting its terms"); <u>Shimmon v. National</u>

8

Screw & Tack Co., 26 Ohio Dec. 315 (1925) ("[w]here the intention of the parties to a contract is not expressly stipulated in the instrument itself, or if there is any doubt as to the intention of the parties, the court, in attempting to arrive at the meaning and intention of the parties, should give great weight to the acts and conduct of the parties, and to the construction and interpretation by them placed upon it for many years continuously after it had been entered into with full knowledge of the questions involved").

BP's arguments against this interpretation of the Agreement are unpersuasive. First, relying on an 1895 case, BP argues that "practical construction" is valueless here because the course of dealing among the parties was "inconsistent and confusing." Defendant's Supplemental Brief at 7-8; Cincinnati v. Cincinnati Gaslight & Coke Co., 53 Ohio St. 278, 41 N.E. 239 (1895). In actuality, BP's conduct consistently recognized Trilegiant's rights to post-termination revenues right up until they realized how much additional money they could appropriate by implementing an automatic succession rather than a termination. Only then did their interpretation of the Agreement change.

Second, BP argues that the parties' course of performance should be given less weight where the acts or conduct are not those of the parties who made the Agreement. However, the parties in this instance are two sophisticated corporations who applied the **same** interpretation to the Agreement for years after its execution. Neither party, as the Cincinnati Gaslight case suggests "put their own construction upon the words used." Id. at 287. The Agreement was consistently construed the same, through both parties' acts and performance, until BP decided it was economically imprudent to terminate the Program and solicit the Program members. The acts and conduct were consistent with the parties' original knowledge and understanding of the Agreement. Id.

9

Finally, and most importantly, BP's interpretation, which treats Trilegiant's termination identically to a material breach, cannot be supported by any reasonable legal analysis. BP claims in its narrow reading that the Agreement's silence must mean that Trilegiant is entitled to no revenues if it terminates the Agreement. This is the same result the Agreement calls for if Trilegiant **materially breaches**. In effect, BP's interpretation penalizes Trilegiant just as if it had materially breached the Agreement. Such an interpretation flies in the face of common sense. The Agreement clearly delineates between the terms "termination" and "materially breach" and the parties' intention was to have different rights and obligations flow from each. If the Court accepts BP's interpretation of the Agreement, it would be manifestly unreasonable and contrary to the parties' intent.

### III.     THE COURT CAN AND SHOULD IMPLY A TERM NECESSARY TO EFFECTUATE THE INTENT OF THE PARTIES

It is axiomatic that when parties to a contract in a commercial setting fail to specify terms that are essential to a determination of their respective legal obligations, courts imply the omitted term. Onderdonk v. Presbyterian Homes of New Jersey, 85 N.J. 171, 425 A.2d 1057 (1981), citing, Restatement (Second) of Contracts § 204. In this instance, if the Court determines the Agreement is silent regarding revenue sharing after Trilegiant's termination, it may imply a term allowing Trilegiant to recover its portion of revenues.

The Restatement (Second) of Contracts has stated that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, **a term which is reasonable in**

10

**the circumstances is supplied by the court."** § 204.  Ohio is in accord with this view.

See e.g., Sebest v. Campbell City School Dist. Bd. of Educ., 2002 WL 1483917 (Ohio App. 7 Dist. Jun 28, 2002) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term"); Dorsey v. Contemporary Obstetrics & Gynecology, Inc., 113 Ohio App. 3d 75, 680 N.E.2d 240 (1996) (If [the court's] interpretation of the agreement determines that a situation involved in a dispute was omitted from the agreement, the court must engage in a process of inference to resolve the omission according to the actual expectations of the parties or general principles of fairness and justice"); Gray-Jones v. Jones**,** 137 Ohio App.3d 93, 738 N.E.2d 64 (2000) ("A court may make a factual determination of intent or reasonableness to supply a missing contract term").

The actual expectations of the parties, as reflected in the Agreement, was that the Program would continue, along with the division of revenues, after Trilegiant's termination.  Reading the Agreement as a whole, it is reasonable to assume that the parties understood that Trilegiant would be entitled to revenues post-termination unless BP terminated the Program altogether or Trilegiant materially breached.  The Court should therefore imply a term that permits Trilegiant to share in revenue post-termination.

BP's argument mischaracterizes both Trilegiant's position and the law.  The case that BP primarily relies on, Petroleo Brasileiro S.A. Petrobas v. Sea Drilling Corp., 1987 U.S. Dist. Lexis 11687, 3-4 (D. La. 1987), is inapposite to the case at bar.  In Petroleo, a

contract existed between companies whereby the Plaintiff chartered a vessel from the Defendant for offshore oil drilling. A dispute arose, in part, over interest to be paid on a mobilization fee. The original contract and its supplement were both completely silent on the issue of interest. In fact, as the court noted, there was not even a "mention" of payment of interest to either contracting party. Accordingly, the court found that because the contract was silent on interest, "the right to recover does not exist." Id.

Here, there are numerous provisions that concern both the continuation of the Program after termination and the continued sharing of revenues. As BP concedes, convenants or promises may be inferred from contractual language and "Ohio courts recognize that 'that which is plainly implied in the language of a contract is as much a part of it as that which is expressed'". Defendant's Supplemental Brief at 3-4, citing, Bush v. Callas McCreary & Assoc., Inc., 1978 Ohio App. LEXIS 9476 (Ohio Ct. App., 1978). However, BP claims that because the Agreement does not "expressly" afford Trilegiant post-termination rights where it elected to terminate the Agreement, the Court cannot imply any such terms. Defendant's Supplemental Brief at 5. This assertion is incorrect. Assuming, arguendo, that the Agreement did not expressly provide for Trilegiant's post-termination rights to revenues, there are numerous contractual provisions that imply that Trilegiant has this right. See infra I. The Agreement is not silent in this regard (See ¶3d, ¶9, ¶15b-¶15e) and there is no need, as BP puts it, to "rewrite the Agreement to provide Trilegiant with additional rights." Defendant's Supplemental Brief at 3. The Court may simply imply whatever reasonable term it feels is appropriate to reflect the actual expectations of the parties. *Farnsworth on Contracts*, §7.16 p. 499-500 (1999).

## **CONCLUSION**

For the foregoing reasons, Trilegiant is contractually entitled to share in post-termination revenues from the jointly created Program.

                                                THE PLAINTIFF
                                                TRILEGIANT CORPORATION


                                                By/s/_____
                                                Robert P. Dolian (CT 04278)
                                                Kevin P. Broughel (CT 25838)
                                                Cummings & Lockwood LLC
                                                Four Stamford Plaza
                                                107 Elm Street
                                                Stamford, CT  06902
                                                Tel.  (203) 327-1700
                                                Fax  (203) 351-4534

## **CERTIFICATE OF SERVICE**

This is to certify that on this 13th day of August, 2004, a copy of the foregoing was served via facsimile and first-class U.S. Mail, postage prepaid, on:

Steven M. Greenspan, Esq.
Brian D. Porch, Jr., Esq.
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103

/s/_____
Kevin P. Broughel

.StmLib1:1070388.1 08/13/04