UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRILEGIANT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No: 3:02 CV 2237(MRK) |
| | ) | |
| BP PRODUCTS NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF DECISION

_____This case arises out of a 1992 agreement between SafeCard Services, Inc. ("SafeCard"),

the predecessor-in-interest of Plaintiff Trilegiant Corporation ("Trilegiant"), and BP Oil

Company, the predecessor of Defendant BP Products North America, Inc. ("BP"), relating to a

credit card program known as the BP Horizon Card Program.  Following termination of the

agreement, Trilegiant sued BP for breach of contract, breach of the implied duty of good faith

and fair dealing, tortious interference with contractual relations and violation of Connecticut's

Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq*.[1]  The Court held a

bench trial on Trilegiant's claims on July 26-29, 2004 and final argument on August 6, 2004.[2]  In

---

[1]  The Court has subject matter jurisdiction over this action because the amount in
controversy exceeds $75,000 and the parties are citizens of different states.  *See* 28 U.S.C. §
1332. Trilegiant is a Delaware corporation with its principal place of business in Norwalk,
Connecticut.  Complaint [doc. # 1] ¶ 1.  BP is a Maryland corporation with its principal place of
business in Illinois. Answer [doc. # 9 ] ¶ 2.

[2]  In addition to their Joint Pretrial Memorandum [doc. # 45], which contained detailed
proposed findings of fact and conclusions of law, the parties also filed post-trial supplemental
briefs.  *See* Def.'s Supp. Br. [doc. # 56]; Pl.'s Supp. Br. [doc. # 57].

accordance with Rule 52 of the *Federal Rules of Civil Procedure*, the Court makes the following findings of fact and conclusions of law.

## I.

**The Agreement**

Trilegiant is one of the companies that are operated by the Cendant Marketing Group ("Cendant").[3]  Trilegiant provides membership-based travel, shopping, health, entertainment and consumer protection services that are billed periodically to members on their credit or debit cards.  BP Products is a petroleum corporation.  This dispute centers on an agreement that BP entered into with Trilegiant's predecessor-in-interest, SafeCard, dated as of August 3, 1992 (the "Agreement").

No individual from BP or SafeCard who was involved in the negotiations leading to the Agreement or in its initial implementation testified about the parties' intent or purposes in entering into the Agreement.[4]  However, the Agreement itself recites: that BP "desire[d] to market a package of additional services and benefits on a fee basis to its existing credit card customers as well as potential new credit card customers"; that SafeCard was in the "business of providing such services and . . . possesse[d] certain expertise and capabilities in marketing such services"; and that BP desired to utilize Safecard's expertise and capabilities "in marketing and

---

[3]  During certain periods, Trilegiant was independent of Cendant, but that is not relevant to any issue in this case.  Unless otherwise noted, all references to Trilegiant in this opinion will include Cendant and Comp-U-Card, a division of CUC International, Inc. ("CUC"), with which Cendant later merged.

[4]  In any event, the Agreement contains an integration clause that provides that the Agreement constitutes the entire agreement of the parties regarding the subject matter and that there are are "no understandings, agreements, representations, express or implied not specified herein."  Ex. 1, ¶ 10.

providing the package of services and benefits to be generally known as the BP Horizon Card

Program . . . and having the service and benefit features" enumerated on certain attached exhibits.

*See* Ex. 1.  The Agreement also states that the "promotion of goodwill toward BP and its

products" is the "essence" of the Agreement.  *Id*. ¶ 11.  Thomas Rusin, Executive Vice President,

Product Management for Cendant, described the BP Horizon Card Program (the "Horizon Card

Program") as an "affinity" program and testified that the purpose of such affinity programs is to

develop and enhance customer loyalty for the client, or so-called "affinity partner" – in this case,

BP.

The Agreement describes the Horizon Card Program as consisting of a new BP credit

card with a "Horizon Card" designation that would be sold at a fixed annual fee ($25 per year) to

both existing and new BP cardholders (referred to as "Members") and that would entitle the

Members to a variety of services.  *Id*. ¶ 1.  Exhibit B to the Agreement sets forth a list of services

to be provided to Members under the Horizon Card Program; among them were rebates on oil

changes, travel reservation services, travel rebates, emergency cash and airline tickets, life

insurance, credit card protection, lost key return services and car rental discounts.  The

Agreement contemplated that each cardholder would be billed "by BP via their BP credit card

account."  *Id*. ¶ 8.

SafeCard undertook to perform three central functions under the Agreement, which is

confirmed not only by the Agreement itself but also by the testimony of Mr. Rusin and Chip

Vann, who was responsible for the Horizon Program for Trilegiant in 1999-2000.  First,

SafeCard agreed to market the Program to existing BP credit card customers and others who did

not have a BP credit card and to seek to convince them to sign up for the fee-based Horizon Card

Program.  The Agreement states that SafeCard would market the Program through a variety of means, including direct mailings to BP customers and others, inserts in BP bills and so-called "Take-One" cards, which are credit card applications that are available to the public at BP service stations.  *Id*. ¶ 2; *see also* Exs. 155, 156 (sample solicitations to an existing BP credit card holder).

Second, SafeCard would then enroll the new Members by providing them with so-called "fulfillment kits" that explained the Program and its services.  *See* Ex.1, ¶ 3(c).  Third, SafeCard agreed to provide the services that would be offered to those who enrolled in the Program and became Members.  That is, Safecard undertook to provide the required services itself or to procure the services from third-party providers.  SafeCard also maintained a call-in center which Members could call for services and information.

As is relevant to this case, the terms and language of the BP-SafeCard Agreement differs in important respects from the standard agreements that Trilegiant (and Cendant) have typically entered into with affinity partners.  As both Messrs. Rusin and Vann explained, Trilegiant ordinarily is required to pay all of the costs of marketing (also called solicitation), enrollment (also called fulfillment) and services  for the affinity programs it has entered into with its numerous affinity partners.  The Trilegiant witnesses testified that in the early years of a typical affinity program, Trilegiant would lose money, but that Trilegiant would expect to recoup those losses over time through its share of a stream of membership renewals, since long-time members tend to be very loyal to such programs.  Therefore, Trilegiant needs some assurance that it will receive revenues from the affinity program for at least four years in order to allow Trilegiant to recoup its investment in the program – that is, its upfront marketing, fulfillment and servicing

costs.

To that end, and as confirmed by both the testimony of Mr. Rusin and various exhibits, Trilegiant's affinity program contracts ordinarily[5] provide that no termination of the contract between Trilegiant and the affinity partner will "affect [Trilegiant's] right, at its sole option, to extend or renew the Service membership of any Member after termination of [the] Agreement, which right shall continue until the membership is cancelled by either the Member or [Trilegiant]. *See, e.g.*, Exhibit 167, at TRI 2002328-29 (a 1992 BP-Cendant agreement for an affinity program unrelated to the Horizon Card Program); *see also* Ex. 168, at TRI 2002035 (a similar 1998 BP-Cendant agreement; Ex. 189 (a card issuer marketing agreement). In other words, Trilegiant's contracts give it the express right, at its sole option, to continue to service then-existing affinity program members even after the affinity program contract is terminated, thus ensuring Trilegiant the opportunity to recoup its upfront costs through a share of renewal income from then-existing members for as long as Trilegiant wishes to provide membership services.

In fact, the contract language quoted above is taken from a BP-Cendant agreement for an affinity program unrelated to the Horizon Program, which was executed on April 8, 1992, just four months before the BP-SafeCard Agreement was signed. The BP-Cendant contract was executed on behalf of BP by Susan Anderson, the same individual who four months later executed the BP-SafeCard Agreement, which does not contain contract language similar to that quoted above. Trilegiant and SafeCard were not affiliated at the time the BP-SafeCard

---

[5] Indeed, Mr. Rusin testified that *all* of Trilegiant's affinity program contracts with which he is familiar contain the contract language quoted in the text.

agreement was executed.

By contrast to Trilegiant's typical contract with affinity partners, SafeCard's Agreement with BP required BP to reimburse SafeCard for its costs of soliciting new Members, sending fulfillment kits to newly enrolled Members and providing services to Members. Ex. 1, ¶ 3.  In the Agreement, BP agreed to reimburse Safecard for its actual solicitation costs, to pay SafeCard $4.15 per Member for its costs of providing services to Program Members, and to pay SafeCard $1.75 per new enrollee to cover SafeCard's costs of providing fulfillment kits to new Members. Paragraph 4 states that while the costs of solicitation, fulfillment and servicing would be "borne on an on-going basis" by SafeCard, it would "receive all sales proceeds of the Program until it has recovered a sum equal to the total of said costs."  Thus, under the Agreement, SafeCard was not required to make the kind of upfront investment in marketing and servicing expense for the Horizon Card Program that Trilegiant is typically required to make for its affinity programs.[6] The Agreement also gave SafeCard the right to 42.5% of gross Program sales (that is, membership fees) after first being reimbursed for its solicitation, fulfillment and service costs; BP received 57.5% of gross Program sales.  *Id*. ¶ 4.

The language of the termination provision of the SafeCard-BP Agreement also differs from the language of the standard contracts that Trilegiant itself entered into with affinity partners.  In Paragraph 14, captioned "Term," the Agreement states that it will continue for an initial term of one year and will be extended thereafter on a year-to-year basis, "provided that

---

[6] In fact, the Trilegiant's witnesses testified that its costs of actually providing services to Horizon Card Members was significantly below the $4.15 per Member set forth in the Agreement, thereby providing Trilegiant with a significant source of profit in addition to its share of Program revenues.

6

either party may terminate this Agreement by giving written notice to the other not less than

ninety (90) days prior to expiration of the initial term or any subsequent annual extension."

Paragraph 15 of the Agreement, entitled "Termination," then describes the rights of both

SafeCard and BP in the event of termination.

Paragraph 15 is so central to this dispute, the Court quotes the provision in its entirety:

a.    In the event of termination of this Agreement <u>for any reason</u> whatsoever, solicitation for new Members by SafeCard hereunder will cease as of the date it receives notice of termination.  BP may at its sole discretion thereafter solicit Members either for this Program or for any other similar program by itself or by contracting with a third party.

b.    In the event of termination of this Agreement <u>by BP as a result of a material breach of this Agreement by Safecard</u>, including but not limited to SafeCard's failure to provide the services set forth in Exhibit B in accordance with the Performance Standards set forth in Exhibit C, BP, at its sole discretion, will have the right to turn servicing of then-existing Members over to a third party or to itself.  SafeCard will in such event relinquish its right to further renewal revenues from these or any other Members after the date of termination; and BP will have no further obligation to SafeCard.  In such an event, SafeCard will deliver to BP within ten (10) days of receiving notice of termination, complete information regarding any new Members or new terminations or cancellations by Members that BP has not been notified of previously.

c.    If this Agreement is terminated <u>by BP pursuant to paragraph 14 other than as a result of material breach by SafeCard and if BP then discontinues the Program altogether</u> (i.e., the Horizon Card is no longer issued as a credit card product of BP or accepted at BP service stations), BP will inform then-existing Members that the Program is being discontinued and will have no further obligation to SafeCard for renewal revenue from then existing Members.  However, in such event, BP will reimburse SafeCard for any unrecovered marketing costs which SafeCard has incurred (and which expenditures BP had approved pursuant to paragraph 5 herein) prior to the date of such termination.

d.    If this Agreement is terminated <u>by BP pursuant to paragraph 14 other than as a result of a material breach by SafeCard and if BP does NOT then discontinue the Program</u>, then BP at its sole discretion may elect either one of the following two options:

(i)     BP may elect to have SafeCard continue after termination to provide the Program services set forth in Exhibit B to then-existing Members. In such event, BP will continue to bill then-existing Members for the Program on their respective BP credit card accounts and the parties will continue to share renewal revenues from said Members as set forth in paragraphs 3 and 4.

- or -

(ii)     BP may elect to turn servicing of then-existing Members (for the services set forth in Exhibit B) over to a third-party service provider or to assume such servicing functions itself in-house. In such event, BP will continue to bill then-existing Members so long as they remain Members of this particular Program on their respective BP credit card accounts; the then-existing Cost of Service pursuant to paragraph 3b herein will be paid to said third party service provider or retained by BP (as the case may be) as servicing compensation; and the profit remaining after such Cost of Service is deducted from renewal revenues form the then-existing Members will be shared by BP and SafeCard in the proportions set forth in paragraph 3 and 4.

In the event that BP elects to turn servicing over to a third party provider or to take servicing in-house pursuant to subparagraph (ii) above, BP will cause whatever service provider to adhere to the Performance Standards set forth in Exhibit C.

(e)     If this Agreement is terminated by SafeCard as a result of a material breach by BP, then the renewal process for then-existing Members will continue thereafter as described in subparagraph 15d(i) above.

(f)     Before either party may terminate this Agreement as a result of a material breach by the other party, it must notify the breaching party in writing, providing a description of such breach. The breaching party will have thirty (30) days to cure such breach. If such breach is not so cured, then this Agreement will automatically terminate at the end of said thirty (30) day notice period.

*Id.* ¶ 15.[7]

As is relevant to this dispute, the Agreement also provided that it would be governed by

Ohio law. *Id.* ¶ 16.

---

[7] The underlining appears on Exhibit 1 and it is not clear whether it was part of the original Agreement. In any event, the Court has not accorded any significance to the underling.

On March 19, 1996, BP and SafeCard amended the Agreement in three respects. Ex. 27.
First, the parties revised the list of services provided under the Horizon Card Program and
changed the percentage split of gross Program revenues to 63.5% (BP) and 36.5% (SafeCard).
Second, they amended paragraph 14 as follows:

> The term of this Agreement is hereby extended to August 15, 1999. Thereafter,
> this Agreement will extend on a year to year basis, provided that either party may
> terminate this Agreement on August 15, 1999 or on each of the succeeding annual
> anniversary dates thereafter upon providing written notice to the other not less
> than ninety (90) days prior to such date. Notwithstanding the above, either party
> may terminate this Agreement at any time for cause by reason of the others'
> material breach of this Agreement, by providing the other party with at least
> ninety (90) days prior written notice.

*Id*. ¶ 2. Finally, the parties agreed that "[s]hould at any time during the term of this Agreement,
SafeCard, or its parent . . . be acquired by a non-affiliated third party reasonably disapproved by
BP, BP shall have the right to terminate this Agreement by providing SafeCard at least thirty (30)
days notice of termination. In the event of such termination, Paragraphs 15(a) and 15(d) of this
Agreement will apply." *Id*. ¶ 4.

Later in 1996, SafeCard was acquired by Trilegiant, which thereby succeeded to
SafeCard's rights and responsibilities under the Agreement. The BP Horizon Card Program
remained in effect, and Trilegiant and BP continued to split Program revenues after reimbursing
Trilegiant for marketing, fulfillment and servicing costs.

**Termination of the Agreement**

In early 1999, Chip Vann took over responsibility at Trilegiant for the Horizon Card
Program. He testified that at that time, Trilegiant was no longer marketing the Horizon Card,
though Trilegiant was still enrolling new members who applied for the Program through Take-

One brochures they obtained at BP's stations.  Trilegiant was also still servicing existing Horizon Card Members.  According to Mr. Vann, the response rates to solicitations were so low that Trilegiant concluded that it "could not make back the original money that we invested to acquire the customer.  So we discontinued marketing."[8]

Exhibit 2 shows the number of solicitation pieces sent out for the Horizon Program by type from 1996 through 1998.  The exhibit shows a relatively dramatic fall off in solicitations from a total of over 11 million solicitation pieces in 1996 to less than 1.5 million pieces by 1998.  Exhibit 2 also shows a decline in response rates to solicitations, and perhaps not so coincidentally, a steady decline in total Horizon Card Members from 152,425 in 1996 to 110,470 by 1998.  *See* Ex. 2.

In or about September 1999, Mr. Vann communicated with BP to determine if Trilegiant could stop processing the Take-One applications.  According to Mr. Vann, Trilegiant was moving its computer operations from Wyoming to Connecticut and its new computer system could no longer process the Horizon Card Take-One applications.  Therefore, Trilegiant was manually enrolling those new Members who had obtained Take-One cards, a process that was both labor intensive and expensive for Trilegiant.

On September 8, 1999, Carey Isom, who had just been given responsibility for the

---

[8]  On cross-examination, Mr. Vann testified that he was not certain whether he was aware that the Agreement, unlike other Trilegiant affinity program contracts, required BP to reimburse Trilegiant for its marketing expenses.  On redirect, Mr. Vann explained that even if Trilegiant was reimbursed out of program revenues, Trilegiant remained at risk because program revenues might not cover its marketing expenses. Mr. Vann acknowledged, however, that so far as he was aware, revenues from the Horizon Card Program had always exceeded Trilegiant's marketing, fulfillment and servicing expenses.  If that were the case, it is difficult to understand why Trilegiant was concerned in 1999 about recovering its "investment" in marketing.

Horizon Card Program at BP, sent an email to Mr. Vann inquiring about the fact that Trilegiant

had stopped marketing the Horizon Card Program and wanted to cease enrolling new Members.

Ms. Isom's initial email stated:

> From [Trilegiant's] perspective, can you explain was [sic] has led to the demise of
> the Horizon program?  Is it that the file was too small to support or that
> [Trilegiant] is walking away from fee card offerings?  I understand you asked BP
> to stop accepting orders for take one apps.  What happens next?

Ex. 29.  In the email string that followed, Mr. Vann told Ms. Isom:

>  To be frank, fee card marketing is not profitable.  We tend to shy away from
> unprofitable marketing.  For fee card requests received from "take ones," a letter
> should be drafted to notify and redirect the cardmember to another offer.  Maybe
> offer a standard BP card instead.  What do you think?  Would you like help in
> drafting the letter?  Let me know.

*Id*.  Isom responded (sarcastically):

> Who's frank?  Well . . . it may not be profitable for you but we're rather enjoying
> our fee card profits my friend.  Would you be interested in bidding for the entire
> BP-Amoco fee business or take a pass?  If not, what are your intentions for
> terminating the contract?  Thanks for offering to help with the "redirect" piece.
> Aren't you obligated under the contract to issue memberships to interested
> applicants?

*Id*.  Mr. Vann then replied as follows:

> We would love it if you gave this business to another vendor.  Hey, why not give
> it to Signature?  Maybe they could do a lifetime fee card product (Just kidding).  It
> looks like we missed the 8/15/99 termination widow.  We would like to work with
> you to keep the program going and somehow divest ourselves in the process.  Let
> me know.

Ex. 29.[9]

---

[9]  Mr. Vann explained that the reference to "Signature," was to a company affiliated with
Montgomery Ward that went bankrupt because it entered into unprofitable long-term deals.

A day after this email exchange, Mr. Vann emailed Kelly Clift, a fellow Trilegiant

employee who worked on the administrative aspects of the Horizon Card Program in Wyoming:

> I'm working with my contact at BP-Amoco to get out of processing BP Horizon fee card applications. I need some information on the financials. Since this is a JV [joint venture], and we say it's not profitable for us to continue (that's why we want to stop marketing), it should be unprofitable for BP-Amoco for new member enrollments. . . If it is a small number, it might be easy to convince them to discontinue.

Ex. 72.

Mr. Vann and Ms. Isom continued to exchange emails regarding these and other issues in

September and October 1999. *See* Ex. 75. In his testimony, Mr. Vann described his purpose in

these exchanges in a telling fashion that is worth quoting:

> Q.    The two things you were looking at as a business person in '99 was, we don't want to spend any more money to market and we don't want to enroll any new people, correct?
> A.    Correct.
> Q.    So what you did is you got on the phone and you got on your electronic mail and you said to the people at BP, we don't want to do two of the three things that our contract says we have to do, isn't that right sir?
> A.    Yes.
> Q.    Just so I'm clear, I don't want to be too cute about this, the three things you have to do [under the Agreement] are solicit, enroll and service, and what you are saying is, to BP, let's change the deal, I just want to service, I don't want to solicit, enroll or market, am I right sir?
> A.    Correct.
> Q.    And you tried all the way through August and September and the beginning of October to convince BP to change the terms of the contract to relieve you of your responsibility to do two of the three things you had to do, correct?
> A.    Correct.
> Q.    And BP said, no, we are not going to change the deal, we like this program, we want you to continue to market it, correct, sir?
> A.    Correct.

Trial Tr. Excerpt [doc. #58].

By a letter dated October 27, 1999, Mr. Vann wrote Ms. Isom that Trilegiant was

terminating the Agreement effective August 15, 2000.  As Mr. Vann testified, had the Agreement

allowed Trilegiant to do so, it would have terminated the Agreement sooner.  The termination

letter, which was drafted by Trilegiant's lawyers, states as follows:

> SafeCard hereby terminates the Agreement effective August 15, 2000 pursuant to
> Paragraph 14 of the Agreement.  Upon such effective date, SafeCard will cease to be
> bound by the Agreement in any respect except for its continuing obligations under
> Section 6 (Confidentiality) and Section 10 (Indemnity), and BP will cease to be bound by
> the Agreement in any respect except for its continuing obligations under Section 9
> (Payment to SafeCard) for so long as Members continue to pay their annual fees under the
> Program.

Ex. 3.  BP does not appear to have responded to this termination letter and in fact, from the

record and according to the witnesses, there does not appear to have been any further

communication between Trilegiant and BP regarding this matter in 1999.

**BP's Harmonization Program**

At or around the same time as Trilegiant was seeking to be relieved of its marketing and

enrollment duties under the Agreement, BP was also considering whether it wished to continue

the Horizon Card Program and if so, whether to do so with Trilegiant.  In fact, unbeknownst to

Trilegiant, at or around the same time as it was preparing to notify  BP that Trilegiant was

terminating the Agreement, BP itself was considering terminating the Agreement by declaring

Trilegiant in breach or by buying Trilegiant out of the Agreement.  As a consequence,  counsel

for both parties acknowledged that Trilegiant's decision to terminate the Agreement in October

1999 relieved BP of what otherwise would have been a difficult decision for BP.  *See, e.g.,* Ex. 5

(BP internal memo; "We tossed around the idea of claiming a breach to avoid renewal income

sharing, however, [Trilegiant] terminated the Agreement in the meantime.").

In December 1999, BP merged with Amoco, and in approximately the early  fall of 1999,

13

in anticipation of that merger, BP began evaluating the credit card products offered by each

company with a goal of consolidating the various cards offerings of the two companies.  This

consolidation and evaluation became known as the "harmonization program." At that time, the

companies offered approximately 15 different credit card programs, including their own affinity

fee card programs: Amoco had its MultiCard and BP had the Horizon Card.

BP retained Eire Direct Marketing Inc. – and in particular, Ellen Best at Eire – to

coordinate the harmonization program, which included reviewing the features of the current

offerings and evaluating whether to continue with two separate card programs or combining the

companies' cards into one BP/Amoco card program.  A September 17, 1999 memo from Eire

sets forth the objectives of the evaluation process and the implications to consider.  One such

implication was stated as follows:

     A.     Current BP Horizon file is owned and managed by Cendant/CUC

        ● Maintain renewals there?  Cost to buy-out?

        ● Issue news from a new third-party vendor OR move this file to Amoco

        MultiCard membership?

Ex. 102.

In internal emails at BP on October 5 &  6, 1999, – several weeks before Trilegiant's

October 27  termination letter – BP employees discussed Chip Vann's email explaining why

Trilegiant no longer wished to market the Horizon Program or enroll new members.  One states:

"It looks like we have another reason to claim a breach."  Ex. 170.  In response, Catherine

Wilton-Bransch, Ms. Isom's superior, wrote to Isom as follows:

I certainly was not advocating just switching Horizon to [another vendor] without

completing the entire [harmonization] study and determining what products will be moving forward. If as a result of that study you should determine that you want to outsource, the Chipster's breach merely gives you grounds to cut them out completely and no longer pay them residuals. Even if you decide to keep everything in house, it may still allow you to cease paying residuals.

*Id.*; *see also* Ex. 5 ("We tossed around the idea of claiming a breach to avoid renewal income.").

On October 13, Ms. Isom informed Ms. Wilson-Bransch and others at BP that Trilegiant would be issuing a termination letter but would continue to process new enrollments through August 15, 2000. Ex. 103. In response, Ms. Wilson-Bransch recommended review by legal counsel, stating "I would argue that 'continuing to process enrollments' does not fulfill their contractual obligation to market actively and thus they have breached. *This would allow us to move to another vendor without continuing to pay them residuals which we are otherwise obligated to do*." *Id.* (emphasis added).

**Events Following Termination**

Following the sending of its termination letter in October 1999, Trilegiant continued to service Horizon Card members and to enroll new Members, and Trilegiant and BP continued to share Program revenues in accordance with the Agreement. In or about May 2000, it became clear to BP that it would not complete its harmonization process and therefore would not be in a position to make final decisions about what credit cards products it would be offering BP and Amoco customers (including whether it would continue the Horizon Program) by the August 15, 2000 termination date set forth in Trilegiant's termination letter, Ex. 3. According to Ms. Best, as of May 2000, the harmonization program was still in its preliminary stages and no decisions had yet been made regarding the type of cards that would be offered. She testified that at that time, they hoped to complete the process by mid-2001.

15

Accordingly, BP began to consider its options for continuing to provide services to the existing Horizon Card Members while BP completed its harmonization review and decided what products the merged companies would offer. One option was to convince Trilegiant to continue to service existing Members after the August 15 date and until final arrangements could be made regarding the BP and Amoco card programs. Yet another option was to move all Horizon Card Members to the then-existing Amoco MultiCard. Another was to retain third-party vendors to service the Horizon Card Members. *See* Exs. 7, 146.

Jim DuBoyce of BP was asked to contact Trilegiant to determine if Trilegiant would be willing to continue to provide services to Horizon Card members. BP was concerned that existing BP Horizon Card Members would be dropped from the Program as of August 15, 2000 and before BP was able to complete its harmonization program and launch whatever new cards would be issued as a result of that program. To that end, Mr. DuBoyce called Nayr Inglesias, who had taken over responsibility from Chip Vann for the Horizon Card Program at Trilegiant. *See* Ex. 171 (email from DuBoyce to Best and Kilrea from BP).[10]

On May 19, 2000, after checking with others at Trilegiant including her superior (*see* Ex. 63), Ms. Inglesias emailed Mr. DuBoyce in pertinent part as follows: "Here is an update on Feecard: We continue to accept new members until August when the contract is officially over. We are getting approximately 75-100 joins a month []. We continue to service all renewals as well as new members. . .[Trilegiant] has the rights to renewal billings, so there are no changes currently planned for those members." Ex. 9. Mr. DuBoyce shared Ms. Inglesias' email with

---

[10] Ms. Inglesias testified that she met with Mr. Vann before taking over for him, and Mr. Vann told her that Trilegiant had decided to terminate the Agreement and that the Horizon Program was no longer profitable.

others at BP with the observation (shared by others at BP) that "this is what we were looking for: they do not process new members but will continue to service existing members." *Id.*

In the May to July 2000 time period, BP continued to refine its options for harmonization and the actions needed to ensure that existing Horizon Members continued to receive services and to ensure that no new Horizon Members were enrolled until BP completed its harmonization efforts. *See, e.g.*, Exs. 15, 17.  On May 25 and July 5, 2000, Mr. DuBoyce emailed Ms. Inglesias asking for "confirm[ation] that [Trilegiant] will continue to service existing members after August 2000 according to procedures currently in place."  Ex. 58.  On July 10, Ms. Inglesias replied as follows: "After August 2000 [Trilegiant] will not be accepting new members. [Trilegiant] will continue to service: existing members [;] any new members brought on prior to August 2000 [;] any members renewing prior to August 2000."  *Id.*  Ms. Inglesias testified that she understood at this time that BP needed Trilegiant's help during the transition period between the end of the Horizon program and the launch of the new BP fee card that it was going to launch post merger and she told Mr. DuBoyce that Trilegiant was prepared to give BP that transition help – that is, to provide BP with a "bridge."  Mr. DuBoyce responded to Ms. Inglesias' email as follows: "Thank you.  This was our understanding.  We are working . . . to stop accepting applications for new members and should have this process in place next week.  Would you like to see any of the communication pieces?  At the same time we are working on the plan not to renew members as they come due over the next year."  *Id.*

On July 25, Ms. Inglesias and Mr. DuBoyce exchanged many emails.  First, Ms. Inglesias responded to Mr. DuBoyce's July 10 email with a question, "Why would you want to stop renewals?  Are the BP Horizon cards not being issued anymore, in other words not going to exist

for [Trilegiant] to bill renewals?  Please advise ASAP."  Ex. 18.  "Without new members, the

program will eventually die," was Mr. DuBoyce's response the same day. "It was our

understanding that [Trilegiant] did not wish to continue servicing the program in general and new

members in particular."  *Id.*  Ms. Inglesias replied, "[Trilegiant] has the rights to the renewals.

The Agreement made last year was to terminate all new enrollments as of 8/15/2000," to which

Mr. DuBoyce responded:

> You are correct. [Trilegiant] has the right to revenue from the renewals but BP is not
> required to continue the program. [Trilegiant's] decision to stop processing new members
> reduces the value of this asset on an ongoing basis which has caused BP to review our
> strategy for the Horizon product.

*Id.*

Later that same day, Ms. Inglesias sent another email to Mr. DuBoyce in which she

restated the contents of her July 10 email that after August 15, 2000 Trilegiant would continue to

service existing members and also added the following, "By contract, renewal billings will not

cease.  [Trilegiant] and [BP] have the rights to renewal commission."  Ex. 19.  Mr. DuBoyce

responded that it was BP's understanding that Mr. Vann's termination letter terminated the

"entire contract" and therefore BP "made plans to stop renewals over the next 12 months."  Ex.

20.  He offered to fax her the termination letter.  Ms. Inglesias responded that she had a copy of

the termination letter, which she said references the fact that Trilegiant "does have rights to

renewals."  *Id.*; *see also* Ex. 59.  Ms. Inglesias said that the contract was currently being reviewed

by Trilegiant's legal counsel.  Mr. DuBoyce replied:

> We do not dispute [Trilegiant's] right to the renewals nor was it our intention to cancel
> the contract.  Our actions have been based on Chip's conversations with Carey Isom in
> late-1999 which led us to believe [Trilegiant] wanted out completely and which was
> confirmed by his letter which clearly terminates the entire agreement.  Please get back to

me as soon as possible as we are ready to implement the process to begin withdrawing this program from the market.

Ex. 20.[11]   There is nothing in the record to indicate whether Ms. Inglesias ever got back to Mr. DuBoyce following Trilegiant's legal counsel's review, and Ms. Inglesias could not recall responding to this email from Mr. DuBoyce.

**Transition to MultiCard**

Nevertheless, in accordance with the email correspondence between Mr. DuBoyce and Ms. Inglesias, Trilegiant continued to provide services to those individuals who were Members of the Horizon Card Program as of August 15, 2000 and also continued to process any Membership renewals, though no new Members were being accepted.  *See* Ex. 61.  The parties agree that Trilegiant continued to be paid in accordance with the Agreement and to share in the Program revenues under the terms of the Agreement.[12]

Throughout 2000 and during 2001, BP continued to evaluate what it would do with its existing Amoco and BP fee cards and what services it would offer with such a card.  *See, e.g.,* Exs. 12, 14, 24, 34.  BP retained a consultant who conducted a customer satisfaction survey in an effort to determine which services the members liked and wanted.  *See* Ex. 193.  Ms. Best testified that by approximately April 2001, BP had decided that its new affinity fee card for both Amoco and BP would be called the "BP MultiCard," but that BP had not yet settled on the precise package of benefits and services that would be offered to BP MultiCard members.

---

[11]  Ms. Best, who received a copy of Ms. Inglesias' emails sent Mr. DuBoyce and others an email which stated, among other things, "Please advise if and what I should do to combat this new position being stated by [Trileigant]."  Ex. 19.

[12]  *But see infra* at 22-23.

The BP MultiCard that was ultimately provided to Amoco cardholders as well as Horizon Card Members is similar to the Horizon Card in that the program is an affinity card program for which members are charged an annual fee and in return receive certain services and features. However, the annual fee for the BP MultiCard was ultimately set at a higher rate than the Horizon Card ($29.95 instead of $25) and the services that BP ultimately decided to offer MultiCard members differ in certain respects from those offered Horizon Card Members. *See* Ex. 85 (comparing features of BP MultiCard and Horizon Card); *see also* Exs. 107, 117, 145. According to Ms. Best, one feature of the BP MultiCard – the ability to use it as a charge card at locations other than BP stations – was dramatically different from the Horizon Card (which could only be used at BP locations) and is unique among oil company affinity cards. Unlike the Horizon Card Program, BP decided to contract directly with third-party providers to provide the services and features offered to MultiCard members.[13]

In June 2001, Lisa Kilrea, Marketing Manager for BP, contacted Ms. Inglesias to set up a call to discuss BP's plans for the Horizon Program, because it was clear to BP personnel that the new BP MultiCard could not be launched by the August 15, 2001 date that Mr. DuBoyce had previously estimated to Trilegiant. On July 13, 2001, Ms. Kilrea sent the following email to Ms. Inglesias:

> This note serves as confirmation that BP is discontinuing the BP Horizon and BP Horizon Visa cardmember programs effective November 1, 2001. Due to the merger of BP and Amoco, we have now harmonized our card portfolios and will be offering a new product to our Base cardmembers going forward.

---

[13] According to Ms. Best, one of the companies with which BP contracted to provide services was Trilegiant, which provides the credit card registration service to BP MultiCard members, as it previously had provided to members of the Amoco MultiCard.

As we have discussed, the Horizon program will be dissolved over a period of 12 months beginning on November 1, 2001 and completing on October 31, 2002.  When members become eligible for monthly renewal, they will be notified that the Horizon program has been discontinued, and they will be offered the new BP MultiCard program.  The cardmembers will be solicited for the new program, and this will not be an automatic succession.

BP and [Trilegiant] need to begin discussions regarding how we will be sent the cardmember renewal files for solicitation. . . .

Please acknowledge receipt of this note, and your agreement to ensure we are working toward the same objective.  It's important that we communicate in advance to our renewing cardmembers, as well as continuing to service the benefits for those members who will continue on the Horizon program until the end of October of 2002.

Ex. 62.[14]  This email was drafted by Ms. Best.  *See* Ex. 26.[15]

Ms. Inglesias responded to Ms. Kilrea via email on July 16 as follows: "At this time, we are not in agreement [with your email].  In looking at the contracts Trilegiant . . . has the rights to the renewal base.  I am currently setting up some internal discussions and will let you know further information."  Ex. 62.  In response, Ms. Best emailed Ms. Kilrea the following:

---

[14]  Trilegiant informed the Court on July 27, 2004 that it had decided not to pursue any claim against BP relating to the BP Horizon Visa Card.  Therefore, Trilegiant's claims in this case relate solely to the BP Horizon Card.

[15]  Ms. Best testified that she had never reviewed the terms of the Agreement and did not as a matter of practice involve herself in legal affairs.  The Court finds it difficult to believe the latter proposition, given that Ms. Best consistently inserted herself into discussions regarding legal options and drafted documents with legal implications, such as Ms. Kilrea's email.  *See, e.g.,* Ex. 5 (handwritten notes by Ms. Best); Ex. 20 (Mr. DuBoyce asks Ms. Best if he is "on the right track" with Ms. Inglesias and she responds that she has a "comprehensive file of all that has occurred"); Ex. 80 (Best email to Kilrea: "Here's another . . . the loophole might be that you'll need to terminate the agreement."); Ex. 124 (Montague email to Best regarding legal counsel's finalization of a letter to Trilegiant).  The Court has no way of determining on this record whether Ms. Best testified truthfully when she claimed never to have seen the Agreement, though the Court finds that proposition also difficult to believe given Ms. Best's critical role in harmonizing the credit card programs of BP and Amoco and her frequent notes and comments on what she understood to be the parties' rights under the Agreement.

21

> What Nayr says is technically true, except that if you discontinue the program, you can solicit for a new product but not succeed them automatically. Jim and BP legal can confirm. I know that from my earlier records on Horizon and we had a legal opinion from Joan Zwit [BP's in-house counsel].

*Id.*; *see also* Ex. 13 (Best notes: "Be clear that this is a new product so that we don't owe [Trilegiant] any fee renewal").

Ms. Inglesias also emailed Ms. Kilrea's note to Susan Schilt in Trilegiant's operations group, and she responded with a quote and comments on the Agreement. Ms. Schilt said, "I think the big question is to confirm that they are discontinuing the program since the members will be offered the Amoco MultiCard or would this be a continuation of the product?" Ex. 64. At the request of Trilegiant's lawyers, Ms. Inglesias asked Ms. Kilrea to put her July 13 email in a letter for Trilegiant's legal files (Ex. 30) and Ms. Kilrea complied on July 26, 2001 (Ex. 31). On July 30, 2001, Ms. Inglesias told Ms. Kilrea what she needed to comply with Ms. Kilrea's request for cardmember renewal files, which were maintained by Trilegiant as well as Citi, the bank that supplied credit to Horizon Card Members. Ex. 32; *see also* Ex. 70.

In response to Ms. Kilrea's letter, Trilegiant appears to have decided to withhold money from BP pending resolution of the issue of membership renewals. The way Program revenues were handled is that Citi, which provided the credit facilities for the Horizon Program, billed Members for the annual fee on their credit cards and then remitted those fees to Trilegiant, which reimbursed itself for expenses under the Agreement, paid itself its share of the Program revenues and then remitted the remaining 63% to BP. Ms. Inglesias testified that sometime in July 2001, Trilegiant decided to stop sending BP its share of Program revenues. *See* Exs. 187, 188. As an email from Susan Schilt noted, "Until we reach some kind of consensus on what to do about the

renewals, please continue to hold [BP's commission]." Ex. 187.  Ms. Inglesias was involved in

this decision along with Trileigant's legal counsel.  Before it resumed paying BP its share of

Program revenues in or about February 2002, Trileigant had withheld approximately $400,000

from BP.  *See* Exs. 160, 44.

       In the summer of 2001, it appears to this Court (and counsel for Trilegiant conceded) that

both BP and Trilegiant believed that BP would not be automatically transferring Horizon Card

Members to the new BP MultiCard, but BP would instead inform Horizon Card Members that

the Horizon program was being terminated and then solicit the former Members to sign up for

the new BP MultiCard.  According to BP's witnesses, BP had always wanted to automatically

transfer (or "succeed") Horizon Card Members to the BP MultiCard, since that would ensure the

smoothest transition and the lowest possible number of individuals who would discontinue their

memberships.  However, according to BP, the decision on whether it could automatically succeed

or would have to solicit was in the hands of Citi, and at least initially Citi did not believe BP

could automatically succeed because the two credit card programs were too dissimilar.  As

explained in testimony and without putting too fine a point on it, the laws and regulations

governing credit card solicitations apparently prohibited automatic succession unless the card

offerings were sufficiently similar in terms of financial features.

       BP's witnesses testified (and documentary evidence confirms) that in late October 2001,

Citi changed its mind and approved automatic succession for Horizon Card Members, thereby

concluding that the BP Horizon Card and BP MultiCard offerings were sufficiently similar to

allow automatic succession under applicable law.  *See* Ex. 86; *see also* Exs. 83, 39, 112.

Trilegiant's counsel sought to show that BP made the switch to automatic succession because of

financial concerns about losing members if BP had to resort to solicitation. *See* Ex. 22 (showing an approximately $1 million budget impact in 2002). It is undisputed, however, that sometime in the fall of 2001, BP for the first time received clearance from Citi to automatically succeed Horizon Card Members to the new BP MultiCard. It is also undisputed that BP never informed Trilegiant of this change; nor did BP share with Trilegiant any of the communications that BP intended to send Horizon Card Members. S*ee, e.g.*, Ex. 141. Rather than working through Trilegiant to effectuate this change, BP worked with Citi and its membership list. *See* Exs. 35, 36, 39, 87, 88 (Kilrea to Citi: "I need your help with getting the list of current cardmembers."), 114, 118, 140, 142.

The transition from the Horizon Card to the BP MultiCard was originally planned for early 2002 but it did not occur until June 2002, because (as Ms. Best and Ms. Kilrea explained) of delays in changing the credit card equipment at BP stations so that it would accept the new MultiCard and because of Citi's operational issues. On May 1, 2002, Jennifer Montague, who had assumed responsibility from Lisa Kilrea for the BP Horizon and MultiCard Programs, wrote a letter to Nat Lipman, CEO of Trilegiant. Ex. 44. The letter reviewed the events since Trilegiant's termination and advised Mr. Lipman that BP "plan[ned] to offer the existing fee cardholders (from both the BP and Amoco portfolios) the new BP MultiCard and cancel all former card programs." *Id.*[16] Ms. Montague stated that "[o]ver the past few months several disconcerting events have happened between our two organizations which are of great concern,"

---

[16] According to Ms. Montague and Ms. Best, the transition from the Amoco MultiCard to the new BP MultiCard was accomplished in approximately November 2001. Ms. Best testified that Citi made the decision to proceed with the Amoco transition first, because the Amoco MultiCard had more members than the Horizon Program and because Citi had always approved the Amoco program for automatic succession.

and she explicitly referred to Trilegiant's withholding from BP of over $400,000 in Program revenues. *Id*.[17]  The letter concludes with Ms. Montague asking Mr. Lipman to respond by May 15, 2002 "to ensure a smooth transition of our BP Horizon cardmembers to the new BP MultiCard product."

Ms. Montague's letter was drafted by BP's legal counsel. *See* Ex. 124.  Ms. Montague's letter appears to have been Trilegiant's first notification that the transition to the BP MultiCard was imminent.  The letter does not expressly state that BP planned to automatically succeed Horizon Card Members to the MultiCard.

Mr. Lipman never responded in writing to Ms. Montague's letter.  However, he called her and scheduled a conference call that included both companies' lawyers.  According to Ms. Montague, during the call, Trilegiant told BP that Trilegiant considered itself entitled to the renewal revenues from Horizon Card Members and that Trilegiant would sue BP for damages if BP proceeded as planned.  Ms. Montague testified that Mr. Lipman never asked how existing Horizon Card Members would be contacted and told about the new MultiCard.

As of the beginning of May, Citi had "turned off" the billing for Horizon Card Members.  Trilegiant was not notified of this action in advance and contacted Citi to complain that "their transmission have been interrupted."  Ex. 47.  Ms. Montague spoke with an employee of Trilegiant to explain the discontinuance of the Horizon Program and that Trilegiant's payments would be delayed until the transition to the BP MultiCard was final.  Ex. 183.  At or around the same time, Ms. Montague contacted several companies that provided services or

---

[17]  The letter also makes reference to Ms. Inglesias failing to respond to BP's phone calls regarding termination and transition issues.  However, there is no documentation to support this assertion.

25

benefits under the Horizon Card Program (e.g., Chubb, Avis, Diner's Club, etc.) and informed them that on June 26, 2002 all Horizon Card Members would "be reissued the new BP MultiCard." *See* Ex. 48, 177.[18]

By letter dated May 15, 2002, Ms. Montague wrote to Ms. Inglesias for the purpose of "inform[ing her] that BP will be terminating the BP Horizon card program effective June 30, 2002. BP will not need Trilegiant's services after this date as these cardholders will automatically receive a new BP Multicard plastic prior to June 30th." Ex. 50. This letter appears to be the first notification to Trilegiant that BP would automatically succeed Horizon Card Members to the BP MultiCard. Trilegiant did not respond to Ms. Montague's May 15 letter.

In late May 2002, Horizon Card Members received a letter from BP (mailed to the Members by Citi) that informed them that in late June they would receive a BP MultiCard "to replace your existing BP Horizon account." Ex. 176. In late June, 2002, 49,970 Horizon Card Members were automatically transferred to, and accepted, the BP MultiCard. *See* Exs. 130, 180, 55.[19] It is the renewal revenues from those Members that is the focus of this action, which Trilegiant filed against BP in late 2002.[20]

---

[18] At trial, Trilegiant's counsel stated that Trilegiant does not claim that BP tortiously interfered with Trilegiant's relationships with these third-party service providers. Trilegiant's tortious interference claim is focused solely on a claimed interference with Trilegiant's alleged relationship with the Horizon Card Members.

[19] Only 254 Horizon Card Members chose not to accept the BP MultiCard. Ex. 180.

[20] On the issue of damages, Trilegiant provided the testimony of Greg Hilskinki, Trilegiant's Senior Vice-President of Marketing Analysis, who provided the Court with spreadsheets regarding his calculation of Trilegiant's claimed damages. Depending upon whether he used a 5, 10 or 20-year period of projection and discount rates of between 10-16%, Mr. Hilsinki's analysis shows an alleged damage range of between approximately $1.2 million to $1.9 million. *See* Ex. 185A. Except for punitive damages, the damages that Trilegiant sought

## II.

In its Amended Complaint [doc. # 32], Trilegiant has sued Trilegiant for breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), violation of Connecticut's Unfair Trade Practices Act ("CUPTA"), Conn. Gen. Stat. § 42-110a *et seq*. (Count III), tortious interference with contractual relations (Count IV) and unjust enrichment (Count V). Both parties agree that Trilegiant's contract claims are governed by Ohio law, and there is no real dispute regarding the substance of the law governing those claims.[21] Both parties also agree that if the Court resolves Trilegiant's contract claim against the company by concluding that Trilegiant has no right under the Agreement to renewal income from Horizon Card members, then Trilegiant cannot succeed on any of its other claims against BP, including its tort and CUTPA claims. That is, both parties agree that Trilegiant's ability to succeed on Counts II-V is entirely dependent upon Trilegiant first prevailing on its basic breach of contract claim against BP.

For the reasons stated below, the Court rejects Trilegiant's claim that BP breached the

---

are the same for both its contract and its tort claims.

While the Court need not resolve disputes regarding damages in view of its disposition of Trilegiant's claims, the Court notes that the low end of the range – and thus a five-year period (which Trilegiant uses in its own planning) and a discount rate of 16% (which was recommended by the only expert  who testified on the subject, Alan Schachter, Ex. 190) – provides a far more accurate assessment of Trilegiant's likely losses.

[21] As to the tortious interference claim, the parties disagree on whether Illinois law or Connecticut law governs and whether the Court's decision on this choice of law issue would make any difference in the circumstances of this case. *See* Plaintiff's Motion In Support of Application of Connecticut Law to Tortious Interference with Contract Claim [doc. # 48]. In view of the Court's disposition of Trilegiant's breach of contract claim, the Court has no need to resolve this issue and therefore DENIES Trilegiant's Motion [doc. # 48] as moot.

Agreement.  Therefore, the Court need not reach Trilegiant's other claims.  The Court has nonetheless provided a comprehensive review of the testimony and evidence relating to each of Trilegiant's claims, as set forth above.  Based upon the testimony and exhibits presented, the Court feels constrained to observe (for the benefit of the parties, if no one else) that it would be hard pressed to find that any conduct on BP's part (or for that matter, Trilegiant's) was tortious or constituted an unfair trade practice, regardless how the Court were to resolve Trilegiant's contract claims.  In the Court's view, this case is nothing more than a straightforward breach of contract claim, with each side believing in good faith that its construction of the contract was the correct one and each side acting to protect its own interests in accordance with its good faith beliefs regarding the parties' obligations and responsibilities under the Agreement.

In assessing Trilegiant's breach of contract claim, it is important at the outset to state what is not in dispute.  Both parties agree that Trilegiant terminated the Agreement when Chip Vann sent his October 27, 1999 letter, in which he stated that "SafeCard hereby terminates the Agreement effective August 15, 2000 pursuant to Paragraph 14 of the Agreement."  Ex. 3.  Both parties also agree that at the time of termination, neither party was in material breach of the Agreement.  Therefore, the portions of the Agreement that deal with termination in the event of a material breach by either party are not the focus of this dispute.

Both parties also agree that this Court should construe the Agreement "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St. 2d 244, 247, 313 N.E.2d 374, 376 (1974); *see* Pl.'s Supp. Br. [doc. # 57] at 1-2; Def.'s Supp. Br. [doc. # 56] at 2-3.  For the "intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enterprises, Inc.*,

28

64 Ohio St.3d 635, 638, 597 N.E. 2d 499, 501 (1992).  In Ohio as elsewhere, "[w]hen the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.  As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219, 797 N.E.2d 1256, 1261 (2003) (internal citations omitted).

What is in dispute is that Trilegiant asserts that even after its termination of the Agreement, it had an express or implied right under the Agreement to continue to receive the renewal revenues from then-existing Members where, as Trilegiant alleges, BP has continued the Horizon Card Program under the guise of the BP MultiCard.  Trilegiant claims that BP breached the Agreement by failing to share with Trilegiant the renewal revenues from those Horizon Card Members who became BP MultiCard members.  BP counters that Paragraph 15 of the Agreement expressly provides those circumstances under which Trilegiant would be entitled to renewal revenues after termination and that under that provision, Trilegiant is given no right to renewal revenues when, as here, Trilegiant terminates the Agreement.  Alternatively, BP asserts that under Paragraph 15(c) of the Agreement, Trilegiant has no right to renewal revenues if BP discontinues the Horizon Card Program altogether and that is precisely what BP did when it moved the Horizon Card Members to the BP MultiCard.

**No Express Right To Renewal Revenues.**    Examining the Agreement as a whole and the intent of the parties as reflected in the language they chose to employ, the Court agrees with BP that the Agreement does not give Trilegiant the rights it claims.  *See Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Author.*, 78 Ohio St.3d 353, 361, 678 N.E.2d 519, 526 (1997) (contracts should be construed as a whole).  Paragraph 14 and 15 of

the Agreement are quite clear and explicit. Nothing in either of those provisions gives Trilegiant the right to receive renewal revenues when, as here, it terminates the Agreement in the absence of a material breach by BP.

Paragraph 14 describes the duration of the Agreement, and it gives either party the right to terminate the Agreement upon providing notice to the other not less than 90 days before the annual anniversary date of the Agreement. That is what Trilegiant did when it sent Mr. Vann's letter. Nothing in Paragraph 14 gives Trilegiant the right to share in renewal revenues following a termination of the Agreement in accordance with Paragraph 14.

Paragraph 15 is the only provision of the Agreement that addresses Trilegiant's right to continue to receive renewal revenues following termination, and this provision is clear and unambiguous.

Paragraph 15(a) provides the rules that govern in the event of termination "for any reason whatsoever." In that circumstance, Trilegiant must cease soliciting new Members for the Horizon Card Program. And, importantly, Paragraph 15(a) grants BP the right "at its sole discretion thereafter [to] solicit for Members for the Horizon Program or for any other similar program by itself or by contracting with a third party." That is precisely what BP did when it transitioned from the Horizon Card Program to the BP MultiCard. Yet nothing in Paragraph 15(a) gives Trilegiant any right to share in renewal revenues in the event that, as occurred here, BP exercised its undoubted right to solicit Horizon Card Members for "any similar program" following termination of the Agreement.[22]

_____

[22] Trilegiant seeks to make much of the fact that BP automatically succeeded Horizon Card Members to the BP MultiCard, rather than cancelling their Memberships and then soliciting them for the BP MultiCard. The Court is unpersuaded. In the Court's view, the precise method

Paragraphs 15(b) through 15(e) then set forth in great detail the specific circumstances in which Trilegiant would be entitled to continue to receive renewal revenues following termination of the Agreement.  Yet none of those provisions gives Trilegiant the right to continue to receive renewal revenues when, as here, it terminates the Agreement in the absence of a material breach by BP.

It is worth summarizing the parties' rights under those provisions:

¶ 15(b) governs termination by BP as a result of a material breach of the Agreement by Trilegiant.  In that circumstance, BP is given the right to turn servicing of then-existing Members over to a third-party and Trilegiant relinquishes "its right to further renewal revenues from these or any other Members after the date of termination";

¶ 15(c) applies if the Agreement is terminated by BP other than as a result of a material breach by Trilegiant and if BP then discontinues the Program altogether.  In that event, BP would have "no further obligation to [Trilegiant] for renewal revenues from then existing Members."

¶15(d) covers termination by BP other than as a result of a material breach by Trilegiant and if BP does not then discontinue the Program.  In this circumstance, BP is given the option to have Trilegiant continue after termination to provide services to then-existing Members, in which event the parties will continue to share renewal revenue.  Alternatively, BP may elect to turn servicing over to a third-party (or assume those responsibilities itself), in which event the cost of servicing then existing Members will be paid to the third-party (or retained by BP as the case may be) and BP and Trilegiant will then share renewal revenues in accordance with the percentages in the Agreement.

¶15(e) applies in the Agreement is terminated by Trilegiant as a result of a material breach by BP.  In those circumstances, the renewal process for then-existing Members would continue as described in paragraph (d).

Ex. 1.

Ordinarily, contracting parties have no obligations to each other after termination of their contract unless otherwise provided in the contract itself.  Paragraph 15 is the only provision of

---

by which the Horizon Card Members became BP MultiCard members is not determinative under the Agreement.

the Agreement that addresses post-termination rights to renewal revenues, and it is apparent that the parties sought to identify in that provision those circumstances in which Trilegiant would be entitled to receive renewal revenues following termination.  The fact that Paragraph 15 (which is very detailed and specific) does not grant Trilegiant the right to renewal revenues when, as here, it terminates the Agreement in the absence of a material breach by BP, leads this Court to conclude that the parties did not intend Trilegiant to receive renewal revenues in those circumstances.[23]  To hold otherwise would be to create a provision (and obligation) for the parties that they did not create for themselves.  *See Ullman v.* May, 147 Ohio St. 468, 475, 72 N.E.2d 63, 66 (1947); *Adkins v. Bush*, No. CA2002-05-131, 2003 WL 21257970, at *3 (Ohio App. June 2, 2003); *Morgan v. Morgan*, No. 93-C-36, 1994 WL 265899, at *4 (Ohio App. June 14, 1994); *see also Jeffery B. Peterson & Assocs. v. Dayton Metro. Hous. Auth.*, No. 17306, 2000 WL 1006562, at *7-8 (Ohio App. July 21, 2000) (applying the doctrine of *expressio unius est exclusio alterius* to interpret a contract that mentioned certain terms specifically to exclude all others); E. Allen Farnsworth, *Contracts* § 7.11 (2d ed. 1990) ("Where certain things are specified in detail in a contract, the other [terms] of the same general character relating to the same matter are generally held to be excluded by implication."); Grover C. Grismore, *Principles of the Law of Contracts* § 105, at 164 (1947) (same).

   **No Implied Right to Renewal Revenues.**    Trilegiant contends that even if the

---

[23]  Certainly BP, at least, knew how a contract could be worded to grant a company like SafeCard broad rights to renewal revenues in virtually all circumstances following termination, since Susan Anderson of BP, who executed the Agreement with SafeCard, signed an affinity program agreement with Cendant just four months before signing the SafeCard Agreement.  *See* Ex. 167, at TRI 2002310.  The language of the BP-Cendant agreement is very different from the language of the BP-SafeCard Agreement.

Agreement does not expressly grant it the right to renewal revenues in the circumstances of this case, the Court should nonetheless imply such a right as consistent with the parties' intent as reflected throughout the Agreement. In particular, Trileigant argues that various provisions of the Agreement show that the parties expected the Program to endure post-termination and that its revenues would continue to be shared after termination. Pl.'s Supp. Br. [doc. # 57 at 3]. In particular, Trileigant relies on Paragraphs 3(d), 9, and 15(a)-(e).

None of the provisions relied on by Trileigant supports its claim of an implied right to renewal revenues in the circumstances of this case. Paragraph 3(d) merely states that "[o]n a monthly basis *during and after the term of the Agreement*, SafeCard will prepare and submit to BP a reconciliation in a format to be mutually agreed upon which will set forth the Member billings . . ." (emphasis added). While Trileigant seizes on the words "during and after the term of the Agreement," that phrase cannot bear the weight that Trileigant accords to it. Of course, the parties contemplated that in certain circumstances, Trileigant would continue to service existing Members even "after the term of the Agreement." For example, BP might ask Trileigant to do so under the provisions of Paragraph 15(d). In that circumstance, Trileigant would necessarily need to provide the reconciliations required by Paragraph 3(d).

But the issue in this case is not whether there are some circumstances in which it might be appropriate for Trileigant to continue to provide reconciliations under Paragraph 3(d) after termination of the Agreement. Rather, the issue is whether the parties contemplated that Trileigant would continue to do so where, as here, Trileigant terminated the Agreement in the absence of a material breach by BP. Paragraph 3(d) says nothing about that issue. Instead, one must look to Paragraph 15 for that answer. As discussed above, Paragraph 15 specifies in great

33

precision the circumstances in which Trilegiant would have the right to continue to receive

Program revenues.  Termination by Trilegiant in the absence of a material breach by BP is not

one of them.

Similarly, Paragraph 9 says nothing about Trilegiant continuing to receive renewal

revenues after termination.[24]  Indeed, on its face, that provision has nothing whatsoever to do

with termination or the parties' rights following termination.

Trilegiant also urges the Court to imply a right to renewal revenues from Paragraphs

15(a)-(e).  In effect, Trilegiant reads these provisions as evidencing the parties' intent to share

renewal revenues after termination in *all* situations except those in which Trilegiant is expressly

denied that right in Paragraph 15.  The parties could easily have worded their agreement in that

manner.  But they did not.  Instead, the parties carefully delineated a lengthy series of scenarios

in which Trilegiant would receive renewal revenues, none of which include the circumstances of

this case.  In the Court's view this omission is telling, for it suggests to this Court that the parties

did not intend that Trilegiant would continue to share in renewal revenues when it terminated the

Agreement in the absence of a material breach by BP.  As the Ohio Court of Appeals has rightly

observed, "where there is no uncertainty, but only a absence in the agreement of a provision

about a particular matter, the court must not construe as included something intended to be

excluded nor make the contract speak where it is silent."  *Morgan*, 1994 WL 265899, at * 4.

_____

[24]  Paragraph 9 provides as follows: "BP will remit on a monthly basis any monies due to
SAFECARD as specified herein, within thirty (30) days after charges for Program membership
are billed to the Members' respective credit card accounts.  BP shall have the right to reject
billing a prospective Member for credit reasons; however, if BP approves the billing and it
subsequently turns into bad debt without a specific cancellation of the Program from the member,
then BP's obligation to pay SAFECARD shall continue whether or not BP ultimately receives
payment from the Member."  Ex. 1, ¶ 9.

*See, also, Int'l Union of Auto. Workers v. L.T. Patterson,* 82 Ohio Law Abs. 296, 159 N.E. 2d 923, 926 (Ohio Misc. 1956) (courts are "justly prudent and careful in inferring covenants or promises, lest they make the contract speak where it was intended to be silent or make it speak contrary to what, as may be gathered from all the terms and the tenor of the contract, was the intention of the parties."). Here, the Court believes it would be contrary to the intent of the parties to imply a provision giving Trilegiant the right to share in renewal revenues when Trilegiant itself chose to terminate the Agreement.

The Court believes that its construction of the Agreement not only accords with the parties' intent as reflected in the language they chose, but also that it is the most sensible interpretation of the Agreement. *See EM Ltd. v. Republic of Argentina*, 282 F.3d 291, 294 (2d Cir. 2004) (relying on "a commonsense interpretation" of contract language). SafeCard was obviously concerned about being denied renewal revenues when, through no fault of its own, BP chose to terminate the Agreement and effectively appropriate the fruits of SafeCard's hard work. Therefore, to protect itself and ensure that it would be able to recoup any initial costs it incurred in arranging to provide services under the Agreement, SafeCard included provisions that gave it certain rights to renewal revenues if BP terminated the Agreement other than as a result of a material breach by SafeCard. The language of Paragraph 15 of the Agreement suggests a give and take between the parties in delicately balancing their respective interests in such circumstances. However, there was no need for SafeCard to include a similar provision in the event it wished to terminate the Agreement other than as a result of a material breach by BP, since that determination would be entirely within SafeCard's control. Presumably, so long as it was profitable for SafeCard to continue to perform under the Agreement, it would chose not to

terminate the Agreement and that choice would guarantee SafeCard the right to continue to share of program revenues.

What happened, of course, is that Trilegiant decided for its own business reasons that it no longer wished to perform two of the three obligations it had undertaken in the Agreement – that is, as Mr. Vann acknowledged, in 1999 Trilegiant decided that it no longer wished to market the Horizon Program or enroll new Horizon Card Members. In those circumstances, Trilegiant had two choices. It could try to renegotiate Agreement and relieve itself of unwanted obligations, as Mr. Vann testified he tried to do but without success.[25] Or, Trilegiant could walk away from its obligations under the Agreement by terminating it. In those circumstances, however, Trilegiant had no right to renewal revenues if, as Paragraph 15(a) provides, BP chose "at its sole option" to continue the Horizon Program or "any other similar program."

In the Court's view, it is entirely sensible that the parties decided that if Trilegiant chose to terminate the Agreement and be relieved of its obligations, Trilegiant should no longer share in Program revenues. Otherwise, Trilegiant could (as it seeks to do here) relieve itself of the Agreement's burdens, yet continue to reap its benefits for the next 10 or 20 years. Nothing in the Agreement suggests that the parties intended to allow Trilegiant to have it both ways in this manner – that is, to relieve itself of contract duties yet fully share in program revenues *ad infinitem*.

Trilegiant has also suggested that the language of the Agreement suggests that the parties

---

[25] Since Trilegiant was being grossly over-reimbursed for its service costs under the Agreement, there is little wonder why Trilegiant was more than willing to continue to provide services under the Agreement. Of course, in order to convince BP to relieve Trilegiant of duties under the Agreement, Trilegiant might well have been required to reduce its share of continuing Program revenues or adjust its service reimbursement.

considered the Horizon Program membership to be an asset that belonged jointly to Trilegiant and BP and that in those circumstances, it would be unfair and contrary to the intent of the parties to allow BP to derive renewal revenues from the Horizon Program membership without sharing the revenues from that "jointly owned" asset with Trilegiant.  The Court disagrees with Trilegiant's premise that the parties considered the Horizon Program membership a to be jointly owned asset.  To the contrary, numerous provisions in the Agreement reflect the fact that the parties contemplated that BP would retain complete and sole control over the Horizon Program membership.  That is undoubtedly why SafeCard felt the need  to include provisions in the Agreement specifying the circumstances under which it would be entitled to share in the revenues derived from that membership following termination of the Agreement.

Thus, the "promotion of the goodwill of BP" (not both BP and SafeCard) was stated to be the essence of the Agreement.  Ex. 1, ¶ 11.  And unlike Trilegiant's typical affinity agreements, SafeCard was fully reimbursed for its solicitation, fulfillment and servicing costs; therefore, SafeCard was not required to "invest" its own funds in creation of a jointly owned asset.  *Id*. ¶ 3.  BP had the right to approve all creative design.  *Id*. ¶ 5.  Notably, SafeCard was barred from disclosing to third parties the names of Members, but there was no similar limitation placed on BP, and the Agreement further states that any such disclosure by SafeCard would constitute irreparable injury to BP (not SafeCard).  *Id*. ¶ 6.  BP was given the option "at its sole discretion" to solicit Members for the Horizon Program "or any similar program" after termination; by contrast, SafeCard was barred from soliciting new Members after termination.  *Id*. ¶ 15(a).  Finally, BP was given the right to continue the Program after termination other than as a result of a material breach by SafeCard, and was given the further right "at its sole discretion" to elect to

have SafeCard continue to provide services or to turn servicing over to a third-party.  *Id.* ¶ 15(d).

SafeCard was given no such right.  In short, SafeCard was nothing more than a provider of

expertise and services that appears to have been well compensated for its efforts to enhance BP's

goodwill.  SafeCard was not an owner, joint or otherwise, of the Horizon Program or its

membership.

Of course, SafeCard easily could have inserted language in the Agreement providing that

the Horizon Card Members belonged to both SafeCard and BP.  SafeCard did not do so.  The

Court believes there is a very good reason for that: such a provision would have been contrary to

the parties' intent as reflected in their Agreement.

**No Right To Renewal Revenues Based on Post-Termination Conduct.**    Finally,

Trilegiant argues that in construing the Agreement, the Court should look to post-termination

conduct and statements by BP personnel, which Trilegiant claims acknowledge its right to

renewal revenues in the circumstances of this case.  *See* Pl.'s Supp. Br.[doc. # 57] at 6-9.  The

Court disagrees for several reasons.

First, Trilegiant acknowledges that the Court can consider evidence outside the

Agreement to ascertain the parties' intent only if the Agreement itself is ambiguous or reasonably

susceptible to more than one interpretation.  *U.S. Fidelity & Guaranty Co. v. St. Elizabeth

Medical Cntr.*, 129 Ohio App. 3d 45, 56, 716 N.E.2d 1201, 1208 (1998); Pl. Supp. Br. [doc. #57]

at 5.  For the reasons previously stated, the Court does not believe the Agreement is ambiguous

or susceptible to multiple interpretations.

Second, it is undisputed that the communications in question were not made by anyone

who negotiated the Agreement.  Conduct or comments by persons who did not negotiate the

Agreement are entitled to little, if any, weight.  *See Cincinnati Gaslight & Coke Co.,* 53 Ohio St. 278, 285-288, 41 N.E. 239, 242 (1895).  Furthermore, even though Trilegiant seeks to draw legal meaning from the communications, none of them were made by anyone who was shown to have legal training.  The intent of the parties is reflected in the language of the Agreement itself, not in the often conflicting and equivocal views of non-lawyers who may never have even read the Agreement itself.

Third, the communications by BP personnel that Trilegiant relies on (most of which are internal BP communications that never were shared with Trilegiant) do not in the Court's view rise to the level of  "a course of performance accepted or acquiesced in without objection."  *See* Restatement (Second) of Contracts § 202(4).  Conduct of only one party alone cannot ordinarily alter the terms of a contract.  It seems apparent that there was no consensus between the parties regarding Trilegiant's right to renewal revenues following termination.  To the contrary, the parties took varying positions on the issue and in the end acknowledged their disagreement over the  interpretation of the Agreement.  *See* Ex. 5, 18, 20, 58.  A comment from an Ohio federal judge  seems particularly apt in this case:

> To have any value as a practical construction, the course of dealing should be uniform, unquestioned, and full concurred in by both parties.  A right claimed by one party, and from time to time denied or disputed by the other, though for the time being, conceded, cannot from such concessions, be regarded as established.

*B.F.Goodrich Co. v. American Motorists Co.*, 1986 U.S. Dist. LEXIS 25205, at *31-32 (N.D. Ohio May 22, 1986).

There is little question that in the period leading up to and following Trilegiant's termination notice both sides postured about their respective legal rights, and both sides sought to

put themselves in the best possible position in the event that either party claimed a breach.  Little wonder, then, for example, that BP personnel would want to do what they could to characterize the BP MultiCard as an entirely new card product (*see, e.g.,* Ex. 13), since in that event, as Trilegiant's counsel conceded at argument,  Trilegiant clearly would have "no further obligation to [Trilegiant] for renewal revenues from then-existing Members"  under the plain language of Paragraph 15(c).  However, the fact that BP took steps to improve its legal position in the event of litigation with Trilegiant  does not mean, as Trilegiant insists, that BP was vulnerable without those steps.

As discussed above, Trilegiant has failed to satisfy its burden of proving that under the Agreement it had the right to continue to share renewal revenues after it terminated the Agreement for reasons other than a material breach by BP.  Therefore, BP's refusal to share with Trilegiant renewal revenues from the 49,970 Horizon Card Members who accepted the BP MultiCard does not constitute a breach of the Agreement, even if, as Trilegiant alleges,  the BP MultiCard is so similar to the Horizon Card that BP did not discontinue the Horizon Program altogether as defined in Paragraph 15(c) the Agreement.[26]  In view of the Court's disposition of this threshold contract issue, there is no need for the Court to address the other issues and claims raised by the parties.

---

[26]  The Court expresses no view on whether the BP MultiCard is so similar to the Horizon Card that BP did not discontinue the Horizon Program within the meaning of Paragraph 15(c).

**III.**

Accordingly, the Clerk is directed to enter judgment for BP and against Trilegiant on all counts of the Amended Complaint [doc. # 32] and to close this file.


IT IS SO ORDERED,


/s/ _____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: <u>October 13, 2004</u>.

41